# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| GREE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NOS. 2:19-CV-00200-JRG |
| | § | 2:19-CV-00237-JRG |
| SUPERCELL OY, | § | 2:19-CV-00310-JRG |
| | § | 2:19-CV-00311-JRG |
| *Defendant*. | § | |

## MEMORANDUM ORDER

Before the Court are motions in all of the above-captioned cases[1] entitled Defendant Supercell Oy's Motion to Exclude the Testimony of GREE, Inc.'s Damages Expert, Stephen Becker (the "Motions") filed by Defendant Supercell Oy ("Supercell"). **Dkt. No. 154** in Case No. 2:19-cv-200-JRG-RSP ("the -200 case"), **Dkt. No. 140** in Case No. 2:19-cv-237-JRG-RSP ("the -237 case"), **Dkt. No. 117** in Case No. 2:19-cv-310-JRG-RSP ("the -310 case"), and **Dkt. No. 123** in Case No. 2:19-cv-311-JRG-RSP. Having considered the Motions, the Court finds that they should be **DENIED**.

## I.   BACKGROUND

In all of the above captioned cases, Plaintiff GREE, Inc. ("GREE") filed complaints against Supercell alleging that Supercell infringes certain of its United States patents. Between all four cases, GREE alleges infringement of U.S. Patent Nos. 10,300,385 (the "'385 Patent"); 10,307,675

---

[1] Both Supercell and GREE note that the parties filed identical motions and responsive briefing in all four above-captioned cases. (Case No. 2:19-cv-311-JRG-RSP, Dkt. No. 147 at 1 n.1; Case. No. 2:19-cv-311-JRG-RSP, Dkt. No. 163 at 1 n.1). Accordingly, the Court will cite to the motion and responsive briefing as filed in Case No. 2:19-cv-200-JRG-RSP.

(the "'675 Patent"); 10,307,676 (the "'676 Patent"); 10,307,677 (the "'677 Patent"); 10,328,347 (the "'347 Patent"); 10,335,683 (the "'683 Patent"); 10,328,346 (the "'346 Patent"); 10,355,689 (the "'689 Patent"); 10,076,708 (the "'708 Patent"); 10,413,832 (the "'832 Patent"); 9,079,107 (the "'107 Patent"); and 9,561,439 (the "'439 Patent") (collectively, the "Asserted Patents"). (Dkt. No. 154 at 1 n.1; Dkt. Nos. 67, 128). GREE asserts that Supercell's Clash of Clans, Clash Royale, and Hay Day mobile games infringe the Asserted Patents. (Dkt. No. 154 at 3). All three games—Clash of Clans, Clash Royale, and Hay Day—are free to play, generating revenue through optional in-game purchases. (*Id.*). The Asserted Patents claim different functionality; thus, GREE accuses different features in each of Clash of Clans, Clash Royale, and Hay Day, but not all features of these mobile games. (*Id.*). Each of these mobile games include many features that are not accused of infringement. (*Id.*).

Dr. Becker is GREE's damages expert. Dr. Becker opines that the structure of the reasonable royalty in this case is a running royalty expressed as a percentage of gross revenues from each of the accused Supercell games. (Dkt. No. 172-2 at ¶¶ 131–32; Dkt. No. 172-3 at ¶¶ 145–46; Dkt. No. 172-4 at ¶ 177; Dkt. No. 172-5 at ¶ 178). Dr. Becker determined the appropriate royalty would be a percentage of the gross revenues of Supercell's accused games because Supercell does not track revenue earned from any one feature. (Dkt. No. 172 at 12). To calculate the appropriate royalty, Dr. Becker relies on survey data from GREE's survey expert, Dr. Neal. (*Id.* at 3). Dr. Neal surveyed players of the accused games to measure awareness, importance, and usage of the accused features. (*Id.*). Dr. Becker also relies on opinions from Dr. Akl, GREE's technical expert, to determine the comparability of various asserted features. (*Id.* at 10).

In each case, Dr. Becker used Dr. Neal's survey data to calculate the incremental revenue impact of each accused feature by calculating the percentage reduction in play time given the

removal of each accused feature based on the survey data. (Dkt. No. 172-2 at ¶¶ 123–25; Dkt. No. 172-3 at ¶¶ 133–34; Dkt. No. 172-4 at ¶¶ 128–29; Dkt. No. 172-5 at ¶¶ 153–54). Dr. Becker also calculated the "elasticity measure"[2] of time spent in a game versus revenue and combined this elasticity measure with the estimated decrease in playing time among users to generate a marginal revenue impact for each feature ("play less" players). (Dkt. No. 172 at 3–4). Dr. Becker also noted that some players would spend more time playing the game if the asserted feature was removed from the game ("play more" players). (Dkt. No. 172-2 at ¶¶ 126–28; Dkt. No. 172-3 at ¶¶ 135–37; Dkt. No. 172-4 at ¶¶ 130–32; Dkt. No. 172-5 at ¶¶ 155–57). Using a logit model, Dr. Neal's survey reports also indicated that each additional feature of a game rated as being "important" was associated with a percentage increase in the predicted likelihood of a player being a paying player. (Dkt. No. 172 at 3–4). Dr. Becker used this information to calculate the incremental revenue associated with each accused feature. (*Id.*). From this information, Dr. Becker concluded that the parties would consider a range of revenue impact values in determining an appropriate reasonable royalty: (1) net "play more" players against "play less" players; (2) "play less" players only; and (3) rates generated by the logit model. (*Id.* at 4–5).

Dr. Becker used these three values as a starting point for his calculations. Dr. Becker then made further adjustments to values to account for the contribution of non-patented features and other incremental costs to Supercell tied to revenue. (*Id.* at 5). Taking all the foregoing into account and based upon Dr. Becker's analysis of the *Georgia-Pacific* factors, Dr. Becker then opined that the parties would have agreed to a midpoint of the range of revenue impact values. (*Id.*).

Dr. Becker performed the above analysis for all Asserted Patents, but his analysis of the '346 Patent in the -237 case differed slightly. (*Id.*). Unlike the other features at issue, the feature

---

[2] "Elasticity measure" provides a measure of the percentage change in revenue for each percent change in time spent playing the game. (Dkt. No. 172 at 3).

3

accused of infringing the '346 Patent is not optional. (*Id.*). Instead it is used by all Clash Royale players. (*Id.*). Dr. Akl's opines that the Asserted Patents related to the eight optional features of Clash Royale are technologically comparable to the '346 Patent. (*Id.* at 5, 10). Relying on this opinion, Dr. Becker opines that in determining the average incremental revenue impact of the feature accused of infringing the '346 Patent, the parties would have referenced the average incremental revenue impact of the eight comparable Clash Royale features surveyed under the same methodology. (*Id.* at 5). Using this as a starting point, Dr. Becker then adjusted the rate for the '346 Patent based on his analysis under the *Georgia-Pacific* factors. (Dkt. No. 172-3 at ¶¶ 216–230).

Supercell now moves to strike Dr. Becker's damages opinions as being based on unreliable methodologies in violation of FRE 702 and *Daubert*.

## II. LEGAL STANDARD

### a. Expert Witnesses

A qualified expert witness may offer opinion testimony if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

"[T]he Rules of Evidence—especially Rule 702" require that judges act as gatekeepers to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). However, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Id.* at 594; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("Daubert makes clear that the factors it mentions do not constitute a

'definitive checklist or test.'"). While the party offering the expert bears the burden of showing that the testimony is reliable, it "need not prove to the judge that the expert's testimony is correct . . . ." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 1999) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). Ultimately, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) (citing *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014), overruled in part not relevant here by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

"The reliability prong [of Daubert] mandates that expert opinion 'be grounded in the methods and procedures of science and … be more than unsupported speculation or subjective belief.'" *Johnson*, 685 F.3d at 459 (quoting *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (ellipsis in original)). "The relevance prong requires the proponent to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue." *Id.* (quoting *Curtis*, 174 F.3d at 668). But "[i]t is within the purview of a qualified expert to determine which evidence should be afforded significant weight, so long as he applies reliable principles and methods in making this determination." *Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-cv-33-JRG-RSP, 2016 WL 125503, at *4 (E.D. Tex. Jan. 9, 2016). Further, experts may rely on other experts for expertise outside their field. *Apple*, 757 F.3d at 1321; see also *TQP Dev., LLC v. 1-800-Flowers.com, Inc.*, No. 2:11-cv-248-JRG, 2015 WL 6694116, at *4 (E.D. Tex. Nov. 3, 2015) ("Dr. Becker was entitled to rely upon Dr. Jaeger's technical analysis when constructing his

damages model and presenting it to the jury, and the jury was free to judge the credibility of both experts.").

### b. Damages

Upon a finding of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . ." 35 U.S.C. § 284. "A 'reasonable royalty' derives from a hypothetical negotiation between the patentee and the infringer when the infringement began." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868–69 (Fed. Cir. 2010) (citation omitted). A comprehensive (but unprioritized and often overlapping) list of relevant factors for a reasonable royalty calculation appears in *Georgia–Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

"A patentee is only entitled to a reasonable royalty attributable to the infringing features." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 1265 (2019). The patentee bears the burden of proving damages. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citations omitted). Thus, the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features . . . ." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Accordingly, royalties must be apportioned between the infringing and non-infringing features of the product. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *Lucent*, 580 F.3d at 1336–37. If the patentee fails to tie the theory to the facts of the case, the testimony is excluded. *Uniloc USA*, 632 F.3d at 1315.

"[A]pportionment can be addressed in a variety of ways, including 'by careful selection of the royalty base to reflect the value added by the patented feature [or] … by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (brackets and ellipsis in original) (quoting *Ericsson*, 773 F.3d at 1226). Therefore, there is "nothing inherently wrong with using the market value of the entire product [as a royalty base], especially when there is no established market value for the infringing component or feature, so long as the multiplier accounts for the proportion of the base represented by the infringing component or feature." *Id.* (quoting *Lucent*, at 1339). An alternative to the general rule of apportionment is the entire market value. *Power Integrations*, 904 F.3d at 977–78 (citing *VirnetX*, 767 F.3d at 1327). "The entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for consumer demand." *Lucent*, 580 F.3d at 1336 (quoting *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986); see also *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (en banc). Thus, no apportionment is required if the "patented technology drove demand for the entire product." *VirnetX*, 767 F.3d at 1329.

### III.   ANALYSIS

Supercell moves to strike Dr. Becker's expert opinions on five bases: (1) Dr. Becker's alternative starting points are unreliable; (2) Dr. Becker's midpoint methodology is unreliable; (3) Dr. Becker's opinions regarding the '346 Patent are unreliable; (4) Dr. Becker failed to apportion his damages opinions based on the value attributable to the patented invention; and (5) Dr. Becker's damages opinions regarding the "Copy Layout" feature in the -200 case are improper. The Court will address each in turn.

1. Dr. Becker's Alternative Starting Point

Supercell argues that the methodology Dr. Becker used in calculating the alternate starting point for the estimated incremental revenue impact based on Dr. Neal's logit model is unreliable because neither of the two values that go into the calculation—likelihood of being a paying user and percentage of players who view a certain feature as important—are measures of gross revenues. (Dkt. No. 154 at 4–5). Supercell argues that missing from this calculation is any indication of how much additional revenue a given user is likely to contribute as a result of any certain feature. (*Id.* at 5). Supercell further argues that Dr. Becker's alternative starting point is an artificial means of adjusting his royalty rates upward. (*Id.* at 6).

GREE argues that Dr. Becker's methodology is reliable and sufficiently tied to revenue. (Dkt. No. 172 at 6–7). GREE contends that each additional feature measured in Dr. Neal's logit analysis and rated as being important was associated with a percentage increase in the predicted likelihood that a player would be a paying player. (*Id.* at 6). Accordingly, GREE argues that Dr. Becker's analysis, using the percent increase in the likelihood of being a paying player multiplied by the percentage of playing respondents who indicated the accused feature was important, demonstrated that the inclusion of each accused feature is associated with a percentage of the gross revenues in each accused game. (*Id.* at 7). Additionally, GREE argues that Dr. Becker could not have determined how much additional revenue a given user is likely to contribute as a result of each feature, as Supercell suggests, because Supercell only keeps records of its gross revenues, not incremental revenue per feature of any particular game. (*Id.* at 7, 10).

The Court finds that this disagreement goes to the weight of the evidence. Dr. Becker provided a basis for arriving at these values, and his analysis was based on uncontested data specific to each case. Supercell is free to address its concerns with Dr. Becker's opinions during

cross-examination. Accordingly, Dr. Becker's opinions as to his alternative starting points are based on a sufficiently reliable methodology and pass muster under Federal Rule of Evidence 702.

2. Dr. Becker's Midpoint Analysis

Supercell argues that Dr. Becker's midpoint methodology is unreliable and should be excluded. (Dkt. No. 154 at 6). Supercell argues that Dr. Becker purports to rely on survey data to establish the low and high end of the range of royalty values, but his decision to "split the difference" and adopt the midpoint lacks any reliable basis. (*Id.*). GREE argues that Dr. Becker did not simply just "split the difference." (Dkt. No. 172 at 8). Rather, GREE argues that Dr. Becker's decision to adopt the midpoint of the range of royalty values is based on his analysis of the *Georgia-Pacific* factors. (*Id.* at 8). After analyzing the *Georgia-Pacific* factors, Dr. Becker concluded that neither party would have had stronger bargaining power, and thus the parties were likely to meet at the midpoint. (*Id.*).

The Court finds that Dr. Becker's analysis of the *Georgia-Pacific* factors is sufficiently tied to the facts of the case to support his opinion that the parties in these cases would be most likely to settle on the midpoint of the range of royalty values. *See Georgia–Pac.*, 318 F. Supp. at 1120. As such, Dr. Becker's midpoint analysis is based on a sufficiently reliable methodology and should not be excluded.

3. Dr. Becker's Opinions Regarding the '346 Patent

Supercell next takes issue with Dr. Becker's calculation of the value of the feature accused of infringing the '346 Patent. (Dkt. No. 154 at 8–11). Supercell argues that Dr. Becker failed to perform any analysis on this feature like it did for the other eight optional features of Clash Royale. (*Id.* at 8). Supercell argues that Dr. Becker's attempt to convert his calculations based on survey data about the eight other optional features of Clash Royale to the feature accused of infringing

9

the '346 Patent is flawed. (*Id.* at 9). It states that "[a]lthough Dr. Becker attempted to account for differences in usage, this adjustment fails to remedy the absence of any valuation of the feature itself." (*Id.* (citing *Uniloc USA*, 632 F.3d at 1317 ("Beginning from a fundamentally flawed premise" results in a "fundamentally flawed conclusion."))). Supercell further argues that GREE's own survey expert cautioned against this method of calculation. (*Id.* at 10). Additionally, Supercell argues that while Dr. Becker relied on Dr. Akl, who found the patents that relate to the eight optional features technologically comparable to the '346 Patent, Dr. Akl's report is conclusory. (*Id.*). Therefore, it argues that Dr. Becker's adoption of the average royalty rate of the eight optional features for the feature accused of infringing the '346 Patent should fail because "alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).

GREE responds that Dr. Becker could not rely on survey data concerning the feature accused of infringing the '346 Patent because that feature is not optional but is used by 100% of Clash Royale users. (Dkt. No. 172 at 2). GREE argues that attempting to seek survey data on a game that did not use this feature would not provide helpful data because it would essentially provide data on something other than the infringing technology. (*Id.*). Accordingly, GREE contends that Dr. Becker considered the evidence, consulted with GREE's technical and survey experts, and analyzed the comparable eight optional features of Clash Royale to arrive at appropriate royalty rate for the '346 Patent. (*Id.* at 10). Further, GREE argues that Dr. Neal did not caution against Dr. Becker's methodology of using data on eight optional features to inform the royalty rate of one un-surveyed feature, but rather the wholesale replacement of data from one surveyed feature to another surveyed feature. (*Id.* at 11). GREE also points out that Dr. Becker relied on GREE's technical expert, Dr. Akl, who opined that the patents related to the eight

10

optional features were technically comparable to the '346 Patent to account for the difference in the accused features. (*Id.* at 10). Thus, it argues that Supercell's complaint is not a methodology challenge, but rather an attack on the evidence. (*Id.* at 10–11).

The Court finds that Dr. Becker's testimony concerning this issue rests on a sufficiently reliable foundation if it is assumed that the asserted patents are all technologically comparable. Dr. Becker is not a technical expert. Therefore, it was proper as well as logical that he would rely on Dr. Akl, a technical expert, who concluded that the patents are technologically comparable. It is perfectly acceptable for experts to rely on other experts. *Apple*, 757 F.3d at 1321 ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field."); *see also TQP Dev.*, 2015 WL 6694116, at *4. Furthermore, Dr. Akl's testimony is not at issue in this motion. Therefore, this portion of Supercell's motion fails because Dr. Becker reasonably relied on another expert's opinions for comparability of the patents—opinions that are not at issue in this motion—and conducted a reliable analysis based on those opinions. Accordingly, the Court finds that Supercell's challenge to Dr. Becker's opinions on this basis fails and should be and is denied.

4. Dr. Becker's Apportionment

Supercell also takes issue with the fact that GREE uses Supercell's gross revenues for its royalty base. Supercell argues that this constitutes a failure to apportion in violation of the entire market value rule as well as an improper reference that violates the Federal Circuit's "evidentiary principle" regarding damages.

a. *Entire Market Value*

Supercell first argues that Dr. Becker used Supercell's total revenues (i.e., the entire market value) of the accused games as his royalty base. After collecting Supercell's entire revenues as the

11

royalty base, Dr. Becker multiplied the total revenue by a percentage purporting to represent the "value" of a feature of the Asserted Patents. Supercell contends that the entire market value rule only "allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for consumer demand." *Lucent*, 580 F.3d at 1336 (citation omitted). Yet, Dr. Becker admits that the accused features do not drive customer demand and are just a few "out of many elements of the game that contribute to its success." (Dkt. No. 172-2 at ¶ 165). In line with this reasoning, Supercell contends that the Federal Circuit has rejected the assertion that apportioning just the royalty rate, as opposed to the royalty base, is allowed. (Dkt. No. 154 at 13 (citing *Uniloc USA*, 632 F.3d at 1320; *VirnetX,* 767 F.3d at 1327–29)). Supercell therefore argues that Dr. Becker's use of the Supercell's total revenues as his royalty base is a failure to apportion the royalty base in violation of the entire market value rule.

GREE responds that the royalty rate was apportioned to separate the contribution of each Asserted Patent from the contributions of the non-patented elements of the Supercell games. (Dkt. No. 172-2 at ¶¶ 165–66, 195–200; Dkt. No. 172-3 at ¶¶ 178–79, 202–206; Dkt. No. 172-4 at ¶¶ 168–69, 198–203; Dkt. No. 172-5 at ¶¶ 211–12, 238–243, 270–73, 300–303.) It contends that starting an apportionment analysis with revenue or profit does not violate the entire market value rule. (Dkt. No. 172 at 13–14 (citing *Exmark Mfg.*, 879 F.3d at 1349; *Lucent*, 530 F.3d at 1325)). GREE explains that the only revenue data Supercell maintains is based on its gross revenues for all money spent by users on its games. (*Id.* at 12). Supercell does not track revenue of the accused features, does not have any prior comparable licenses, and does not have any valid non-infringing alternatives. (*Id.*). Therefore, GREE has no other revenue data from which a royalty base can be determined.

The Court agrees with GREE. Dr. Becker conducted an apportionment analysis. This alone makes the entire market value exception inapplicable as it is an alternative to apportionment. Essentially, the entire market value rule holds that no apportionment is needed since "the feature patented constitutes the basis for consumer demand." *Lucent*, 580 F.3d at 1336. If this demanding showing is made, the patentee can request the entire market value of the infringing product. Dr. Becker does not suggest this—instead he simply begins with the gross revenues of Supercell's products and apportions from there. As described above, Dr. Becker's preferred royalty rates pass muster as Dr. Becker took care to apportion his rates so they would only include the infringing features of the allegedly infringing products. Therefore, Dr. Becker performed a sufficient apportionment analysis even if his royalty base was Supercell's gross revenues. This is especially true since there are no established market values for the allegedly infringing features or, at the very least, Supercell has not provided these values to GREE or the Court.

As to Supercell's argument that the royalty base must be apportioned, the Federal Circuit has stated that apportionment can be addressed in a variety of ways, including "by careful selection of the royalty base to reflect the value added by the patented feature [or] . . . by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." *Exmark Mfg.*, 879 F.3d at 1348 (quoting *Ericsson*, 773 F.3d at 1226). Thus, "[t]here is nothing inherently wrong with using the market value of the entire product [as a royalty base], especially when there is no established market value for the infringing component or feature, so long as the multiplier accounts for the proportion of the base represented by the infringing component or feature." *Id.* (quoting *Lucent*, 580 F.3d at 1339). As the reproduced quotations make clear, the Federal Circuit allows a high royalty base when, as here, it is combined with a royalty rate that takes the high base into account and the facts do not reasonably present other alternatives.

13

### b. Overall Product Revenues

Supercell also argues that Dr. Becker's reference to Supercell's overall product revenues should also be excluded because it violates the Federal Circuit's "evidentiary principle" regarding damages. (Dkt. No. 154 at 14 (citing *Ericsson*, 773 F.3d at 1226–27)). It argues that Dr. Becker's reliance on the entire market value of Supercell's games lacks any correlation to the value of the features that are claimed in GREE's patents, citing Federal Circuit cases that purportedly hold that a patentee cannot offer a large number to the jury in order to make their damage request seem more reasonable. (*Id.* (citing *Ericsson*, 773 F.3d at 1226–27; *LaserDynamics*, 694 F.3d at 68; *Uniloc*, 632 F.3d at 1320; *VirnetX*, 767 F.3d at 1327–28)). GREE responds that, as an initial matter, the issue of whether testimony about Supercell's total product revenues should be excluded is not a proper *Daubert* objection. (Dkt. No. 172 at 14). It further argues that Dr. Becker's conclusions as to the correct reasonable royalty rates in this case are based on the incremental value each accused feature adds to Supercell's games in accordance with Federal Circuit case law. (*Id.* (citing *Ericsson*, 773 F.3d at 1226)).

The Court finds that Dr. Becker's use of Supercell's gross revenues is appropriate. As mentioned above, GREE has no other revenue data from which a royalty base can be determined nor does Supercell provide Dr. Becker an alternative method he could use. Essentially, Supercell is asking the Court to prevent GREE from putting on a damages case. The Court declines the invitation. This is not a situation where GREE chose an inappropriately large number to skew the damages horizon and make its damage request seem more reasonable. Instead, the gross revenues data is the best available data, making GREE's use of it appropriate. Accordingly, Supercell's request to strike Dr. Becker's opinions regarding Supercell's gross revenues due to his purported failure to apportion damages to the value attributable to the patented inventions is denied.

5. Dr. Becker's Opinions Regarding the "Copy Layout" Feature in the -200 case

Lastly, Supercell argues that Dr. Becker should be precluded from arguing that GREE is entitled to a royalty in the -200 case for the alleged infringement of Clash of Clans because GREE accused the same features of infringing U.S. Patent No. 9,597,594 in an earlier case. (Dkt. No. 154 at 15); *See* Case No. 2:19-cv-71-JRG. As such, Supercell argues that GREE is estopped from seeking damages on this basis as it would result in an impermissible double recovery. (Dkt. No. 154 at 15). GREE argues that Dr. Becker's opinions in the -200 case also relate to the Create/Save Layout feature, which could not have been a stand-alone accused feature in the earlier case and is therefore not estopped here. (Dkt. No. 172 at 15). Moreover, GREE argues that Supercell cannot assert double recovery because it has not satisfied the judgment from the first case. (*Id.*).

The Court finds that whether GREE's claims for infringement in the -200 case are proper is not appropriately the subject of this motion under FRE 702 or *Daubert*. Accordingly, the Court finds that Supercell's challenge to Dr. Becker's opinions on this basis fails and should be and is denied.

## IV. CONCLUSION

Accordingly, and in light of the foregoing, the Court **DENIES** Supercell's Motions Dkt. No. 154 in Case No. 2:19-cv-200-JRG-RSP, Dkt. No. 140 in Case No. 2:19-cv-237-JRG-RSP, Dkt. No. 117 in Case No. 2:19-cv-310-JRG-RSP, and Dkt. No. 123 in Case No. 2:19-cv-311-JRG-RSP.

**SIGNED this 11th day of February, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE