**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| GREE, INC., | § | |
| | § | |
| *Plaintiff,* | § | Case No. 2:19-cv-00200-JRG-RSP |
| | § | Case No. 2:19-cv-00237-JRG-RSP |
| v. | § | Case No. 2:19-cv-00310-JRG-RSP |
| | § | Case No. 2:19-cv-00311-JRG-RSP |
| SUPERCELL OY, | § | |
| | § | |
| *Defendant.* | § | |

## REPORT AND RECOMMENDATION

Before the Court are the four motions for summary judgment of invalidity under 35 U.S.C. § 101 filed by Defendant Supercell Oy in the above captioned matters. The first motion is in Case No. 2:19-cv-00200-JRG-RSP (the "200 Case"): Supercell's Motion for Summary Judgment of Invalidity for Failure to Claim Patent-Eligible Subject Matter Under 35 U.S.C. § 101 (the "200 MSJ"). **200 Case Dkt. No. 159**. The second is in Case No. 2:19-cv-00237-JRG-RSP (the "237 Case"): Supercell's Motion for Summary Judgment of Invalidity for Failure to Claim Patent-Eligible Subject Matter Under 35 U.S.C. § 101 (the "237 MSJ"). **237 Case Dkt. No. 142**. The third is in Case No. 2:19-cv-00310-JRG-RSP (the "310 Case"): Supercell's Motion for Summary Judgment of Invalidity for Failure to Claim Patent-Eligible Subject Matter Under 35 U.S.C. § 101 (the "310 MSJ"). **310 Case Dkt. No. 119**. The fourth is in Case No. 2:19-cv-00311-JRG-RSP (the "311 Case"): Supercell's Motion for Summary Judgment of Invalidity for Failure to Claim Patent Eligible Subject Matter Under 35 U.S.C. § 101 (the "311 MSJ"). **311 Case Dkt. No. 126**.

Across each of these motions for summary judgment Supercell seeks invalidity of several patents. In the time since the filing of this motion, the parties have significantly narrowed the asserted patents in the above-captioned matter to nine remaining asserted patents and twelve

claims. 200 Case Dkt. No. 250. Of these remaining asserted patents, Supercell's 200 MSJ seeks invalidity of Claim 7 of U.S. Patent No. 10,335,683 (the "'683 Patent"), Claim 6 of U.S. Patent No. 10,307,676 (the "'676 Patent"), and Claim 4 of U.S. Patent No. 10,329,347 (the "'347 Patent"). 200 Case Dkt. No. 159 at 10. Supercell's 237 MSJ seeks invalidity of Claim 3 of U.S. Patent No. 10,328,346 (the "'346 Patent) and Claim 8 of U.S. Patent No. 10,335,689 (the "'689 Patent"). 237 Case Dkt. No. 142 at 5. Supercell's 310 MSJ seeks invalidity of Claim 1 of U.S. Patent No. 10,076,708 (the "'708 Patent") and Claims 2 and 3 of U.S. Patent No. 10,413,832 (the "'832 Patent"). 310 Case Dkt. No. 119 at 11. Finally, Supercell's 311 MSJ seeks invalidity of Claims 1 and 6 of U.S. Patent No. 9,079,107 (the "'107 Patent") and Claims 1 and 5 of U.S. Patent No. 9,561,439 (the "'439 Patent). 311 Case Dkt. No. 126 at 5, 9.

## I.    BACKGROUND

### A.  200 Case[1]

The '683 Patent, '676 Patent, and '347 Patent all share a common specification and claim priority to the application that was issued as Patent No. 9,597,594 (the "'594 Patent"). Dkt. No. 159 at 5; *see* Dkt. No. 169 at 5–6; *see also* Dkt. No. 159-9. The '594 Patent is directed to games played on portable devices where multiples players can fight against, help, and communicate with each other. *Id.* at col.1 ln.20–26. Such games include city building games where players build a city within a virtual space. *Id.* at col.1 ln. 27–30. The '594 Patent further describes the perceived problem of difficulty in reorganizing the virtual cities. *Id.* at col.1 ln. 42–60. According to the '594 Patent, "[t]he present invention has been devised to address the above problem, and an object of the invention is to provide a method for controlling a computer, a recording medium and a

---

[1] All citations in this subsection refer to the Dkt. Nos. in the 200 Case.

computer that improve the usability of city building games and continuously attract players to the game." *Id.* at col.1 ln.61–65.

Claims 1–4 and 8–20 of the '594 Patent were determined to be invalid under 35 U.S.C. § 101 by the Federal Circuit. *GREE, Inc. v. Supercell Oy*, 2019-1864, 834 Fed.Appx. 583 (Fed. Cir. Nov. 19, 2020). In that decision, the Federal Circuit found that the claims of the '594 Patent were directed to the abstract idea of "creating and applying a template of positions of one or more game contents" and "are so broad that they encompass automation of the 'well-understood, routine, conventional activity' of correspondence chess." *GREE, Inc.*, 834 Fed.Appx. at 588–89.  However, the Federal Circuit also found that Claims 5–7 did claim eligible subject matter because "they claim a solution to [a] technological problem encountered in the creation and application of templates in a computer game."  *Id.*

The Court previously ordered GREE and Supercell to submit additional briefing with respect to this Federal Circuit decision and how the analysis affects the remaining asserted claims at issue in Supercell's Motion. Dkt. No. 257. On April 8, 2021, GREE submitted its supplemental briefing. Dkt. No. 259. Shortly thereafter Supercell submitted its supplemental briefing. Dkt. No. 260.

In the time since the filing of this motion, the parties have further narrowed the claims in this matter. On March 12, 2021, GREE and Supercell filed an updated Section D ("Contentions of the Parties") to the joint pretrial order. Dkt. No. 250. In the updated Section D the '385 Patent, '675 Patent, and '677 Patent are no longer asserted in the above-captioned matter, and only the '676 Patent's Claim 6, '347 Patent's Claim 4, and '683 Patent's Claim 7 remain asserted. *Id.* at 2–3.

**B.  237 Case[2]**

The '346 Patent is titled "Storage Medium Storing Game Program, Game Processing Method, and Information Processing Apparatus." Dkt. No. 142 at 5–6 (citing Dkt. No. 142-2 at Cover). It regards game program, game processing method, and an information processing apparatus for managing and playing a game by selecting panels and divisions to display the panel. *Id.* at 6 (citing Dkt. No. 142-2 at Abstract, col. 1 ln. 22–28).

The '689 Patent is titled "Non-Transitory Computer Readable Recording Medium, Game Control Medium, Server Device, and Information Processing System." Dkt. No. 142 at 10 (citing Dkt. No. 142-3 at Cover) It regards battle games where units deployed on a battlefield may have a unit parameter varied based on its position relative to another unit. *Id.* (citing Dkt. No. 142-3 at Abstract).

**C.  310 Case[3]**

The '708 Patent and '832 Patent are both entitled "Game Control Method, Game Server, and Program" and have identical specifications. Dkt. No. 119 at 5 (citing Dkt. Nos. 119-2 and 119-3). The '832 Patent is a continuation of the '708 Patent. *Id.* (citing Dkt. Nos. 119-2 and 119-3). Both patents regard "increas[ing] variations on methods for acquiring items, increase the predictability of acquisition of an item with a high rarity value or the like, and heighten interest in the game." Dkt. No. 119-2 at 2. More specifically, the asserted claims of the '708 Patent and '832 Patent regard an interactive display of cells associated with items. Dkt. No. 119-2 at 20; Dkt. No. 119-3 at 20.

**D.  311 Case[4]**

---

[2] All citations in this subsection refer to the Dkt. Nos. in the 237 Case.
[3] All citations in this subsection refer to the Dkt. Nos. in the 310 Case.
[4] All citations in this subsection refer to the Dkt. Nos. in the 311 Case.

The '107 Patent and '439 Patent are both entitled "Game Control Method, Game Control Device, and Recording Medium" and share a common specification. Dkt. No. 126 at 5 (citing Dkt. Nos. 127-1 and 127-2). The '439 Patent is a divisional of the '107 Patent. *Id.* at 5–6 (citing Dkt. No. 127-2 at Cross Reference to Related Application). Both patents regard a game control method and device for grouping users, giving game pieces to users in accordance with user operation, and granting a reward if a set of required game pieces are given. Dkt. No. 127-2 at Abstract. More specifically, the asserted claims of the '107 Patent and '439 Patent claim this based on either a parameter value for each of a plurality of users or skill level information. Dkt. No. 127-2 at 28; Dkt. No. 127-1 at 27–28.

## II.    LEGAL STANDARDS

The Court evaluates a motion for summary judgment under the law of the Fifth Circuit. *See Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 405 (Fed. Cir. 2018) ("We review the district court's grant of summary judgment under regional circuit law."). In the Fifth Circuit, "[s]ummary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Warren v. Fed. Nat'l Mortg. Ass'n*, 932 F.3d 378, 382 (5th Cir. 2019) (citing Fed. R. Civ. P. 56(a)). Put another way, since the movant bears the burden on summary judgment, the movant's failure to wholly foreclose the existence of genuine disputes of material fact will preclude summary judgment. *See id.*; Fed. R. Civ. P. 56(a).

"A fact is material if it would affect the outcome of the case, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* (quoting *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018)) (internal quotation marks omitted). "Evidence at the summary judgment stage must be viewed in the light

most favorable to the non-moving party, and reasonable inferences must be drawn in that party's favor." *Id.* (citing *Fisk Elec. Co. v. DQSI, L.L.C.*, 894 F.3d 645, 650 (5th Cir. 2018)).

While the Court is not required to search the record for facts not expressly addressed by the parties, material factual disputes that are readily apparent from the "underlying facts contained in the affidavits, depositions, and exhibits of record" will preclude summary judgment. *Greenwich Ins. Co. v. Capsco Indus., Inc.*, No. 18-60032, 2019 WL 3773450, at *2 (5th Cir. Aug. 12, 2019). In the context of patent litigation, the patents-in-suit are exhibits of record because they are "considered to 'merge[] into the pleadings' . . . ." *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 755 (Fed. Cir. 2019) (applying First Circuit law); accord *Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019) (requiring the Court to review "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint" in evaluating a motion to dismiss under Rule 12).

With these guiding principles in mind, the Court turns to the substance of the patentable subject-matter inquiry.

A patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 610 (Fed. Cir. 2016) (quoting 35 U.S.C. § 101). Under the "two-part test described by the Supreme Court in *Alice*, '[the Court] must first determine whether the claims at issue are directed to a patent-ineligible concept,' such as an abstract idea." *Id.* (quoting *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014)). "If so, [the Court] must then consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.*

6

Patent eligibility under § 101 is an issue of law that may be determined on summary judgment. *Intellectual Ventures II LLC v. Sprint Spectrum, L.P.*, No. 2:17-CV-00661-JRG-RSP, 2019 WL 7580245, at *2 (E.D. Tex. May 2, 2019). The issue of whether the claims are directed to a patent ineligible concept under Alice Step One is a question of law for the Court, but fact questions may exist concerning the analysis under Alice Step Two. *See id.*

If claims are directed to ineligible subject matter, then the court "search[es] for an 'inventive concept,' or some element or combination of elements sufficient to ensure that the claim in practice amounts to 'significantly more' than a patent on an ineligible concept." *DDR Holdings, LLC v. Hotels.com*, 773 F.3d 1245, 1255 (Fed. Cir. 2014); *see also Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) ("[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.").

### III.   ANALYSIS

#### A.  200 Case[5]

The '683 Patent, '676 Patent, and '347 Patent all share a common specification, but the '683 Patent Claim 7 omits the claim term "template," which is used in the '676 Patent Claim 6 and '347 Patent Claim 4. Dkt. No. 159 at 5; *see* Dkt. No. 169 at 5–6; *see also* Dkt. No. 159-9. Supercell briefed, of the remaining asserted patents, the '347 Patent and '676 Patent (collectively, the "Template Patents") together with a first representative claim and the '683 Patent (the "Non-Template Patent") with a second representative claim and argued them all together. The '676 Patent's Claim 6, '347 Patent's Claim 4 (collectively, the "Template Claims"), and '683 Patent's Claim 7 (the "Non-Template Claim") (collectively, the "200 Case Asserted Claims") are all that remain asserted.  Since Supercell argued these three claims together, and the patents share a

---

[5] All citations in this subsection refer to the Dkt. Nos. in the 200 Case.

common specification, the Court will discuss them together. *See* Dkt. No. 159 at 5; *see also* Dkt. No. 169 at 5–6; *see also* Dkt. No. 159-9.

Supercell asserts that none of the claims improve the functioning of a computer or claim any advancements in computer technology, but "simply aspire to the abstract idea of creating and applying templates in a game, or more broadly reproducing game contents based on transmitting and receiving information, on generic computer technology performing such routine tasks." Dkt. No. 159 at 5.

### 1.  Step One of *Alice*

Under step one, the Court begins by analyzing the asserted claims to determine whether they are directed to an unpatentable abstract idea or something more, such as an improvement to existing technology. *See, e.g., Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017). Supercell argues that the claimed abstract concepts are mental processes and longstanding methods of organizing human activity, more specifically that the Template Claims "are directed to the abstract idea of managing and playing a game involving creating, storing, and applying a template of positions of one or more game contents arranged in a game space" and that the Non-Template Claim is "directed to the abstract idea of managing and playing a game involving receiving and transmitting information for reproducing positions of game contents arranged in a game space." Dkt. No. 159 at 12.

Supercell continues by first analogizing the 200 Case Asserted Claims to the patents in *Planet Bingo*, where the Federal Circuit found that claims directed toward the computer-aided management of bingo games were patent-ineligible, and correspondence chess, a game wherein players send postcards to each other indicating turn-based moves and then move corresponding pieces on a chess board. *Id.* at 13–15 (citing *Planet Bingo, LLC v. VKGS LLC*, 576 Fed. Appx.

1005, 1005–1007 (Fed. Cir. 2014)). Supercell argues that the 200 Case Asserted Claims are directed to the second embodiment in the specification, a "multi-player environment wherein multiple players progress the game together" making it a "social game" and thus a "method[] of organizing human activity" that is ineligible under *Tech Pharm. Services*. *Id.* at 15 (citing *Tech Pharm. Services, LLC v. Alixa Rx LLC*, Case No. 4:15-cv-00766-ALM, 2017 WL 3129905, at *3 (E.D. Tex. July 24, 2017)).

Second, Supercell asserts the 200 Case Asserted Claims merely automate a manually achievable process. Dkt. No. 159 at 16–17. Supercell "provides a useful contrast" by distinguishing the 200 Case Asserted Claims from *Core Wireless*, where the Federal Circuit found "[t]he asserted claims in this case are directed to [the concept of] an improved user interface for computing devices, not to the abstract idea of an index" and that "these claims are directed to [a concept of] a particular manner of summarizing and presenting information in electronic devices." *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356 (Fed. Cir. 2018)). Supercell argues that the 200 Case Asserted Claims merely recite broadly claimed result-oriented functions. Dkt. No. 159 at 17–18.

Third, Supercell argues the claims are not directed to an improvement in computer functionality or other technology. *Id.* at 18–20. Supercell asserts the 200 Case Asserted Claims merely claim a generic computer implementation of an abstract idea and that this applies to user interface technology. *Id.* (citing *Trading Techs. Int'l v. IBG LLC*, 921 F.3d 1084 (Fed. Cir. 2019)).

GREE attempts to distinguish the 200 Case Asserted Claims from the claims in *Planet Bingo* and the analogy to correspondence chess by arguing the 200 Case Asserted Claims are drawn toward real-time computer city-building games which do not have a pen-and-paper analog. Accordingly, the claims are "necessarily rooted in the problems arising from computer city-

building games and their corresponding graphical user-interfaces." Dkt. No. 169 at 18–19, 22–23. GREE responds to Supercell's argument that the claims are directed to a "social game" by noting that Supercell identified no precedent showing a social game is necessarily abstract. GREE further notes that the case Supercell cited regarding "methods of organizing human activity" was about "ordering, storing, and distributing pharmaceuticals" and had nothing to do with social games. *Id.* at 20 (quoting *Tech Pharm. Servs., LLC*, 2017 WL 3129905 at *3).

GREE then argues that the 200 Case Asserted Claims do not automate the moving of game contents, but rather "provide the user with a benefit that is not manually achievable—the simultaneous, rather than iterative, arrangement of the game contents." *Id.* GREE cites from the specification of the '594 Patent, with which the 200 Case Asserted Claims share a common specification, where it describes the problem in the art that "it is very complicated for a player to change positions, types, levels, etc., of individual items. Further, it is hard to understand what kind of effect changing a city would have against an attack from a different player." *Id.* (citing '594 Patent at col. 1:50–60). GREE further cites to the specification's solution: "by making the arrangement of facilities changeable by using templates, the usability of city building games is improved, and it becomes possible to continuously attract players to the game." *Id.* at 20–21 (citing '594 Patent at col. 15:49–52).

GREE challenges Supercell's attempt to distinguish *Core Wireless*, arguing that in *Core Wireless* the claims improved a "process [that] could seem slow, complex, and difficult to learn, particularly to novice users," by reducing the actions required of a user. That, combined with the improved efficiency disclosed by the specification, "clearly indicates that the claims are directed to an improvement in the functioning of computers." *Id.* at 21 (quoting *Core Wireless*, 880 F.3d at 1363). GREE then compared the 200 Case Asserted Claims to those in *DDR Holdings*, which

10

found that when the problems solved by an invention are those "specifically arising in the realm of computer" technology, and thus "necessarily rooted in computer technology," the claims do not merely "recite the performance of some business practice known" in the art. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014).

GREE argues that the 200 Case Asserted Claims are necessarily rooted in computer game technology. Dkt. No. 169 at 22. GREE asserts that conventional board games do not suffer from the problems caused by the difficulty in changing "the positions, types, levels, etc., of individual items," which are known problems in city building games. (quoting '594 Patent at col. 1:50-53). GREE notes that conventional board games are limited in the setup and arrangement of pieces, while computer games allow for "much more complicated play since activity is simulated in real time." *Id.* GREE then quotes *Enfish*: "the first step in the Alice inquiry in this case asks whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016)).

In their supplemental briefing, GREE argued that Claim 4 of the '347 Patent is eligible because it requires "displaying a plurality of thumbnail images corresponding to the templates and receiving a user selection corresponding to those thumbnail images." Dkt. No. 259 at 4. GREE asserts "the Federal Circuit noted that '[t]he claims [of the '594 Patent] do not limit how the claimed device displays template creation or application to the player.'" *Id.* (quoting *GREE, Inc.*, 834 Fed.Appx. at 588). GREE argues that "these claim elements go directly to improving a user interface for a city building game and thus demonstrate that these claim elements are non-abstract improvements to a user interface." *Id.* at 4–5 (quoting Dkt. No. 169-1 at 19).

GREE also argued that Claim 6 of the '676 Patent likewise "require[s] displaying thumbnails and receiving user input via those thumbnails, which distinguishes [it] from correspondence chess." Dkt. No. 259 at 7. Finally, GREE argued that Claim 7 of the '683 Patent include elements that render it materially different from the ineligible '594 Patent claims.

Supercell argued in their supplemental briefing that the Federal Circuit determined that all claims of the '594 Patent were found directed to "the abstract idea of creating and applying a template of positions of one or more game contents." Dkt. No. 260 at 5 (quoting *GREE, Inc.*, 834 Fed.Appx. at 588). Supercell further asserted that the Federal Circuit rejected GREE's argument that the '594 Patent claims "recite a specific improvement to the user interfaces of computer city-building games." *Id.* at 9 (citing Dkt. No. 169 at 18).

Supercell further argued, "the sole user interface elements recited for the remaining claims are 'images' or 'thumbnail images' which are 'displayed on a screen' or 'displayed on a template selection screen.' The claims require no particular interface structure or corresponding functionality." *Id.* (citing Dkt. 159-12 at ¶¶ 29, 48). Supercell continued, "as the Federal Circuit correctly ruled with respect to the '594 patent, displaying images alone does not constitute an improvement in user interface technology." *Id.* (citing *GREE, Inc.*, 834 Fed.Appx. at 588–89).

The Court is convinced that the 200 Case Asserted Claims are directed to an abstract idea and are more comparable to the patents in *Planet Bingo* than *DDR Holdings*. Like the claims at issue in the Federal Circuit's decision regarding the '594 Patent, the Template Claims are directed to the abstract idea of creating and applying a template of positions of one or more game contents. *See GREE, Inc.*, 834 Fed.Appx. at 588. The 200 Case Asserted Claims also recite limitations with respect to transmission and storage of the template. Dkt. No. 159-5 at 36; Dkt. No. 159-7 at 35; Dkt. No. 159-8 at 36. This does not change the nature of the claims but merely (1) limits the storage

of the template to the technological environment of a server or memory and (2) automates the transmission of information.

The first additional limitation merely describes the abstract idea of storing information in a generic server or memory. As Supercell analogizes, this is comparable to the human behavior of retaining a post card. *See* Dkt. No. 159 at 14. The second additional limitation merely automates the transmission of information. As Supercell analogizes, this is comparable to the human behavior of sending and receiving post cards. *Id.*

GREE argues that Claim 4 of the '347 Patent and Claim 6 of the '676 Patent "require displaying thumbnails and receiving user input via those thumbnails, which distinguishes them from correspondence chess." Dkt. No. 259 at 7. The Federal Circuit did note that "[t]he claims do not limit how the claimed device displays template creation or application to the player," but immediately following the Federal Circuit continued, "the sole claim requiring display of any information to the player, provides no detail regarding how the information is displayed, mandating only that the information be displayed 'in a discernible condition.'" *GREE, Inc.*, 834 Fed.Appx. at 588. Likewise, Claim 4 of the '347 Patent and Claim 6 of the '676 Patent only require displaying thumbnails and provide no detail regarding how the thumbnails are displayed or arranged. While they also require receiving user input via those thumbnails, this does not change the nature of the claim. Accordingly, the Court finds that all of the 200 Case Asserted Claims are directed to the abstract idea of creating and applying a template of positions of one or more game contents.

### 2.  Step Two of *Alice*

Because the 200 Case Asserted Claims are directed to an abstract idea, this Court analyzes whether there is an inventive concept such that the 200 Case Asserted Claims amount to more than

an abstract idea. There is not. The 200 Case Asserted Claims merely automate the abstract idea of creating and applying a template of positions of one or more game contents with generic computer components utilizing their standard functionality.

In the Federal Circuit's decision regarding the '594 Patent, it found the '594 Patent's claims 5–7 required something more "in reciting specific steps for applying templates in mismatched template scenarios" such that "these claims require something more than automating correspondence chess." *GREE, Inc.*, 834 Fed.Appx. at 589. The Federal Circuit also found the added limitations "'further define the concept of, or solution to, "creating and applying a template" itself,' because 'there are potentially infinite ways' to apply a template, and claims 5–7 expressly specify particular ways." *Id.* The 200 Case Asserted Claims here do not include limitations that require something more than the automation of a correspondence game. *See* Dkt. No. 159-5 at 36; Dkt. No. 159-7 at 35; Dkt. No. 159-8 at 36. Claim 4 of the '347 Patent and Claim 6 of the '676 Patent merely "require displaying thumbnails," which is comparable to moving pieces on a home chess board to reflect the status of the correspondence chess game. *See* Dkt. 259 at 7. With respect to Claim 7 of the '683 Patent, it doesn't have any display limitation or any other inventive concept: it merely recites receiving and transmitting information between generic terminals to arrange game contents within a game space. Accordingly, the Court finds that the 200 Case Asserted Claims fail to recite an inventive concept.

## B.  237 Case[6]

The '346 Patent is titled "Storage Medium Storing Game Program, Game Processing Method, and Information Processing Apparatus." Dkt. No. 142 at 5–6 (citing Dkt. No. 142-2 at Cover). It regards game program, game processing method, and an information processing

---

[6] All citations in this subsection refer to the Dkt. Nos. in the 237 Case.

apparatus for managing and playing a game by selecting panels and divisions to display the panel. *Id.* at 6 (citing Dkt. No. 142-2 at Abstract, col. 1 ln. 22–28). Supercell argues the '346 Patent is "directed to the abstract idea of managing a game and playing a game involving selection of a panel and a division for displaying the panel." *Id.* at 5.

The '689 Patent is titled "Non-Transitory Computer Readable Recording Medium, Game Control Medium, Server Device, and Information Processing System." Dkt. No. 142 at 10 (citing Dkt. No. 142-3 at Cover) It regards battle games where units deployed on a battlefield may have a unit parameter varied based on its position relative to another unit. *Id.* (citing Dkt. No. 142-3 at Abstract). Supercell argues the '689 Patent is "directed to the abstract idea of managing a game and playing a game that involves varying attack strength of a unit based on a positional relationship with another unit." Dkt. No. 142 at 5.

The two patents do not share a familial relationship. Accordingly, the Court will analyze each independently.

### 1. Step One of *Alice*: '346 Patent

Under step one, the Court begins by analyzing the asserted claims to determine whether they are directed to an unpatentable abstract idea or something more, such as an improvement to existing technology. *See, e.g., Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017). Supercell argues that the asserted '346 Patent claims are "directed to the abstract idea of managing a game and playing a game involving selection of a panel and a division for displaying the panel." Dkt. No. 142 at 15. Supercell points to post-grant reviews of U.S. Patent No. 9,770,659 and 9,636,583 (the "PGR Revoked Patents"), which the '346 Patent is a continuation of, where allegedly similar claims were found patent ineligible, and argues there is no material difference between the claims found ineligible by the United States Patent and Trademark Office ("USPTO")

and the asserted claims of the '346 Patent. To support their argument, Supercell tabled the limitations of Claim 1 of the '346 Patent and Claim 1 of the invalidated '583 Patent, highlighting what Supercell argue are "variation[s] of limitations . . . ." Dkt. No. 142 at 16–18.

Supercell also compared the '346 Patent to *In re Smith*, *Planet Bingo*, *In re Marco Guldenaar Holding B.V.*, and a prior *GREE* opinion--Federal Circuit cases Supercell asserts regard "game management concepts that the Federal Circuit has held constitute abstract concepts directed to organizing human activity." Dkt. No. 142 at 20 (citing *GREE, Inc.*, 2020 WL 6789058, at *3; *In re Smith*, 815 F.3d 816, 819 (Fed. Cir. 2016); *Planet Bingo LLC*, 576 Fed. App'x. at 1007–08; *In re Marco Guldenaar Holding B.V.*, 911 F.3d 1157 (Fed. Cir. 2018)). Supercell then compares various limitations in the '346 Patent to limitations in *In re Smith* and argues "[t]he limitation of transmission of information for display is . . . indistinguishable from a game rule concerning a dealer or player selecting and disposing cards . . . ." Dkt. No. 142 at 21.

GREE argues that Supercell disregards that the '346 Patent "provide[s] an innovative user interface" that "enhances the visual effect of the game by including a display region formed by one or more frames" and that "[c]onventional card-based games did not include a display divided in this manner and in which panels are dynamically placed and displayed." Dkt. No. 156 at 5–6 (citing Dkt. No. 142-2 at col. 1 ln. 53–67, ln. 35–44). GREE continues, asserting "the claims are directed to solving problems arising from prior art two-dimensional card battle games and the lack of visually appealing graphical user interfaces for those games" and that accordingly the claims are not directed to an abstract idea but are patent eligible. Dkt. No. 156 at 10 (citing Dkt. No. 142-2 at ln. 1 col. 32–52).

Regarding Supercell's comparison of the '346 Patent to the PGR Revoked Patents, GREE counters that those are non-final PGR decisions vacated pursuant to *Arthrex*, appealed to the

16

Federal Circuit, and are stayed at a remand before the Patent Trial and Appeal Board. Dkt. No. 156 at 10–11 (citing *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019)). GREE further argues that those decisions were made under the broadest reasonable interpretation claim construction standard as opposed to *Phillips* and that the burden of proof was merely preponderance of the evidence as opposed to clear and convincing evidence as is the case here. *Id.* at 11.

GREE also argues the '346 Patent "improve[s] computer functionality by solving problems arising from prior art two-dimensional card battle games and the lack of visually appealing graphical user interfaces for those games. These games cannot be played outside of the context of the claimed computer components on which they run." *Id.* GREE quotes the Federal Circuit in *Enfish* as stating "some improvements in computer-related technology when appropriately claimed are undoubtedly not abstract" and notes they emphasized that "[s]oftware can make non-abstract improvements to computer technology just as hardware improvements can." *Id.* at 11–12 (citing *Enfish, LLC*, 822 F.3d at 1335).

GREE asserts that limitations directed to the high visual effect relating to "moving characters" and "information of motion" are absent from the claims of the PGR Revoked Patents and that Supercell does not address this limitation. *Id.* at 13. The first half of the limitation of Claim 1 of the '346 Patent at issue reads "the control function further receives information related to selection of one or more divisions in which the one or more characters indicated in the selected one or more panels are to be displayed." Dkt. No. 142-2 at 21. The second half of the limitation, which Supercell does not highlight as existent in the PGR Revoked Patents, reads as follows:

> as one or more moving characters in a game display screen including one or more regions formed by the one or more divisions, and transmits information for displaying the one or more moving

> characters according to the information of motion associated with
> each panel stored in the storage unit.

Dkt. No. 142 at 18; *see* Dkt. No. 142-2 at 21. GREE argues the '346 Patent asserted claims are distinct from the claimed methods in *In re Smith, Planet Bingo*, and *In re Marco Guldenaar* as the claims "explicitly recite a particular user interface that is an improvement over past games, involving multiple divisions for the disposition of panels which indicate characters, which are then displayed as one or more moving characters according to the information of motion associated with each panel." Dkt. No. 156 at 15.

GREE and Supercell discuss Claim 1 of the '346 Patent as representative of the asserted claims of the '346 Patent. The Court notes that this claim is not asserted at this point, but rather only Claim 3 of the 346 Patent. Dkt. No. 226 at 2–3. Claim 3 of the '346 Patent reads as follows:

> The recording medium according to claim 1, wherein the data storage function further stores each panel associated with information of text to be displayed to overlap each panel to the storage unit, and
> the control function transmits information for displaying the game display screen in which the one or more panels overlapped with the text are disposed in the one or more divisions on the basis of the one or more panels selected by the first user and the information of text to be displayed to overlap each panel.

Dkt. No. 142-2 at 21–22. Like the claim limitation that GREE cites explicitly reciting a user interface improvement, the additional limitations of Claim 3 recite text displaying text overlapping the panels. The Court finds that between these two limitations, Claim 3 of the '346 Patent is not directed to an abstract idea but rather a distinct improvement to computer functionality by claiming a specific user interface where users can place panels in distinct divisions that can further form regions and responding to this user interaction with moving characters according to information motion and overlapping text. This effect of displaying moving characters in accordance with motion information associated with panels that users select and place in specific divisions is, as

18

GREE says, an improvement to a computerized battle game that cannot be played in this way outside of the context of the claimed computer components on which they run. *See* Dkt. No. 156 at 12. Accordingly, the Court finds that Claim 3 of the '346 Patent is not directed to an abstract idea.

### 2.  Step Two of *Alice*: '346 Patent

Although the Court finds that Claim 3 of the '346 Patent is not directed to an abstract idea, out of an abundance of caution the Court analyzes step two of *Alice*. Supercell argues that the '346 Patent claims do not recite any inventive concepts sufficient to make a patentable invention but "broadly recite results-oriented, well-understood, routine, and conventional steps or functions, or generically-named components . . . that are described using purely-functional language." Dkt. No. 142 at 22.

GREE argues that there is a genuine issue of material fact here as GREE's expert Dr. Akl has opined that the asserted claims, as an ordered combination, are not routine, well-understood, or conventional but rather "reflect improvements to the user interface in computer battle games . . . ." Dkt. No. 156 at 16 (quoting Dkt. No. 156-1 at 5). GREE further argues that the ordered combination of the claims amounts to "something more" than a mere abstract idea and recites more than generic functions or computer components. The Court agrees.

Claim 3 of the '346 Patent, taken as a whole, recites a particular user interface where users can place panels in distinct divisions that can further form regions and responding to this user interaction with moving characters according to information motion and overlapping text. Even if Claim 3 of the '346 Patent were an abstract idea, the combination of the limitations clearly creates an inventive concept in the specific details of the graphical user interface and particular game mechanics associated with those aspects.

### 3. Step One of *Alice*: '689 Patent

Under step one, the Court begins by analyzing the asserted claims to determine whether they are directed to an unpatentable abstract idea or something more, such as an improvement to existing technology. *See, e.g., Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017). Supercell argues the claims of the '689 Patent are "directed to the abstract idea of managing and playing a game involving varying attack strength of a unit and rely solely on generic computer components to carry out that abstract idea." Dkt. No. 142 at 26.

Like their argument with respect to the '346 Patent, Supercell compares the '689 Patent to *Planet Bingo*, *In re Smith*, and *In re Marco Guldenaar*. *Id.* at 27. Supercell also asserts that in a different PGR final written decision involving a GREE patent, "the PTAB held that claims directed to 'controlling an attack according to a difference in parameter value between two characters and to a number of attacks within a predetermined timer' were abstract and patent ineligible." *Id.* (citing Dkt. No. 142-11 at 13–24). Supercell further argues that "[t]he allegedly-inventive concept of a battle game using cards or characters that 'dynamically varies parameters in accordance with game progress' is a fundamental behavior of every game in the role-playing game (RPG) genre, whether played on a computer or using pen-and-paper (e.g., Dungeons & Dragons)." *Id.* at 28.

GREE responds that "Supercell over-simplifies and incorrectly summarizes the invention of the '689 Patent" and misses that the '689 Patent "claims improvements to a user's interaction with a computer by dynamically varying an attack strength of a first unit in a battle game . . . ." Dkt. No. 156 at 20. GREE asserts that the '689 Patent provides an improvement to computer technology that the Federal Circuit found patentable in *Enfish* and says "[t]he invention provides improved interaction with the computer in a game. The game cannot be played outside of the context of the claimed computer components. Accordingly, the claimed invention is rooted in

20

computer technology and addressed to the functioning of a computer." Dkt. No. 156 at 20–21. GREE continues: "[t]he '689 Patent claims a dynamic variance in parameters based on a positional relationship between two characters – i.e., a specific "technological improvement"—complete with detailed rules—to "achieve an improved technological result in conventional industry practice." *Id.* at 22 (citing *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016)).

GREE distinguishes the '689 Patent claims from *Planet Bingo* by arguing the claims at issue there regarded number verification to reduce tampering or other security risks similar to the issue in *Alice*, while the '689 Patent "invention improves the user's interaction with the computer by dynamically varying a component in a computerized battle game." *Id.* at 22. GREE asserts that Supercell cites but does not analogize *In re Smith* and *In re Marco Guldenaar* and distinguishes them as regarding "probabilities" created through shuffling a deck of cards and rolling dice, where the invention in the '689 Patent is not based on probability but rather varying parameters to solve a problem of predictability and probability. *Id.* at 22–23.

GREE argues that "[a] human cannot replicate the dynamic variance of the parameters in a computerized battle game described in the '689 Patent . . . ." *Id.* at 23. GREE also argues that this particular argument regarding providing a solution to the problem by providing improved user interaction persuaded the patent examiner during prosecution to withdraw a § 101 rejection. *Id.* at 23–24 (citing Dkt. No. 156-7 at 6).

Supercell makes its argument using Claim 1 as representative of the asserted '689 Patent claims. Dkt. No. 142 at 12. The only claim of the '689 Patent currently asserted is Claim 8. Dkt. No. 226 at 2–3. Claim 8 is a dependent claim of Claim 5, which is a method claim variant of Claim

1. *See* Dkt. No. 142-3 at 24–25. Claim 8 reads "[t]he game control method according to claim 5, wherein the first unit and the second unit belong to the identical group." *Id.* at 25.

The Court is convinced that Supercell has not overcome the presumption of validity. GREE has distinguished the '689 Patent Claim 8 from *Planet Bingo*, *In re Smith* and *In re Marco*. Further, the Court is convinced that "deploying a plurality of units on a field displayed on a display" combined with "varying an attack strength of a first unit. . . in response to the first unit and a second unit. . . satisfying a first positional relationship by a movement" where "the first positional relationship is satisfied by the movement causing the second unit to be located within a first range of the first unit" recites an improvement in the user's interaction with the computer via the display and positional relationship between units, which are displayed, such that it is not merely an abstract idea. *See* Dkt. No. 142-3 at 24.

The first and second units are displayed. *Id.* The variance of attack strength of the first unit occurs in response to the positional relationship between the first and second unit and their movement. *Id.* Since the first unit and second unit are displayed and moveable, a user can see in real time and approximate the positional relationship between the first and second unit, and accordingly move one unit to avoid or invoke this variance. The display, variance, and moveability together create user interactivity that goes above and beyond a mere abstract idea.

### 4.  Step Two of *Alice*: '689 Patent

Although the Court finds that Claim 8 of the '689 Patent is not directed to an abstract idea, out of an abundance of caution the Court analyzes step two of *Alice*. Supercell argues the '689 Patent claims fail to provide an inventive concept and recite only conventional and functional components incidental to implementing an abstract idea. Dkt. No. 142 at 28. Supercell continues, asserting the '689 Patent claims "merely recite a variation of the Zone of Control effect . . . that is

a well-known battle game concept dating back before computer games to tabletop strategic games." *Id.* at 30.

GREE responds that that claims at issue as an ordered combination are not routine, well-understood, or conventional, but rather reflect improvements to how the user interacts with the computer components to provide a unique game experience. Dkt. No. 156 at 24. GREE quotes the Federal Circuit in *Bascom*: "[t]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *Id.* at 25–26 (quoting *Bascom Glob. Internet Servs., Inc.*, 827 F.3d at 1350).

The Court agrees with GREE's argument. Indeed, it is the claim taken as a whole between the display, variance, and moveability that goes above and beyond an abstract idea. Likewise, even if the claim did recite an abstract idea, the Court finds that the combination of these limitations forms an inventive concept embodied by a specific improvement to how the user interacts with the computer to invoke or avoid the parameter variance.

### C.  310 Case[7]

The '708 Patent and '832 Patent are both entitled "Game Control Method, Game Server, and Program" and have identical specifications. Dkt. No. 119 at 5 (citing Dkt. Nos. 119-2 and 119-3). The '832 Patent is a continuation of the '708 Patent. *Id.* (citing Dkt. Nos. 119-2 and 119-3). Both patents regard "increas[ing] variations on methods for acquiring items, increase the predictability of acquisition of an item with a high rarity value or the like, and heighten interest in the game." Dkt. No. 119-2 at 2. More specifically, the asserted claims of the '708 Patent and '832 Patent regard an interactive display of cells associated with items. Dkt. No. 119-2 at 20; Dkt. No.

---

[7] All citations in this subsection refer to the Dkt. Nos. in the 310 Case.

119-3 at 20. Supercell argues that the '708 Patent and '832 Patent are both "directed to an abstract idea of managing game inventory using conventional computer components." Dkt. No. 119 at 5.

The Court will analyze Claim 1 of the '708 Patent and Claims 2 and 3 of the '832 Patent (collectively, the "'708 Patent Family Claims") together because they share a common specification.

### 1. Step One of *Alice*

Under step one, the Court begins by analyzing the asserted claims to determine whether they are directed to an unpatentable abstract idea or something more, such as an improvement to existing technology. *See, e.g., Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017). Supercell argues that the '708 Patent Family Claims are "directed to the abstract idea of managing a game inventory and rely solely on generic computer components to carry out that abstract idea." Dkt. No. 119 at 13. Supercell asserts that "[g]overning case law makes clear that claims directed to managing information within a game, e.g., managing game inventory, are patent-ineligible abstract concepts." *Id.* (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343 (Fed. Cir. 2014); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097– 98 (Fed. Cir. 2016); *Smartflash LLC v. Apple Inc.*, 680 Fed. App'x 977, 983 (Fed. Cir. 2017)).

Supercell further argues that "the limitations of 'displaying' 'a plurality of cells and acquirable [or obtainable] item information' and 'associating' . . . items . . . 'with each of the plurality of cells' [are] indistinguishable from the information management practices found to be abstract in *FairWarning IP* and *Elec. Power Grp., LLC*." *Id.* at 14 (citing *FairWarning IP*, 839 F.3d at 1097–98; *Elec. Power Grp., LLC*, 830 F.3d at 1354). Supercell continues, asserting that "differentiating a display by use of size, colors, or patterns to reflect rarity is the type of generic

display formatting that fails to constitute an inventive concept." *Id.* (citing *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1347 (Fed. Cir. 2018); *Trading Techs. Int'l*, 921 F.3d at 1385).

Supercell asserts that the prosecution history confirms the claims are directed to patent-ineligible abstract concepts. *Id.* Specifically, Supercell points out that the patent examiner rejected the claims until GREE amended its claims to add the "virtual game" and "including a character which indicates a rarity value of an item associated with at least one of the cells" limitations and that these limitations do not change the abstract nature of the claims. *Id.* at 14–15. Supercell argues that the specification concedes the latter limitation was already well understood, routine and conventional, pointing to gacha, Pokemon and Magic: The Gathering card games. *Id.* at 15 (citing Dkt. No. 119-2 at col. 1 ln. 43–44, col. 4 ln. 11–14; Dkt. No. 119-8, ¶ 19).

GREE responds that the '708 Patent Family Claims "improve computer functionality by solving problems arising from prior art card battle games and the lack of predictability of acquiring a high value card" and that "[t]hese games cannot be played outside of the context of the claimed computer components on which they run." Dkt. No. 134 at 9. GREE argues that Supercell ignores the character of the claims as a whole and over-simplifies the invention. *Id.* at 10 (citing *Enfish*, 822 F.3d at 1339). GREE continues, asserting that "[t]he invention improves the utility of computerized battle games that cannot be played outside of the context of the claimed computer components on which they run." *Id.* GREE also argues that the '708 Patent Family Claims "explicitly recite[] a benefit of retaining the interest of users in the games which is not abstract." *Id.* at 11 (citing Dkt. No. 119-2 at col. 1 ln.47–53; *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018); *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008 (Fed. Cir. 2018)).

GREE further argues that "as the Federal Circuit has repeatedly held, claims disclosing a novel user interface are patent eligible." *Id.* (citing *Core Wireless*, 880 F.3d at 1363). GREE distinguishes the present matter from *Electric Power Group*, arguing the Federal Circuit held the claims were directed to an abstract idea because "the focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools." *Id.* at 12 (quoting *Electric Power Grp.*, 830 F.3d at 1354). GREE continues by distinguishing the present matter from *Content Extraction*, arguing the claims were directed to the abstract idea of "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." *Id.* (quoting *Content Extraction*, 776 F.3d at 1347). Next, GREE distinguishes the present matter from *FairWarning*, arguing the claims related to "the practices of collecting, analyzing, and displaying data, with nothing more." *Id.* (quoting *Smartflash*, 839 F.3d at 1097–98). Finally, GREE distinguishes from *Smartflash* arguing the claims there were "directed to the abstract idea of conditioning and controlling access to data based on payment." *Id.* (quoting *Smartflash*, 680 F. App'x at 982–83).

GREE asserts that contrary to the claims in the above cases, the '708 Patent Family Claims are directed to aspects of a virtual game and "particular user interfaces associated therewith which are an improvement on computers as tools and are not an abstract idea." *Id.* Further, GREE argues the '832 Patent claims in particular have distinct limitations which serve to improve the computer technology on which they are implemented.

Considering the above arguments and the text of the '708 Patent Family Claims themselves, the Court finds they are not "directed to the abstract idea of managing a game inventory" but rather regard the creation and use of a specific user interface for interacting with acquirable items randomly selected from an item information table with displayed characters

26

indicating a rarity value of an associated item. *See* Dkt. No. 119-2 at 20; Dkt. No. 119-3 at 20. Supercell's analysis of the individual limitations diminishes the invention to a sum of the parts that is less than the whole.

With respect to the '708 Patent Claim 1, the claimed invention is "a game control method" that displays during an initialized virtual game "a plurality of cells and acquirable item information that is received from a server over a communication line . . . ." Dkt. No. 119-2 at 20. This server processes selection requests as opposed to such selection requests being processed locally. *Id.* "the plurality of cells being displayed" are specifically "the same size," "each of a plurality of items extracted from an item information table . . . is associated with each of the plurality of cells." *Id.* This "plurality of items"—which is specifically "pertaining to a user"—is "selected randomly only from items in the item information table, and at least one of the cells include[s] a character which indicates a rarity value of an item associated with the at least one of the cells." *Id.* The method "receiv[es], during the virtual game, a selection request," which goes to the server, and "display[s], during the virtual game, an item associate with the selected cell" as determined by the server based on the selection request. *Id.*

This is a sufficiently high level of specificity and detail regarding the layout in the user interface for this claim to ascend past a mere "abstract idea." The Court finds that the '708 Patent Claim 1 is not merely "managing information within a game" but rather is clearly directed to a "particular user interface[] . . . which [is] an improvement on computers as tools . . . ." *See* Dkt. No. 119 at 13; Dkt. No. 134 at 12.

With respect to the '832 Patent Claims 2 and 3, each depend on the '832 Patent Claim 1. The '832 Patent Claim 1 claims "a game control method executed by a game server" and recites detailed limitations regarding the association in a memory of the game server a plurality of cells

with each extracted items, sending information for displaying "a sheet comprising the plurality of cells and obtainable item information" as well as receiving a selection request and sending information for differentiating the cells displayed and providing an item of the extracted items associated with the cell. Dkt. No. 119-3 at 20. Like the '708 Patent Claim 1, this claim describes a particular user interface with additional specific recitation of three types of information that may be displayed and the particular differentiation of cells in a sheet. Beyond that, the '708 Patent Claim 2 additionally recites that "the information for differentiating the display of the one cell includes information for differentiating a pattern of the one cell according to the item type of the item associated with the one cell" and Claim 3 additionally recites "wherein the information sent to the user terminal for displaying the sheet includes information of a character to be displayed in each of the plurality of cells, the character indicating a rarity value of each item associated with each cell."

Analyzing these claims in their entirety, they provide a sufficiently high level of specificity and detail regarding the layout in the user interface for this claim to ascend past a mere "abstract idea." The Court finds that the '832 Patent Claims 2 and 3 are not merely "managing information within a game" but rather clearly directed to a "particular user interface[] . . . which [is] an improvement on computers as tools . . . ." *See* Dkt. No. 119 at 13; Dkt. No. 134 at 12.

## 2.  Step Two of *Alice*

Although the Court finds that '708 Patent Family Claims are not directed to an abstract idea, out of an abundance of caution the Court analyzes step two of *Alice*. Supercell argues that the '708 Patent Family Claims "merely recite generic computer components that are used according to their normal, well-understood, and routine functions for performing the abstract idea of managing a game inventory." GREE responds that the inquiry is not whether the claim elements

by themselves are well-known, but rather that the claim elements, as an ordered combination, were well-known, routine, or unconventional. Dkt. No. 134 at 14 (citing *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018)). GREE argues that the '708 Patent Family Claims "recite specific aspects of the information sent from the server to the user terminal where it is displayed in the user interface in multiple cells" and that the specific arrangement of these components relating to both the graphical user interface and game mechanics "like the specific internet filtering in *Bascom*, provides 'something more' than an abstract idea." The Court agrees.

Even if the '708 Patent Family Claims were directed to an abstract idea, the detail and specificity regarding the arrangement of the components and method steps integrating the game mechanics into a particular graphical user interface form an inventive concept sufficient to transform an abstract idea into an eligible invention.

### D.  311 Case[8]

The '107 Patent and '439 Patent are both entitled "Game Control Method, Game Control Device, and Recording Medium" and share a common specification. Dkt. No. 126 at 5 (citing Dkt. Nos. 127-1 and 127-2). The '439 Patent is a divisional of the '107 Patent. *Id.* at 5–6 (citing Dkt. No. 127-2 at Cross Reference to Related Application). Both patents regard a game control method and device for grouping users, giving game pieces to users in accordance with user operation, and granting a reward if a set of required game pieces are given. Dkt. No. 127-2 at Abstract. More specifically, the asserted claims of the '107 Patent and '439 Patent claim this based on either a parameter value for each of a plurality of users or skill level information. Dkt. No. 127-2 at 28; Dkt. No. 127-1 at 27–28.

---

[8] All citations in this subsection refer to the Dkt. Nos. in the 311 Case.

Supercell argues that the '107 Patent and '439 Patent are both "directed to an abstract idea of managing a game on a computer with a select set of game rules or conditions." Dkt. No. 126 at 5. Supercell further argues the claims of the '107 Patent and '439 Patent are "directed to the abstract idea of managing a card game and rely solely on generic computer components to carry out that idea." *Id.* at 10.

Since Claims 1 and 6 of the '107 Patent and Claims 1 and 5 of the '439 Patent (collectively, the "'107 Patent Family Claims") share a common specification and Supercell analyzes them together, the Court will discuss Supercell and GREE's analysis of them together.

### 1. Step One of *Alice*

Under step one, the Court begins by analyzing the asserted claims to determine whether they are directed to an unpatentable abstract idea or something more, such as an improvement to existing technology. *See, e.g., Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017). Supercell argues that the '107 Patent Family Claims are "directed to the abstract idea of managing a game played by a plurality of players, and specifically for managing rewards provided to those players using select game rules." Dkt. No. 126 at 11 (citing Dkt. No. 1-2 at Abstract). Supercell further argues that "courts have also specifically determined that claims directed to multiplayer or group-based games, including a 'method and mobile computing device for multiple players to play games in the real world and to track one another's progress using mobile devices,' is nothing more than the abstract idea of 'organizing human activity.'" *Id.* at 13 (citing *Sandbox Software v. 18Birdies, LLC*, No. 18-1649 (MN), 2019 WL 2524780, *3 (D. Del. June 19, 2019); *In re Marco Guldenaar Holding B.V.*, 911 F.3d at 1161; *In re Smith*, 815 F.3d at 818.

GREE responds that in response to the patent applicant's arguments regarding the claims of the '439 Patent, "the Examiner expressly withdrew the § 101 rejection in view of applicant's 'persuasive' arguments and 'in light of the *Enfish* decision.'" Dkt. No. 140 at 14 (citing Dkt. No. 140-6 at 2). GREE argues that "the claims are directed to solving specific problems arising from social gaming between multiple players on separate terminal devices with various skill levels." *Id.* at 15 (citing Dkt. No. 140-2 at ¶ 78). GREE continues, "[t]he claims recite particular mechanisms that enable a user to play in cooperation with a plurality of users (i.e., a group or guild) "regardless of skill level." *Id.* (citing Dkt. No. 140-2 at ¶ 78; Dkt. No. 1-2 at col. 2 ln. 12–25). GREE asserts "the inventions improve the usability of particular computerized games that cannot be played outside of the context of the claimed computer components on which they run. Therefore, the claimed invention is rooted in computer technology and addressed to the functioning of a computer." *Id.* at 16 (citing *Enfish*, 822 F.3d at 1335).

GREE compares the '107 Patent Family Claims to the claims in *DDR*, which specifically arise in the realm of computer technology and "provide a solution to the 'challenge of retaining control over the attention of the customer,' when in the context of computer and the Internet . . . ." *Id.* (quoting *DDR*, 773 F.3d at 1257). GREE asserts that the same is true here "with respect to the claimed solution to problems in known computerized social games of lack of motivation of users at a low level (i.e., beginner) and/or the inability of a user to play in cooperation with a plurality of users regardless of the user's skill level." *Id.* (citing Dkt. No. 1-2 at col. 2 ln. 12–22).

The Court agrees with GREE's argument that the '107 Patent Family Claims are "drawn toward solving specific problems arising from social gaming between multiple players on separate terminal devices with various skill levels." *See Id.* at 17. Claim 1 of the '107 Patent recites "a game control method" with six steps of (a) storing skill level information relative to users of a game, (b)

grouping the users, (c) providing game pieces to users in a first group based on the skill level information, (d) storing allocation information indicating which game pieces has been provided to which user with a respective skill level, (e) determining whether all of the game pieces required to obtain a game item have been provided to the first group, and (f) allocating the game item when it is determined that all the required game pieces have been provided. Dkt. No. 1-2 at 27–28. Claim 6 of the '107 Patent goes further and requires that in step (c) "each, of the plurality of game pieces is only provided to users with skill levels in a predetermined range, based on the skill level information." *Id.* at 28.

Claim 1 of the '439 Patent likewise recites a "game control method" with nine steps: (a) grouping a plurality of users into groups, (b) storing a correspondence between the plurality of users, (c) transmitting information over a communication network to initiate a cooperative group event, (d) storing a parameter value for each user that is increased with progress in the group event, (e) monitoring progress of the group event and updating the parameter value in accordance with the progress, (f) providing game pieces based on the parameter value, (g) storing allocation information regarding the game pieces, (h) determining whether the required game pieces have been provided, and (i) allocating in a memory the game item to the first group when the required game pieces have been provided within a predetermined time period for the event. Dkt. No. 1-3 at 28. Claim 5 adds two further steps: storing a ranking point for the first group when the required game pieces have been provided and storing a reward in accordance with the total value of ranking points during a predetermined period of time. *Id.*

Supercell's argument oversimplifies the '107 Patent Family Claims. These claims are not merely directed to the abstract idea of managing a game and rewards but detail a specific computing method of both grouping players and rewarding pieces to users—based on skill level

information or a parameter that increases with group event progress—that can be collected by the group to obtain a game item. The claims taken in their entirety, including skill level information or the increasing parameter as a determining factor, make the '107 Patent Family Claims ascend beyond an abstract idea to a provide a particular solution to a specific problem alleged known in computerized social games: the lack of motivation or ability of low level users to play in cooperation with other users regardless of their skill level. Further, the '439 Patent Family Claims are particularly drawn toward computer games in that group event progress is monitored to update the parameter value. Accordingly, the Court finds that the '107 Patent Family Claims are not drawn to an abstract idea but rather provide a specific solution to a particular problem allegedly known in the art.

### 2.   Step Two of *Alice*

Although the Court finds that '107 Patent Family Claims are not directed to an abstract idea, out of an abundance of caution the Court analyzes step two of *Alice*. Supercell argues that the '107 Patent Family Claims recite only generic computer components used according to their normal, well-understood, and routine functions. Dkt. No. 126 at 14. Supercell further argues that the '107 Patent Family Claims are not directed to any improvement in computing or communications technology but rather merely an abstract idea for which computers are invoked merely as a tool. *Id.* at 15 (citing *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1286 (Fed. Cir. 2018) and *Elec. Power Grp.*, 830 F.3d at 1354–55). Supercell asserts that there are no unconventional steps recited in the claims, the claims do not represent improvements to the functioning of the claimed control device, and that there is no inventive concept in motivating players to play in cooperation with users regardless of skill level. *Id.* at 16–18.

GREE responds that, taken as an ordered combination, the claims "recite a specific and unconventional application of a team-based computer game wherein a user is motivate to play in cooperation with a plurality of users regardless of the users' respective skill level—addressing an existing problem in known team-based computer games." Dkt. No. 140 at 19 (citing 140-2 at ¶85; Dkt. No. 1-2 at col. 2 ln. 12–25). GREE argues that, like how the claims in *Bascom* were "something more" than abstract internet filtering but rather a discrete implementation of filtering, the '107 Patent Family Claims reflect a "specific and discrete computerized game mechanism" that does not "preempt[] the entire field of computerized social games."

The Court agrees that, analyzing the '107 Patent Family Claims as a whole with respect to their individual ordered combinations, the '107 Patent Family Claims recite an inventive concept embodied in the discrete game mechanism of grouping users and awarding game pieces to those groups, based on either skill level information or a monitored and updated parameter reflecting group event progress, which collectively lead to the awarding of a game item. This dependency on skill level information in the '107 Patent Family Claims and the user progress parameter, which is monitored and updated, within their respective ordered combinations creates an inventive concept such that even if the '107 Patent Family Claims were directed to an abstract idea, the '107 Patent Family Claims are clearly patentable inventions.

## IV.    CONCLUSION

The Court finds the '676 Patent Claim 6, the '347 Patent Claim 4, and the '683 Patent Claim 7 are invalid under 35 U.S.C. § 101 as abstract ideas that fail to recite inventive concepts. In light of this finding and the fact that the '385 Patent, the '675 Patent, and the '677 Patent, are no longer asserted, the Court **RECOMMENDS** that Supercell's Motion be **GRANTED** with

respect to the '676 Patent Claim 6, the '347 Patent Claim 4, and the '683 Patent Claim 7 and **DENIED** with respect to the '385 Patent, '675 Patent, and the '677 Patent, which are not at issue.

The Court further finds the '346 Patent Claim 3 and the '689 Patent Claim 8 are valid under 35 U.S.C. § 101 as they are not directed to abstract ideas and, even if they were, clearly recite inventive concepts. The Court therefore **RECOMMENDS** that Supercell's Motion be **DENIED** with respect to the '346 Patent Claim 3 and '689 Patent Claim 8.

The Court also finds the '708 Patent Claim 1 and the '832 Patent Claims 2 and 3 are valid under 35 U.S.C. § 101 as they are not directed to abstract ideas and, even if they were, clearly recite inventive concepts. The Court therefore **RECOMMENDS** that Supercell's Motion be **DENIED** with respect to the '708 Patent Claim 1 and '832 Patent Claims 2 and 3.

Finally, the Court finds the '107 Patent Claims 1 and 6 and the '439 Patent Claims 1 and 5 are valid under 35 U.S.C. § 101 as they are not directed to abstract ideas and, even if they were, clearly recite inventive concepts. The Court therefore **RECOMMENDS** that Supercell's Motion be **DENIED** with respect to the '107 Patent Claims 1 and 6 and the '439 Patent Claims 1 and 5.

A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report **by not later than April 26, 2021** bars that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc). Any objection to this

Report and Recommendation must be filed in ECF under the event "Objection to Report and

Recommendations [cv, respoth]" or it may not be considered by the District Judge.

      **SIGNED this 16th day of April, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE