```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE EASTERN DISTRICT OF TEXAS

 3                           MARSHALL DIVISION

 4  GREE, INC.,                  )(
          PLAINTIFF,             )(    CIVIL ACTION NOS.
 5                               )(    2:19-CV-237-JRG-RSP
                                 )(    2:19-CV-310-JRG-RSP
 6  VS.                          )(    2:19-CV-311-JRG-RSP
                                 )(
 7                               )(    MARSHALL, TEXAS
                                 )(
 8  SUPERCELL OY,                )(    APRIL 30, 2021
          DEFENDANT.             )(    9:06 A.M.

 9

10                      TRANSCRIPT OF JURY TRIAL

11          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12             UNITED STATES CHIEF DISTRICT JUDGE

13
    FOR THE PLAINTIFF:        Mr. Steven D. Moore
14                            Mr. Rishi Gupta
                              Ms. Taylor J. Pfingst
15                            KILPATRICK TOWNSEND & STOCKTON, LLP
                              Two Embarcadero Center
16                            Suite 1900
                              San Francisco, CA 94111
17
                              Ms. Taylor H. Ludlam
18                            Ms. Kasey E. Koballa
                              KILPATRICK TOWNSEND & STOCKTON, LLP
19                            4208 Six Forks Road
                              Suite 1400
20                            Raleigh, NC 27609

21  COURT REPORTER:          Ms. Shelly Holmes, CSR, TCRR
                             Official Court Reporter
22                           United States District Court
                             Eastern District of Texas
23                           Marshall Division
                             100 E. Houston
24                           Marshall, TX 75670

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)
```

```
 1   FOR THE PLAINTIFF:        Mr. Alton L. Absher III
                               Mr. Andrew W. Rinehart
 2                             KILPATRICK TOWNSEND & STOCKTON, LLP
                               1001 West Fourth Street
 3                             Winston-Salem, NC 27101

 4                             Mr. Michael T. Morlock
                               KILPATRICK TOWNSEND & STOCKTON, LLP
 5                             1100 Peachtree Street, NE
                               Suite 2800
 6                             Atlanta, GA 30309

 7                             Mr. Gil Gillam
                               GILLAM & SMITH, LLP
 8                             303 South Washington Avenue
                               Marshall, TX 75670
 9
     FOR THE DEFENDANT:        Mr. Michael J. Sacksteder
10                             Mr. Bryan A. Kohm
                               Ms. Shannon Turner
11                             Ms. Winnie Wong
                               FENWICK & WEST, LLP
12                             555 California Street
                               12th Floor
13                             San Francisco, CA 94104

14                             Mr. Jeffrey A. Ware
                               Mr. Jonathan T. McMichael
15                             Ms. Jessica Kaempf
                               FENWICK & WEST, LLP
16                             1191 Second Avenue
                               10th Floor
17                             Seattle, WA 98101

18                             Mr. Geoffrey R. Miller
                               FENWICK & WEST, LLP
19                             902 Broadway, Suite 14
                               New York, NY 10010
20
                               Mr. Deron R. Dacus
21                             THE DACUS FIRM, PC
                               821 ESE Loop 323
22                             Suite 430
                               Tyler, TX 75701
23

24

25
```

P R O C E E D I N G S

1

2          (Venire panel in.)

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:  Thank you.  Be seated, please.

5          Good morning, ladies and gentlemen.  It's good to

6     see you.  Thank you for being here.

7          My name is Rodney Gilstrap, and I am the Chief

8     United States District Judge for the Eastern District of

9     Texas.  I have lived in Marshall since 1981.  I practiced

10    law in and around this area for 30 years, and I've been on

11    the bench here in the U.S. District Court since 2011.

12         I'll make a confession.  I wasn't born in Texas,

13    but I got here as quickly as I could.  I came to Texas

14    in -- well, I'll say I was 18 years of age.  I came to

15    Texas to go to college, and then I stayed and went to law

16    school at Baylor University.  I am married.  I have two

17    grown children.  And my wife owns and operates a retail

18    floral business here in Marshall.

19         Now, I tell you all these things about myself

20    because in a few minutes, I'm going to ask each of you to

21    give me the same kind of information about yourselves, and

22    I think you're entitled to know as much about me as I'm

23    going to find out about each of you.

24         We're about to engage in jury selection in two

25    different civil cases where both cases involve allegations

1   of patent infringement.  We'll be selecting two juries for

2   two separate trials out of this panel that's in the

3   courtroom today.

4          Each jury will consist of eight people.  One trial

5   is going to begin today and continue through the remainder

6   of next week.  A second separate trial will begin on

7   Thursday, May the 13th, and run through May the 20th.

8          Now, before I go any further, let me mention some

9   of the safety precautions that we've taken.  All of you

10  received a letter from the Court giving you an outline of

11  the protocols that we're implementing during this difficult

12  time to maximize everyone's public health and safety.

13         Also, those selected on the juries during these

14  two trials, each member of the jury will have their

15  temperature taken each morning when you arrive at the

16  courthouse.  Each day when we recess for the evening, the

17  jury box, the restrooms, the jury room will all be deep

18  cleaned and disinfected.

19         Also, ladies and gentlemen, once the jury is

20  selected and is in the jury box and we begin the trial

21  process in each of these two cases, I'm going to ask that

22  those members of the jury replace these face masks that

23  you've all got on now, that I can only see about half of

24  your faces, and I'm going to ask each member of the jury to

25  use a plastic face shield instead of the mask that you

1    have.

2          It's important that the lawyers be able to see the

3    jury's entire face.  It's important that the Court be able

4    to see each face of each juror.  And it's important that

5    you be able to see my face.  That's why I don't have a mask

6    on right now.

7          And though counsel will remain masked when they're

8    at counsel table, when they go to the podium to either

9    address the Court or address the jury, they'll take their

10   mask off, too, so that everybody sees the full view of

11   everybody that's communicating with each other.  That's

12   just a necessary part of conducting a jury trial.

13         So we'll make that change once each jury is

14   selected and we begin each of these two trials.

15         Also, those of you that are on the juries, we're

16   going to space you out in the jury box.  We're going to

17   put, as I said, eight jurors in each case.  We'll put four

18   on the front row, four on the back row.  We'll leave a

19   vacant chair between everybody.  You won't be sitting right

20   next to -- shoulder-to-shoulder to another juror during the

21   trial.

22         Also, I've ordered the clerk's office during each

23   of these upcoming trials to provide the jury each day with

24   lunches.  So your lunch is going to be provided by the

25   government.  It will be brought to the jury room.

1          You'll have your lunch in the jury room with your

2     fellow jurors.  You won't be going out into the community,

3     having to look for some lunch and then come back.  Again,

4     that will maintain the distancing that will help contribute

5     to the safety of what we're doing.

6          Also, you probably can't see them, but on both

7     sides of the jury room, just inside the bar, there are

8     free-standing air filtration systems that we've added.

9     They're on and running because I turned them on this

10     morning myself.  And they will run throughout the trial,

11     and they will constantly filter the air in the courtroom

12     throughout the proceeding.

13          There may be some other precautions, ladies and

14     gentlemen, that we'll take and that I'll tell you about as

15     we go further, but I wanted to call those to your

16     attention.

17          Now, if you'll indulge me, I'd like to briefly

18     review with you how we came to have our American civil jury

19     trial system.

20          If you go back in ancient history and if you begin

21     with the Pentateuch, the first five books of the Old

22     Testament, you'll find that the ancient Jewish Nation

23     empaneled juries to decide questions of property ownership

24     and property value.  The ancient Greeks began using the

25     jury system about 1500 BC.

1          And the Romans, as they did with many things,

2   copied the jury system from the Greeks.  And it was the

3   Romans that brought the jury system to what we know as

4   Great Britain today, or England, when they crossed the

5   channel and conquered that island in the 4th century AD.

6          And the jury trial system brought to England by

7   the Romans flourished from that time until about the 12th

8   century AD when a rather tyrannical king came to the throne

9   of what was then Great Britain.  His name was King John.

10         And King John became embroiled with his nobles in

11  many disputes that led that country to the verge of civil

12  war.  One of the specific disputes between King John and

13  his nobles that led to that crisis was King John's efforts

14  to constrain and do away with the right to trial by jury.

15         Thankfully, that did not become a civil war in

16  England.  Civil war was averted, and it was averted by an

17  agreement that the King and his nobles signed as a place

18  called Runnymede.

19         That agreement, you may have all heard of before,

20  is called the Magna Carta.  And in that agreement, it

21  guarantees the right to trial by jury to those in Great

22  Britain.

23         As a matter of fact, ladies and gentlemen, you

24  might be interested in this fact.  28 of our 50 United

25  States have adopted in their own state constitutions the

1    exact language from the Magna Carta, guaranteeing the right

2    to trial by jury.

3            So you can see that when our forefathers came to

4    North America as British colonists, they brought the

5    concept of the jury trial -- the civil jury trial with

6    them.  And the jury trial system flourished in colonial

7    America for over a century.

8            But then another tyrannical king came to the

9    throne of Great Britain.  This time his name was King

10   George, III.

11           And King George, like King John before him, tried

12   to restrict and limit the right to trial by jury among his

13   British colonial subjects.  As a matter of fact, when

14   Thomas Jefferson sat down to write the Declaration of

15   Independence, which, as you may know, spells out the

16   various grounds upon which the American colonists felt

17   compelled to seek a separation from Great Britain and form

18   our own independent country, one of the specific reasons

19   Thomas Jefferson set forth in the Declaration of

20   Independence requiring that we become a separate nation was

21   the King's effort to constrain and limit the right to trial

22   by jury.

23           So you can see, ladies and gentlemen, that -- or

24   you all know that we did become our own independent nation,

25   formed the United States of America.  And shortly after our

1    independence, we adopted what is and continues to be the

2    governing document of our country, the supreme law of the

3    land, the Constitution of the United States.

4            And after the adoption of the Constitution, there

5    were immediately 10 amendments, additions that were added

6    to it.  And you all know those 10 amendments, the first 10

7    amendments to the Constitution, which we commonly call the

8    Bill of Rights.  And within those first 10 amendments, the

9    Seventh Amendment to the Constitution guarantees the right

10   to trial by jury in a civil case.

11           And those 10 amendments in the Bill of Rights were

12   ratified by the several states and became part of our

13   Constitution, our supreme law of the land, in 1791.  So

14   since 1791, every American citizen has had a

15   constitutionally guaranteed right to resolve their civil

16   disputes through a trial by jury.

17           So by you being here today, ladies and gentlemen,

18   in a very real sense, by presenting yourself for jury duty,

19   you are doing your part to preserve and pro -- preserve,

20   protect, and defend the rights conferred by our

21   Constitution, particularly, the right to trial by jury

22   guaranteed by the Seventh Amendment.

23           I always tell citizens who appear for jury duty,

24   as you have this morning, that in my personal view, jury

25   service is the second highest form of public service than

1    any American citizen can render.  In my personal view, the

2    highest form of public service are those young men and

3    women that serve in our armed forces.

4         Now, when the lawyers address you later today, as

5    they will, they're going to ask you various questions, and

6    I want you to understand they're not seeking to pry into

7    your personal affairs unduly.  Let me say it another way.

8    They're not intentionally trying to be nosy.  They're

9    trying to gather relevant information for purposes of

10   helping select and empanel a fair and impartial jury to

11   hear the evidence in this case -- in both of these cases

12   and to return a verdict.

13        The important thing for each of you, ladies and

14   gentlemen, when you may be asked questions by the lawyers,

15   is to give full, complete, and truthful answers.  As long

16   as the answers you give to any question you're asked is

17   full, complete, and truthful, then there are no wrong

18   answers.

19        I don't know if it will happen today, it rarely

20   does, but I want you to know that if by chance any of you

21   were specifically asked a question that you considered in

22   your own circumstances so personal and so private that you

23   were not comfortable answering it in front of everybody

24   else on the panel, you have the option to simply say in

25   response:  I'd like to talk to Judge Gilstrap about that.

1    And if that's your response, I'll provide an opportunity

2    where you can answer that question outside of the presence

3    of everyone else.

4         But you need to know that does not come up very

5    often, but it does, and I want you to be aware that you at

6    least have that option.

7         As I mentioned, ladies and gentlemen, we're

8    selecting two juries for two separate trials during this

9    process today.

10         The first trial, as I mentioned, will begin later

11    this afternoon, and I'm confident it will go through all of

12    next week.  I expect the first trial to continue through

13    the end of next week.  Today is April the 30th, so for the

14    first trial, we're talking about through May the 7th in all

15    likelihood.  That is my best estimate.  It's not a

16    guarantee.  But that's my best estimate.

17         The second trial is going to begin on May the

18    13th, which is a Thursday.  And those of you selected for

19    the second trial -- that will be selected as the second

20    jury for that second trial, which will begin there, will

21    need to come back on May the 13th and present yourself, and

22    we'll start that second trial with the second jury on May

23    the 13th.

24         And I'm confident that that trial is going to go

25    probably a week in duration, so probably from May the 13th

1    through May the 20th.  Again, that's my best estimate.

2            Now, we're going to select the jury for the trial

3    that begins on May the 13th first.  And then after that

4    jury is selected, those jurors will be excused with the

5    instruction to come back on May the 13th when we start that

6    trial.

7            And then we'll proceed to select the jury for the

8    case that's going to begin this afternoon and run through

9    next week.

10           So I need to know at this point, because if you

11   are selected for either of these juries, you'll need to be

12   available to serve throughout the period of time that I

13   anticipate the trials are going to take.

14           So I need to ask if there's anyone on the panel

15   that with regard to two -- those two blocks of time, today

16   through the end of next week and May the 13th through May

17   the 20th, a Thursday to a Thursday in the month of May, if

18   there are any of you that either during those periods of

19   time have a surgical procedure scheduled for yourself or an

20   immediate family member who's dependent upon you or there's

21   some other compelling, serious reason that would keep you

22   from being available to serve during either of those times

23   if you were selected.  If that's the case, that's something

24   I need to know about.

25           If there's anybody that feels like that applies to

1   you, would you raise your hands and let me make a note of

2   it?  And keep them up.

3           Okay.  No. 5.  Thank you, ma'am.

4           Sir, what's your number?  13?  All right.  No. 13.

5           Ma'am, I can't see your number.  Okay.  32.

6           And then there's a lady on the aisle, 24; is that

7   right?

8           VENIRE MEMBER:  Yes, sir.

9           THE COURT:  Thank you.

10          Okay.  Who else have I missed?  34, I see.

11          33.

12          25.

13          Anybody else?  Okay.  Thank you.  I think I've got

14  those marked down.

15          And I need to go -- excuse me.  I need to go back

16  and clarify something.  I asked for both periods of time at

17  the same time.  I need to know separately which particular

18  period of time would be a conflict for you.

19          So, No. 5, is it for this period of time, or is it

20  for the May 13th period of time you'd have a problem for?

21          VENIRE MEMBER:  I'm having dental surgery.

22          THE COURT:  I don't need to know why.  I just need

23  to know which period of time.

24          VENIRE MEMBER:  Both.

25          THE COURT:  Both?  Okay.

1          No. 13, is it one, the other, or both?

2          VENIRE MEMBER:  Both.

3          THE COURT:  No. 24?

4          VENIRE MEMBER:  Both.

5          THE COURT:  No. 25?

6          VENIRE MEMBER:  Both.

7          THE COURT:  No. 32?

8          VENIRE MEMBER:  Probably the second one.

9          THE COURT:  Second one?

10         VENIRE MEMBER:  Yes.

11         THE COURT:  Thank you.

12         No. 33?

13         VENIRE MEMBER:  The second one.

14         THE COURT:  Second one.  Thank you.

15         No. 34?

16         VENIRE MEMBER:  The first one, but possibly the

17    second one.  It's going to be the first for sure.

18         THE COURT:  First for sure, possibly the second.

19    Okay.

20         All right.  Thank you for that clarification.

21         Now, before we go any further, I'd like to give

22    you a brief preview of how we're going to select these two

23    juries.

24         First of all, each of you are going to be asked to

25    answer about nine separate questions where I get to learn

1    as much about you as you learned about me.  And after those

2    questions, those nine questions are asked, the lawyers in

3    the second case that will begin on March the 13th are going

4    to examine the panel and ask any specific questions that

5    they want to ask.  Then after that -- that jury for May the

6    13th is selected and sworn in, I'm going to excuse that

7    jury with the instruction to be back and prepared to go

8    forward on May the 13th.

9         Then once the first jury for the second trial, the

10   May the 13th trial, is selected and sworn and excused, then

11   Ms. Clendening, from the clerk's office, will be back in

12   the courtroom, and she's going to reshuffle all of you and

13   reseat you and you're going to get different numbers so

14   that when the second jury is selected for the case that

15   will begin today, you won't be in the order that you are

16   now.

17        And we'll be in -- I'll be off the bench when

18   that's done, and then when she's got you reshuffled and

19   reseated, then I'll be back, and we'll proceed to have the

20   lawyers from the first case, which will be the second jury

21   that we select, come in and ask their questions and proceed

22   to select that jury.

23        You might note, ladies and gentlemen, the lawyers

24   involved with the jury for May the 13th are seated at the

25   counsel table.  That's because they're going to be picking

1    the first jury.

2           And then the lawyers who will be picking the

3    second jury, which will relate to the trial that will begin

4    later today, they're in the jury box.  So just for your

5    information, that's who these folks are.

6           All right.  At this time, I'm going to call for

7    announcements in the case of Acorn Semi, LLC, versus

8    Samsung Electronics Company Limited, Samsung Electronics

9    America, Inc., Samsung Semiconductor, Inc., and Samsung

10   Austin Semiconductor LLC.  This is Civil Case No.

11   2:19-CV-347.

12          What says the Plaintiff?

13          MR. WEBER:  Good morning, Your Honor.  Bob Weber

14   for the Plaintiff, Acorn Semi, and we are ready.

15          THE COURT:  All right.  Would you introduce those

16   at counsel table with you?

17          MR. WEBER:  Yes, Your Honor.  This is Mr. Doug

18   Dixon with the Hueston Hennigan firm in California.  And

19   also with me is Mr. Tom Horgan, who is the CEO of Acorn

20   Semi.

21          THE COURT:  Thank you.

22          What says the Defendants?

23          MR. CORDELL:  Good morning, Your Honor.  Ruffin

24   Cordell with Fish & Richardson on behalf of Samsung.  And

25   with me are my colleagues, Melissa Smith, and Sheri

1   Salmons --

2          MS. SMITH:  Good morning, Your Honor.

3          MR. CORDELL:  -- and we're ready to proceed.

4          THE COURT:  Thank you.

5          As I told you, ladies and gentlemen, these cases

6   are patent cases arising under the patent laws of the

7   United States.  In the Acorn Semi case versus Samsung, the

8   first jury that we'll be selecting, in that case, what the

9   Plaintiff is claiming is that its patents were infringed by

10  the Defendant, and it's seeking money damages because of

11  that alleged infringement.

12         Now, the Defendants, the Samsung Defendants, deny

13  that they infringe any of the patents owned by the -- by

14  the Plaintiff, Acorn Semi, and they contend that one or

15  more of the Plaintiff's patents are invalid.

16         Now, what I've just told you is a very informal,

17  shorthand way of describing the case in layman's terms.  I

18  know you've all seen the patent video prepared by the

19  Federal Judicial Center, and having seen that, you already

20  know more about patent cases than most people do when they

21  arrive for jury duty.

22         As I said, the lawyers for both sides in this case

23  are about to question the panel in an attempt to gather

24  relevant information, exercise their challenges, and

25  complete the process of selecting a jury of eight people

1    that will try this case.

2         Again, there aren't any wrong answers to the

3    questions you're going to be asked, as long as the

4    responses you give are full, complete, and truthful.

5         Let me remind you the lawyers are entitled to ask

6    the questions that they're going to to gain the information

7    necessary to help us secure a fair and an impartial jury.

8    They're not attempting to pry into your personal affairs.

9         If for any reason they should ask you a question

10   that's improper or not permitted, I will certainly stop

11   them, ladies and gentlemen.  But you should all understand

12   these are experienced trial lawyers.  They are well

13   acquainted with the rules of procedure and the standing

14   orders of this Court, and I don't expect that to happen.

15        One thing I do want to call your attention to

16   because it's possible that the lawyers may ask you about

17   your ability to apply this, and that is the burden of proof

18   that will be applied in this case.

19        In a patent case such as this one, the jury is

20   called upon -- may be called upon to apply two different

21   burdens of proof.  The jury will apply a burden of proof

22   known as the preponderance of the evidence and a second

23   burden of proof known as clear and convincing evidence.

24        Now, when responding to any of the lawyers'

25   questions about the burden of proof, I need to instruct you

1    that when a party has the burden of proof on any claim or

2    defense by a preponderance of the evidence, it means that

3    the jury must be persuaded by the credible or believable

4    evidence that that claim or defense is more probably true

5    than not true.  I'll say that again, more probably true

6    than not true.

7            Sometimes this is talked about as being the

8    greater weight and degree of credible testimony.

9            Let me give you what I hope will be a useful

10   example.  I think you can see in front of me and in front

11   of our court reporter, we have a statue of the Lady of

12   Justice here in the courtroom.

13           She's blindfolded.  She holds unsheathed in her

14   right hand and lowered at her right side the Sword of

15   Justice.  She holds in her left hand above her the Scales

16   of Justice.  Those scales, ladies and gentlemen, are

17   balanced and equal, and that's where these parties start

18   off -- where they start off, balanced and equal in the same

19   position.

20           Think about the burden of proof this way.  Over

21   the course of the trial, both the Plaintiff and the

22   Defendants are going to put their respective evidence

23   before the jury, and that evidence will go on one side of

24   those scales or the other side of the scales.  The

25   Plaintiff's on one side.  The Defendants' on the other.

1          And then when all the evidence has been heard, if

2     a party in the case who has the burden of proof by a

3     preponderance of the evidence, when you look at those

4     scales with all the evidence on both sides, if those scales

5     tip in favor of the party who has the burden of proof by a

6     preponderance of the evidence, even if they tip ever so

7     slightly, then that party has met its burden of proof by a

8     preponderance of the evidence.

9          On the other hand, ladies and gentlemen, when a

10    party has the burden of proving any defense by clear and

11    convincing evidence, the second burden of proof I

12    mentioned, it means that the jury must have an abiding

13    conviction that the truth of the party's factual

14    contentions are highly probable.  Let me say that again for

15    emphasis, an abiding conviction that the truth of the

16    party's factual contentions are highly probable.

17         This is a higher standard of proof.  The clear and

18    convincing evidence standard of proof is a higher burden of

19    proof or standard of proof than the preponderance of the

20    evidence.

21         I'll take you back to the same example.  During

22    the trial, with the parties starting out equal and the

23    scales held above her head being equal and in the same

24    position, all of the evidence is placed for Plaintiff on

25    one side of the scales and for Defendants on the other

1   side.

2          When all the evidence is in, if a party has the

3   burden of proof on any defense by clear and convincing

4   evidence, those scales must tip in that party's favor, and

5   they must tip definitely.  It's not enough that they tip

6   ever so slightly.  And if they do, then that party has met

7   its burden of proof by clear and convincing evidence.

8          Now, neither of these two burdens of proof, ladies

9   and gentlemen, are to be concerned with a third separate

10  and completely different burden of proof that I'm confident

11  you've all heard about in the media and in movies and

12  television called beyond a reasonable doubt.  Beyond a

13  reasonable doubt is the burden of proof applied in a

14  criminal case.  It has absolutely no application in a civil

15  case such as this.

16         You should not confuse clear and convincing

17  evidence with evidence beyond a reasonable doubt.  Clear

18  and convincing evidence is not as high a standard as beyond

19  a reasonable doubt, but it is a higher standard of proof

20  than the preponderance of the evidence.

21         I give you these instructions in case some of the

22  lawyers for the parties in their questioning ask you about

23  your ability to fairly apply those two burdens of proof to

24  the evidence that you'll hear if you're selected as jurors.

25         Now, before the lawyers address you, at this

1  point, we're going to go through and let each of you answer

2  the nine questions that I told you about myself when I

3  started out this morning.

4       You'll find those nine questions -- they should be

5  on the monitors in the courtroom shortly.  You should have

6  copies of them there.

7       Let me explain to you how we're going to do this,

8  ladies and gentlemen.  We have two Court Security Officers

9  with us.  They'll be in the gallery with two handheld

10  microphones.  And when you are called upon to give your

11  information, this is how we're going to do it.  I'm going

12  to do it one at a time.

13       We'll start with Panel Member No. 1, Ms. Carroum.

14  And at that point, I'm going to ask her to stand, remove

15  her mic -- her mask, use the handheld microphone, because

16  it's a big room and it's important that we all hear your

17  answers, answer those nine questions, then hand the

18  handheld microphone back to the Court Security Officer, put

19  your mask back on or pull it back up, and then have a seat.

20       And we'll do that with each member, beginning with

21  No. 1, and going through the entire panel.

22       Also, ladies and gentlemen, later in the process,

23  when the lawyers are at the podium and they're asking

24  specific members of you specific questions, then you should

25  do it the same way.

1          Don't answer until the Court Security Officer

2    brings you a microphone, take that handheld microphone,

3    stand up, pull down or take off your mask, answer the

4    question, hand the microphone back, pull the mask up or put

5    it back on, and have a seat.

6          And, again, remember to hold the microphone close

7    enough so that we all hear you.

8          And we're going to be using two handheld

9    microphones.  They've both been sanitized.  And after the

10   first person uses one handheld microphone, it will be

11   handed back to the Court Security Officer, and the second

12   already sanitized microphone will be used with the second

13   person.  And while that's going on, the first microphone is

14   going to be sanitized so that when the third person gets

15   it, it will be clean and sanitized for their use.

16         And that way nobody's going to get a handheld

17   microphone that anybody else has had their hands on or used

18   that hasn't already been sanitized between these uses.

19   That's why we've got two of them, and that's why they'll be

20   passed back and forth as we go through the process.

21         But as you answer these nine questions, remember,

22   when we get to the part where you'll be called upon to

23   answer specific questions, do it the same way.  Take the

24   handheld mic from the Court Security Officer, stand up,

25   bring your mask down or take it off, hold the microphone

1   close enough so that everybody can hear you.

2        When you've answered the question, hand the

3   microphone back, put your mask back on or pull it up, and

4   have a seat.  Please follow those instructions as we go

5   through this process.

6        So, again, as I said, we'll start with Panel

7   No. 1.  Ms. Carroum, if you'll stand and answer those nine

8   questions for us, please.

9        VENIRE MEMBER:  My name is Crystal Carroum.  I

10  live in Gladewater.  I have no children.  I currently am

11  not working.  My former employment was with Dallas

12  Independent School District.  I worked as an instructional

13  supervisor there for approximately 15 years.  I have a

14  Bachelor's degree in psychology and a Master's degree in

15  interdisciplinary science with cognates in biology and

16  geology.  My husband's name is David Carroum.  He works as

17  a vice president of sales at East Texas Mack Sales.  He's

18  worked there for approximately 25 years.  I have previously

19  served on a jury in a civil case to terminate parental

20  rights, and the judgment was to terminate those parental

21  rights.

22        THE COURT:  How long ago was that, ma'am,

23  approximately?

24        VENIRE MEMBER:  Approximately 15 years ago.

25        THE COURT:  That's fine.  Thank you very much,

1   Ms. Carroum.

2        Next is Panel Member No. 2, Mr. Hunter.

3        VENIRE MEMBER:  My name is Steve Hunter.  I live

4   in Gilmer.

5        THE COURT:  Check that microphone, Mr. Elliott,

6   please.  Make sure it's on or hand him another one.

7        VENIRE MEMBER:  My name is Steve Hunter.  I live

8   in Gilmer.  I have one daughter.  I work for Genesis

9   Endeavors.  It's an oilfield contractor.  I've worked there

10  about eight years.  I went to school at Spring Hill and

11  went to Kilgore College for one year.  My spouse's name is

12  Connie.  And she's retired from Texas Eastman.  And she

13  worked there, like, 10 years.  And I was on a jury one time

14  in Gilmer.  It was a criminal trial.

15       THE COURT:  How long ago was that, sir?

16       VENIRE MEMBER:  Probably 12 years.

17       THE COURT:  Thank you very much, Mr. Hunter.

18       All right.  Next is Panel Member No. 3, Ms. Haugh.

19       VENIRE MEMBER:  My name is Glenda Haugh.  I live

20  in Atlanta, Texas.  I have two children and three

21  stepchildren and 10 grandchildren.  I worked at Texas

22  Department of Transportation for 28 years.  I'm retired.

23  I've been retired for seven years.  My educational

24  background, I went to Atlanta High School.  I also went to

25  East Texas Baptist here in Marshall.  And I went to East

1  Texas State and received a Bachelor's of Business

2  Administration there.  My husband's name is Brad Haugh.  He

3  is also retired from Texas Department of Transportation,

4  and he worked for 37 years there.  I was on the grand jury

5  in Linden.

6          THE COURT:  All right.  Thank you, Ms. Haugh.

7          VENIRE MEMBER:  I can't remember how long ago it's

8  been.

9          THE COURT:  I'm not interested in grand jury

10  service, so if anybody has had grand jury service, you

11  don't need to mention that.

12          Thank you, ma'am.

13          All right.  Next is Panel Member No. 4,

14  Ms. Killingsworth.

15          VENIRE MEMBER:  My name is Melanie Ann

16  Killingsworth.  I live in McLeod, Texas.  I have two

17  children -- grown children.  I work at Flints Furniture in

18  Atlanta, Texas.  I've been there a little over five years.

19  I graduated high school.  My spouse's name is Aaron

20  Killingsworth.  He works at ChromaScape in Atlanta, Texas.

21  He's been there approximately three, four years.  I've had

22  quite a few different -- served on a jury quite a few

23  different times in Linden and here.

24          THE COURT:  What does your husband do again?

25          VENIRE MEMBER:  He works at ChromaScape.  It's --

1  I'm really not sure what all -- they -- it's carbon black.

2  They work with some kind of carbon black stuff.

3          THE COURT:  Okay.  Thank you.  Thank you,

4  Ms. Killingsworth.

5          Next is Panel Member No. 5, Ms. Howard.

6          VENIRE MEMBER:  My name is Jackie Howard.  I live

7  in Gilmer, Texas.  I have two children, six grandchildren.

8          THE COURT:  Ms. Howard, could you hold that

9  microphone a little closer?

10         VENIRE MEMBER:  Is that better?

11         THE COURT:  Let's make sure it's...

12         VENIRE MEMBER:  Okay.  Can you hear me?

13         THE COURT:  That's better.

14         VENIRE MEMBER:  Jackie Howard from Gilmer, Texas.

15  I have two children, six grandchildren.  I'm retired.  I

16  worked as an insurance agent for attorney's malpractice

17  insurance.  And I'm -- like I said, I'm retired.  And my --

18  I have college education.  No degrees, but I've had some

19  college.  My spouse's name is Doyle Howard.  He works at

20  the McBee Operating Company, which is an -- oil production.

21  And he's still working, and he's worked there 41 years.

22  And I've had civil and criminal.

23         THE COURT:  And when and where was your civil jury

24  service?

25         VENIRE MEMBER:  It was here, and it was -- I

1  shouldn't say the name of the people.  I'm so--

2         THE COURT:  Just tell me when -- just where and

3  when?

4         VENIRE MEMBER:  Gosh, it's probably been eight

5  years or so.

6         THE COURT:  That's good enough.  Thank you,

7  Ms. Howard.

8         Next is Panel Member No. 6, Mr. Hall.

9         VENIRE MEMBER:  My name is Michael Hall.  I live

10 right here in Marshall, Texas.  I got one little girl.  I

11 work at Mastercraft at Woodlawn factory -- cabinet factory.

12 I graduated high school.  My wife's name is Autumn Hall.

13 She works at Chili's, and she's been there about three

14 years.  And I've never done jury duty.

15        THE COURT:  All right, sir.  Thank you very much.

16        Next we'll go to Panel Member No. 7,

17 Ms. Cleveland.

18        VENIRE MEMBER:  My name is Jacqueline Cleveland.

19 I live in Pittsburg, Texas.  I don't have any children.

20 I'm currently not working.  I worked at Pittsburg

21 Veterinarian Clinic for about 24 years.  My husband's name

22 is Lawrence Cleveland.  I have an Associate's degree from

23 Northeast Texas Community College.  He's worked at

24 Pittsburg Independent School District for 24 years.  I

25 served on a jury case about five or six years ago.  It was

1    a motor vehicle accident.

2            THE COURT:  Where was that, ma'am?

3            VENIRE MEMBER:  In Pittsburg.

4            THE COURT:  Thank you.

5            All right.  Next is Panel Member No. 8,

6    Mr. Thomason.

7            VENIRE MEMBER:  All right.  My name is Randall --

8    well, my name is Randall Thomason.  I live in Atlanta,

9    Texas.  I got three kids.  I'm self-employed within our

10   family business, which we do a lot of real estate,

11   commercial, residential, land acquisition and timber

12   business, stuff like that.  I've been there 25, 26 years.

13   Graduated high school in Atlanta.  Went to Texas A&M

14   University, got a degree in finance, a minor in accounting.

15   My wife's name is Heather.  She's worked at Atlanta

16   Independent School District for the last 15 years.  And

17   I've never -- I've been to a jury selection but never was

18   called to serve.

19           THE COURT:  All right, sir.  Thank you.

20           Next is No. 9, Mr. Case.

21           VENIRE MEMBER:  My name is Ricky Case.  I have two

22   kids.  I'm a self-employed mechanic.  Been there for 27

23   years.  I went -- I attended TSTI in Waco and graduated the

24   construction equipment mechanic boards.  My wife's name is

25   Sheri Case.  She's unemployed.  She's a house maker.  And

1    I -- I've showed up for jury service but was never picked.

2              THE COURT:  All right.  Thank you, sir.

3              All right.  Next is No. 10, Mr. Williams.

4              VENIRE MEMBER:  My name is Collis Williams.  I

5    live in Longview, Texas.  I have one son and two grandkids.

6    I worked for 38 years at Texas Eastman as a training

7    instructor and an operator.  I'm currently retired.  I have

8    some college.  My wife is deceased.  And I have served on a

9    jury, both criminal and civil.

10             THE COURT:  And where and when, sir?

11             VENIRE MEMBER:  Here in Marshall, approximately

12   five years ago.

13             THE COURT:  Okay.  And your jury service here in

14   Marshall, was it in this court or was it the Harrison

15   County Courthouse?

16             VENIRE MEMBER:  Harrison County.

17             THE COURT:  Thank you, sir.

18             All right.  No. 11 is next, Ms. Crews.

19             VENIRE MEMBER:  Good morning.  My name is Stacey

20   Crews.  I live in Daingerfield.  I have three children.  I

21   work at UT Health East Texas, Pittsburg Hospital.  I've

22   been there about 20 years, and the department I work in now

23   is supply chain.  I'm the manager.  And I've been working

24   there about four years in that department.  I have a

25   college degree, Associate's of Science in social work.  My

1  spouse is Carl Crews.  He works at Brookshire's as a

2  perishable manager.  He's been there about two years now.

3  And I have been on a jury, civil, in Morris County, and I

4  think it's about a couple years ago.

5          THE COURT:  All right.  Thank you, Ms. Crews.

6          VENIRE MEMBER:  Thanks.

7          THE COURT:  Next is No. 12, Ms. Galvan.

8          VENIRE MEMBER:  I'm Rosalinda Galvan.  I have

9  three children.  I work at Texas National Bank here in

10 Marshall.  I've worked there for two years.  I graduated

11 from Marshall High School.  My husband's name is Carlos

12 Galvan.  He works at C&C Oil Field in Carthage.  He's been

13 there about five years.  And I don't have prior jury

14 services.

15         THE COURT:  Thank you very much, ma'am.

16         All right.  Next is No. 13, Mr. Angel.

17         VENIRE MEMBER:  Yes.  My name is Harold Angel.  I

18 live in Gilmer.  I have five kids and 10 grandkids.  I work

19 for First Pediatrics Home Health.  I've worked there for

20 about 13 years.  I have a degree in nursing.  My spouse's

21 name is Elizabeth Angel.  She doesn't work and hasn't for a

22 long time.  And I went -- I've never been picked for jury

23 duty.

24         THE COURT:  All right, sir.  Thank you very much.

25         No. 14 is next, Mr. Cook.

1          VENIRE MEMBER:  My name is Robert Cook.  I live

2   here in Marshall, Texas.  I don't have any children.  I own

3   a corrosion consulting company.  We inspect oilfield tanks.

4   I've done that for 13 years.  I have a Bachelor's of fine

5   arts.  I'm single.  And I've never done jury service.

6          THE COURT:  All right.  Thank you, Mr. Cook.

7          Next is No. 15, Mr. Brotherton.

8          VENIRE MEMBER:  My name is David Brotherton.  I'm

9   from Daingerfield, Texas.  I have two older children.  I

10  work at Texas Eastman, been there since 1989.  I have a

11  Bachelor of Science in industrial engineering.  My wife's

12  name is Luann.  She is a housewife, primary caregiver of my

13  father.  For a long time, she's been there.  I've had two

14  jury services before, civil, and it was in Morris County.

15  Both of them were in the '80s.

16         THE COURT:  Thank you very much.

17         Next is No. 16, Mr. Teague.

18         VENIRE MEMBER:  My name is Jeremy Teague.  I live

19  in Union Grove.  I have no children.  I currently work at

20  Southwest Insulated Panels, working as a shop worker,

21  working -- having worked there almost three years.  I

22  graduated from Kilgore College with an Associate's in

23  Applied Science with HVAC.  I have no spouse and no prior

24  jury services.

25         THE COURT:  All right.  Thank you, Mr. Teague.

1          Next is No. 17, Mr. Reynolds.

2          VENIRE MEMBER:  My name is Kyle Reynolds.  I live

3    in Atlanta, Texas.  I have no children.  I work for Gregg

4    Orr Extreme as a mechanic.  I've worked there for about

5    eight months.  I graduated from Atlanta High School.  And I

6    am currently attending Texarkana College as a part-time

7    student for automotive technology.  I'm single.  And I have

8    never served on a jury.

9          THE COURT:  All right.  Thank you very much.

10          Next is Panel Member No. 18, Mr. Donald.

11          VENIRE MEMBER:  My name is Darrel Donald.  I live

12    here in Marshall.  I have two adult children.  I'm retired

13    from the Navy and from the U.S. Postal Service as a

14    mechanic.  I've been retired for three years.  I went to

15    high school here in Marshall.  My spouse's name is Carol,

16    and she's a DOD analyst.  She's been there probably about

17    eight to 10 years.  Don't know exactly.  I've served on a

18    civil case here in Marshall.

19          THE COURT:  How long ago, Mr. Donald?

20          VENIRE MEMBER:  Probably about 12 to 15 years ago.

21          THE COURT:  Thank you very much.

22          Next is Panel Member No. 19, Mr. Johnson.

23          VENIRE MEMBER:  My name is Dennis Johnson.  I live

24    in Gilmer.  I have one 29-year-old son, expecting our first

25    grandbaby in October.  I work for Upshur County Road and

1  Bridge.  I've been there almost a year.  I'm the heavy

2  equipment operator.  I'm a graduate of Spruce High School

3  in Dallas.  And my wife's name is Dawn Johnson.  She works

4  for Longview Bridge.  I have no idea what she does.  She's

5  only been there about six months.  And I've never served on

6  a jury.

7           THE COURT:  All right.  Thank you, Mr. Johnson.

8           No. 20 is next, Mr. Holbrook.

9           VENIRE MEMBER:  Yes.  I'm Colin Holbrook from

10  Naples, Texas.  No children.  I'm self-employed as an

11  Amazon bookseller.  My educational background is I

12  graduated from Paul Pewitt High School in 2016.  2020, I

13  graduated from LeTourneau University with a Bachelor's in

14  English with minors in history and psychology.  No spouse

15  and no prior jury service.

16           THE COURT:  Thank you.

17           Next is Panel Member No. 21.

18           VENIRE MEMBER:  My name is Betty Kenward.  I have

19  two grown sons.  I do not work.  I'm a housewife.  Didn't

20  finish school.  My husband is Thomas Kenward.  He's retired

21  from U.S. Steel.  And I've not served on a jury.

22           THE COURT:  Thank you, ma'am.

23           Next is No. 22, Ms. Reed.

24           VENIRE MEMBER:  My name is Patti Reed.  I live in

25  Linden.  I have two adult children.  I'm retired.  My

1   previous employment was with Gwinnett County Public Schools

2   in Georgia.  I worked there 21 years.  My educational

3   background is high school with some college.  My spouse's

4   name is Rodney Reed, and his place of employment -- he's

5   retired also.  His previous place of employment was O'Neal

6   Manufacturing.  He was in management.  He worked there --

7   he only worked there for about a year, and before that, he

8   was retired.  They called him out of retirement.  I only

9   have grand jury service.

10          THE COURT:  Thank you, ma'am.

11          All right.  Next is Panel Member No. 23,

12   Ms. Visage.

13          VENIRE MEMBER:  My name is Sharla Visage.  I'm

14   from Longview, Texas.  I have two children.  During COVID,

15   I went to work with my husband at V&T Truck Center for --

16   so about a year.  Before that, I was a stay-at-home mom.

17   My background is I went -- educational background is

18   Marshall High School and graduated with a BA from Baylor

19   University.  My husband's name is Thomas Visage.  He owns

20   V&T Truck Center and buys and sells used 18-wheelers all

21   over the United States.  They started that company in 2006.

22   And I have no prior jury services.

23          THE COURT:  Thank you, Ms. Visage.

24          Next is Panel Member No. 24, Ms. Jones.

25          VENIRE MEMBER:  My name is Shelley Jones.  I live

1   in Diana, Texas.  I have two grown children.  I work at a

2   Ameripack Foods as a food safety quality assurance manager.

3   I've been there approximately three years.  I have high

4   school and multiple food safety courses.  I'm not currently

5   married.  And I've not served on a jury before.

6          THE COURT:  Thank you.

7          No. 25 is next, Ms. Booth.

8          VENIRE MEMBER:  My name is Cassandra Booth.  I'm

9   from Queen City, Texas.  I have three grown children.

10  Place of employment is Christus St. Michael Hospital in

11  food service as a cook.  And I also work as a provider

12  part-time for my aunt.  I've worked there at the hospital

13  for seven years and about three years for -- as a

14  caregiver.  Educational background, I went to school for

15  cosmetology.  My spouse's name is Willie Booth.  He work at

16  Ward Timber as an operator.  And jury services, none.

17         THE COURT:  All right.  Thank you, ma'am.

18         No. 26 is next, Mr. Cook.

19         VENIRE MEMBER:  My name is Marvin Cook.  I have

20  two children.  I live in Gladewater.  I've worked for

21  Halliburton for the last 14 years.  I have an Associate's

22  degree from Texas State Technical College here in Marshall.

23  My wife's name is Brandy.  She's a general manager for a

24  hotel in Longview.  She's done that for the last three

25  years.  The -- the first time I've ever been on a jury.

1          THE COURT:  First time was when you were called

2    today?

3          VENIRE MEMBER:  Yes, sir.

4          THE COURT:  Thank you, sir.

5          All right.  Next is No. 27, Ms. Smith.

6          VENIRE MEMBER:  My name is Candie Smith.  I'm from

7    Hughes Springs.  I have three grown daughters and three

8    grandsons.  I am a home health nurse for Kindred.  I've

9    been with this agency for eight months.  I've been in the

10   healthcare field since '94.  I graduated from Hughes

11   Springs High School, got my EMT through A&M, and my nursing

12   through Northeast Texas.  My spouse's name is Tony Smith,

13   and he's a millwright for Delta Fabrication, and he's been

14   there for five years.  And I've never served on a jury.

15         THE COURT:  Thank you, Ms. Smith.

16         Next is Panel Member No. 28, Ms. Bert.

17         VENIRE MEMBER:  My name is Deanna Bert.  I live in

18   Hughes Springs --

19         THE COURT:  Would you, would you -- Ms. Bert,

20   would you pull your mask down so I can see you?

21         VENIRE MEMBER:  I'm sorry.

22         THE COURT:  That's okay.  Thank you.

23         VENIRE MEMBER:  My name is Deanna Bert.  And I

24   live in Hughes Springs, Texas.  Most of my time is spent in

25   Daingerfield, Texas, however.  Two grown children.  My

```
 1  place of employment, I am retired but owned a flower shop

 2  in Daingerfield, Texas.  Worked as bucket washer, designer,

 3  bookkeeper, et cetera.  I did that for 15 years as an

 4  owner.  Education is high school in Omaha, Texas, at

 5  Pewitt.  My spouse's name is Blake Neeley.  He was a

 6  restaurant owner for 47 years in Daingerfield, Texas.  And

 7  I have served on several juries, civil.

 8            THE COURT:  When and where?

 9            VENIRE MEMBER:  Linden, Texas, 15 years ago, and

10  Morris County.

11            THE COURT:  Thank you, ma'am.

12            Next is No. 28, Mr. Shaver.

13            VENIRE MEMBER:  My name is George Shaver.  And I

14  live in Gilmer, Texas.  I have two children, age 12 and 2.

15  My place of employment, I work at a non-destructive testing

16  oil and gas company called XCEL.  I'm the corporate IT

17  manager there.  I've worked there going on seven years.  I

18  graduated from Gilmer High School, and I got my Associate's

19  degree in business administration from Northeast Texas

20  Community College.  My wife's name is Jocelyn Shaver.  She

21  works in the special education department at Union Grove

22  ISD.  She's been working there almost eight years.  And I

23  have had no prior jury service.

24            THE COURT:  All right.  Thank you, Mr. Shaver.

25            Next is Panel Member No. 30, Ms. Hammett.
```

```
 1              VENIRE MEMBER:  My name is Melissa Hammett.  I
 2     live in Longview, Texas.  I have three grown children, one
 3     teenager, and four grandchildren.  I don't currently work,
 4     but prior to that, I was an administrative assistant for
 5     Eastman Chemical.  I worked there about seven years.  I
 6     have a high school diploma and some college.  My husband's
 7     name is Donny Hammett.  And he is retired from Eastman
 8     after 29 years of work as a chemical operator.  And I have
 9     no prior jury services.
10              THE COURT:  All right.  Thank you very much.
11              Next is Panel Member No. 31, Ms. Waddell.
12              VENIRE MEMBER:  My name is Camilla Waddell.  I
13     have two children.  I work in Gladewater as a baby sitter
14     for three years.  I've got a high school diploma.  My
15     husband's name is Tim.  He works for the City of Longview,
16     warehouse manager, 39 years.  No prior jury service.
17              THE COURT:  Thank you.
18              Next is No. 32, Ms. Rich.
19              VENIRE MEMBER:  Yes.  My name is Susan Rich.  And
20     I live in Atlanta, Texas.  And I have two grown children.
21     And I work at Price Hardware in Atlanta, Texas, as an
22     inventory manager.  I've been there approximately about 10
23     years.  I went -- I graduated from Atlanta High School.
24     I've got some college hours.  My husband is a peace officer
25     and a fireman.  He's been a peace officer for about 35
```

 1  years and a fireman for 25.  And, yes, I have served on a

 2  civil case here in Marshall, probably approximately four to

 3  five years ago.

 4          THE COURT:  In this court?

 5          VENIRE MEMBER:  Yes, sir.

 6          THE COURT:  Okay.

 7          VENIRE MEMBER:  Under you.

 8          THE COURT:  Thank you, ma'am.  Welcome back.

 9          All right.  Next is 33, Ms. Fry.

10          VENIRE MEMBER:  Hi.  My name is Sarah Fry.  I live

11  in Pittsburg, Texas.  I have four children.  I'm a teacher

12  at Mt. Pleasant High School.  Been there for about five

13  years.  I graduated at Texas A&M with a Master's in

14  education.  I have no spouse.  And I have no prior jury.

15          THE COURT:  Thank you.

16          Next is No. 34, Ms. Turner.

17          VENIRE MEMBER:  My name is Misty Turner.  I live

18  in Pittsburg.  I have three children.  I work at Lowe's in

19  Mt. Vernon.  I've been working there for about seven years.

20  I went to high school in Jefferson.  My spouse's name is

21  Kenneth Turner.  He's been at Priefert's in Mt. Pleasant

22  for about 17 years.  And I've not served.

23          THE COURT:  What's the name of your husband's

24  place of work?

25          VENIRE MEMBER:  Priefert's Manufacturer, trailer

 1  manufacturer.

 2          THE COURT:  Okay.  Thank you.

 3          All right.  Next is No. 35, Mr. Livingston.

 4          VENIRE MEMBER:  My name is John Livingston.  I

 5  live in Daingerfield, Texas.  I have two grown children.

 6  I'm retired with the Titus County Sheriff's Office.  I was

 7  a corrections officer.  I was with them for about 11 and a

 8  half years.  I attended Daingerfield High School.  My

 9  wife's name is Carolyn.  She's retired through the

10  Daingerfield Independent School District as manager of food

11  services.  She worked there for 30 years.  I did have a

12  criminal court about 13 years ago.

13          THE COURT:  All right, sir.  Thank you,

14  Mr. Livingston.

15          Next is No. 36, Ms. Pendley.

16          VENIRE MEMBER:  My name is Joni Pendley.  I live

17  in Big Sandy.  I have two children.  I work at a family

18  business called AgPro Systems.  We manufacture soil

19  stimulants and soil stabilizers.  I am also a compliance

20  officer for Essential Engineering & Management, which is in

21  pipeline inspection services and project management.  And I

22  also home school my kids and teach in their co-op.  My

23  educational background is a BA in health and kinesiology.

24  My spouse's name is Tim.  He's the owner of Essential

25  Engineering & Management, which is a company he recently

1  started.  And I served on a criminal case in Houston about

2  15 years ago.

3          THE COURT:  Thank you, ma'am.

4          All right.  Next is No. 37, Mr. Belt.

5          VENIRE MEMBER:  My name is Landon Belt.  I live in

6  Ore City.  I have one four-month-old daughter.  I work at

7  Texas Eastman as an industrial maintenance planner and

8  mechanic.  I've been there about seven years.  I went to

9  Kilgore College and got an Associate's degree, an

10 industrial maintenance mechanic.  My spouse's name is Sarah

11 Belt.  She's a stay-at-home wife.  She's been doing that

12 since we've been married.  And no prior jury service.

13         THE COURT:  All right.  Thank you, Mr. Belt.

14         Next is No. 38, Mr. Hunt.

15         VENIRE MEMBER:  My name is Thomas Hunt.  I live in

16 Hallsville, Texas.  I don't have any children.  I'm retired

17 from T&T Construction, an oilfield contractor.  I worked

18 there about 27 years.  I attended Cyprus-Fairbanks High

19 School.  My wife's name Wynell.  She worked at Cherokee

20 Casino in Tahlequah, Oklahoma.  She's retired.  And I have

21 no prior jury service.

22         THE COURT:  All right.  Thank you, sir.

23         Next is No. 39, Ms. Crossland.

24         VENIRE MEMBER:  My name is Robin Crossland.  I

25 live in Gilmer.  I have one son.  I'm retired from

1  AllenMed.  Worked there about five years.  Have an

2  Associate's degree in accounting.  My husband's name is

3  Jeff.  He works at Upshur Florist.  He's been there about

4  six years.  And I served on a civil case about four or five

5  years ago here, and a criminal case in Upshur County.

6          THE COURT:  And what is AllenMed, please?

7          VENIRE MEMBER:  We did diabetic testing supplies.

8          THE COURT:  Okay.  Thank you, ma'am.

9          Next is No. 40, Mr. Pierce.

10         VENIRE MEMBER:  Hi.  I'm Jonathan Pierce.  I live

11  in Marietta, Texas.  Lived there about the last 10 years

12  while I worked for Cooper Tire & Rubber Company.  Been

13  there for 21 years.  I run a z-calender that makes

14  polyester and nylon liner ply for the tires.  I'm not

15  married but I do have two children.  And I have no prior

16  jury service.

17         THE COURT:  All right.  Thank you, Mr. Pierce.

18         Thank you very much, ladies and gentlemen.

19         Now, I need to say a couple more things to you

20  before I turn the questioning over to the lawyers.

21         The jurors who are selected to serve in this case

22  will serve as the sole judges of the facts, and the jurors

23  selected will make the sole determination in this case

24  about what the facts are.

25         My job as the Judge is to rule on questions of

1  law, evidence, and procedure, to maintain the decorum of

2  the courtroom, and to oversee an efficient flow of the

3  trial.

4          Additionally, I want to say a couple things to you

5  about our judicial system that I hope will put things in a

6  proper perspective for you.

7          In any jury trial, besides the actual parties

8  themselves, there are always three participants:  The jury,

9  the Judge, and the lawyers.

10          With regard to the lawyers, I think it's important

11  for each of you to understand that our judicial system is

12  an adversary system, which simply means that during the

13  course of the trial, the parties will seek to present their

14  respective cases to the jury in the very best light

15  possible.

16          Now, it's no surprise to any of you that lawyers

17  are often criticized in the public and in the media.  But

18  the Court's observed that at least some of that criticism

19  results from a basic misunderstanding of our adversary

20  system in which the lawyers act as advocates for the

21  competing parties.

22          And as an advocate, a lawyer is ethically and

23  legally obligated to zealously assert his or her client's

24  position under the rules of our adversary system.  And by

25  presenting the best case possible on behalf of their

1  clients, the lawyers hopefully will enable the jury to

2  better weigh the relevant evidence, to determine the truth,

3  and to arrive at a just verdict based on that evidence.

4       This system of justice -- this adversary system of

5  justice has served our nation well for over 200 years.

6  America's lawyers have always been, continue to be, and

7  will in the future be an integral part of our system.

8       So as we go forward with the trial in this case,

9  even though it's possible that I might frown from time to

10  time, or even roll my eyes at the lawyers, it's simply

11  because I'm trying to make sure that their advocacy doesn't

12  get outside the boundaries of our adversary system.

13       But please keep in mind, they are doing their

14  jobs, and I think it's important for all of you to be aware

15  of that as we go forward.

16       Also, ladies and gentlemen, during the course of

17  the trial for which this jury is going to be selected, I

18  will do my very best to make sure that no one on the jury

19  knows what I think about the evidence, because determining

20  the facts from the evidence is the jury's job.  It is not

21  my job.

22       Therefore, if you're on this jury, you should not

23  take anything you see or hear, or you think you see or hear

24  as coming from me, as something to consider or a factor to

25  take into account in determining the ultimate facts of the

1   case.

2        (The following was held in the second voir dire

3   proceeding.)

4        (Recess.)

5        (Venire panel in.)

6        COURT SECURITY OFFICER:  All rise.

7        THE COURT:  Be seated, please.

8        Good afternoon, ladies and gentlemen.  We're about

9   to engage in the selection of our second jury today.

10        At this point and on the record, I'll call for

11   announcements in the case of GREE, Inc., versus Supercell

12   Oy, Civil Case No. 2:19-CV-237, 2:19-CV-310, and

13   2:19-CV-311.

14        What says the Plaintiff?

15        MR. GILLAM:  Good afternoon, Your Honor.  Gil

16   Gillam, Steve Moore, and Jamie Laird is with us here as

17   well, Your Honor, for GREE, and we're ready to proceed.

18        THE COURT:  Thank you.

19        What says the Defendant?

20        MR. DACUS:  Good afternoon, Your Honor.  Deron

21   Dacus here with Mike Sacksteder on behalf of Supercell.

22   And at the table with us, Your Honor, is Mr. Greg Harper,

23   who is the general manager and the chief officer in charge

24   of Supercell's U.S. operations.

25        THE COURT:  All right.

1          MS. DACUS:  And we're ready to proceed, Your

2    Honor.

3          THE COURT:  Thank you.

4          As we discussed this morning, ladies and

5    gentlemen, this case is a case involving patent

6    infringement, or allegations of patent infringement, where

7    the Plaintiff contends the Defendant -- in this case the

8    Plaintiff is GREE, and the Defendant is Supercell -- where

9    the Plaintiff contends that the Defendant has infringed

10   patents that it owns and the Plaintiff seeks money damages

11   for that alleged infringement, and the Defendant contends

12   that it does not infringe any of the Plaintiff's patents

13   and that one or more of the Plaintiff's patents are

14   invalid.

15         Now, all of my instructions I gave this morning,

16   including the burdens of proof, and everything you heard

17   from the Court this morning will apply in this case, as

18   well.

19         All right.  Mr. Gillam, at this time, you may

20   address the panel on behalf of the Plaintiff.  Would you

21   like a warning on your time?

22         MR. GILLAM:  Yes, Your Honor.  Five minutes,

23   please.

24         THE COURT:  All right.  Proceed when you're ready.

25         MR. GILLAM:  Thank you, Your Honor.

1          Good afternoon, everybody.  My name is Gil Gillam.

2    I am one of the lawyers that represents our client in this

3    case, GREE.

4          Let me echo what the other lawyers said to you

5    this morning, and I know I speak for everybody here today,

6    how much we appreciate you spending your day with us today,

7    participating in the jury process.  It doesn't -- our

8    system of justice doesn't work without you.  So thank you

9    very much, particularly on behalf of myself and our client.

10          Let me introduce to you a couple of people I did a

11    few moments ago.  This is Steve Moore.  Mr. Moore will be

12    trying this case along with me.

13          And you'll also be meeting another attorney named

14    Taylor Ludlam, and she will be here during the trial of

15    this case.

16          This is Jamie Laird who is assisting us here

17    today, as well.

18          And our client representative will be here later

19    this afternoon for opening arguments, and his name is Eiji

20    Araki.

21          And so let me proceed now and do what the other

22    attorneys did this morning and give you just a few moments

23    that are -- or talk to you for just a few moment that Judge

24    Gilstrap has given us to tell you a little bit about the

25    case and a little bit about why we're here.

```
 1              First of all, I'll do what the other lawyers did,
 2    as well.  I live in Longview, Texas.  I've practiced law
 3    here in Marshall for a little over 40 years now.  I do
 4    practice with Melissa Smith, who you met earlier this
 5    morning.  And we've been practicing together for about 25
 6    years now.
 7              I grew up in Bryan-College Station, went to Baylor
 8    undergrad, went to Baylor Law School, as well.  I have
 9    three children.  They're all adult children.  And I have
10    three grandchildren.  And I have served on two juries.  I
11    was on a DWI case once, and then I was on a case where we
12    spent all day long trying to figure out whether or not
13    somebody had illegally parked at a Walmart over on Fourth
14    Street in Longview.
15              This case that you're going to hear today or,
16    actually, beginning today and into next week -- all cases
17    are important, but I will tell you that I think you're
18    going to find this case more interesting and probably more
19    substantive than that particular case was.
20              So let me tell you a little bit about our client,
21    GREE.  GREE is an innovative media and gaming company that
22    is headquartered in Tokyo, Japan.  It's got about 1,700
23    employees, and it has about 1,800 patents or patent
24    applications worldwide.
25              To understand a little bit about GREE and its
```

1  history, you've got to go back to the early 2000s.  At that

2  time, you may remember, social media was just sort of

3  kicking off at that time.  You may remember MySpace, things

4  of that ilk.  Video gaming at that time was on consoles,

5  like Xbox and Nintendo, that kind of thing.

6        You had multi-player play, but it was basically,

7  if you're going to have that, it was controllers in the

8  same room with people playing in the same room.

9        Games themselves were very expensive at the time.

10  And if you went out and bought a game, it was, say, $50.

11  And if you didn't like it, then it was -- it could be a

12  difficult proposition for you.  But if you spent $50, then

13  you were stuck with the game.

14        Well, GREE claim along, and it actually started a

15  social media platform back in, I think, 2004, and it worked

16  on creating a brand new way of multi-player communication

17  through social video games played on multiple devices.  And

18  that's how GREE has grown over the years.

19        This was right before smartphones that we have

20  today.  In fact, GREE did one of the first mobile social

21  media games in 2007 called Fishing Star.  It was one of the

22  first ones that was out there, and it's still out there

23  today.

24        So why are we here?  Well, as you figured out, and

25  as Judge Gilstrap told you, this is a patent case.  It is

1    about six patents issued by the United States Patent Office

2    to our client, GREE.

3          And the patents in this case relate to GREE's

4    innovations in the area called freemium games -- freemium

5    games.  And what these are, are games that you can download

6    and play for free, but then if you want to then gain

7    additional features or go further in the games, you will

8    pay to go further than that.

9          So instead of going down to Game Stop and spending

10   50 bucks on a game and you don't like it, you're stuck with

11   it, freemium allows you to take a game, play it for free,

12   and then move on and play -- or pay as you move along, if

13   you want to do so.

14         It's GREE's position in this case that the

15   Defendant in this case, Supercell, who is seated at this

16   table over here, is trespassing upon our patents.  They're

17   using our patents without permission in the games that it

18   has come up with.  That's it in a nutshell.

19         It's also our position in this case that Supercell

20   has made a lot of money from its games that uses our

21   patents.  So very simply, the case is basically about this.

22   We're going to present evidence to you of that infringement

23   or trespass, and then we're going to sort through the money

24   that Supercell has made as a result of using our patented

25   technology.

1           THE COURT:  Mr. Gillam --

2           MR. GILLAM:  Yes, Your Honor.

3           THE COURT:  -- you need to move on.

4           MR. GILLAM:  Yes, Your Honor.

5           That's our position in this case.

6           Now, let me move to the questions I've got for

7  you.  Not every case, as we talked about this morning, is

8  right for everybody.  We always understand that.

9           So let me try to get to know you a little bit

10 better.  I will tell you that some people think that if you

11 sit out there quietly, it's the best way to not get picked

12 for a jury.  I can promise you, that is not the way to not

13 get picked for a jury.

14          So I would like you to be as open with me this

15 afternoon as you were with the other attorneys this

16 morning, and as I'm sure you will be with Mr. Dacus here in

17 a few moments.

18          Does anybody know Mr. Dacus, who is seated over

19 here?  Mr. Dacus, Deron Dacus, and his wife, Shannon,

20 practice law in Tyler, Texas.  Does anybody know them?

21          VENIRE MEMBER:  Yes.

22          MR. GILLAM:  Okay.  Yes, ma'am?

23          VENIRE MEMBER:  Well, the last time I was here, he

24 was actually on the case.

25          MR. GILLAM:  Okay.  And which case -- let's see,

1   this is Juror No. 8?

2          VENIRE MEMBER:  Yes.  Yes, sir.

3          MR. GILLAM:  No. 8, and you're Ms. Rich?

4          VENIRE MEMBER:  Yes.

5          MR. GILLAM:  Ms. Rich, did you serve on a jury in

6   that case?

7          VENIRE MEMBER:  Yes.

8          MR. GILLAM:  Okay.  And was that a patent

9   infringement case?

10          VENIRE MEMBER:  Yes, sir.

11          MR. GILLAM:  And did you reach a verdict in that

12   case?

13          VENIRE MEMBER:  Yes, sir.

14          MR. GILLAM:  Do you remember if the verdict was

15   for the Plaintiff or for the Defendant in that case?

16          VENIRE MEMBER:  I think it was for them, yes.

17          MR. GILLAM:  For Mr. Dacus's side?

18          VENIRE MEMBER:  For --  yes, yes, yes sir.

19          MR. GILLAM:  Do you remember whether he

20   represented the Defendant or the Plaintiff in that case?

21          VENIRE MEMBER:  I don't.

22          MR. GILLAM:  Let me ask you this question.

23          VENIRE MEMBER:  Okay.

24          MR. GILLAM:  Do you recall whether or not you

25   awarded damages in that case?

1          VENIRE MEMBER:  I really can't say.  I would hate

2     to say.  I mean, I really don't.  I just remember it was --

3     it was not guilty.

4          MR. GILLAM:  Okay.  Okay.  I Understand.  Thank

5     you.  I think that -- I think I understand that.

6          VENIRE MEMBER:  Yeah.

7          MR. GILLAM:  Thank you, ma'am.

8          Well, let me ask you this question while you're

9     up.  I don't believe I've ever had the pleasure of meeting

10    you before, but you've obviously seen Mr. Dacus, who is an

11    excellent lawyer, work in the courtroom before.  But

12    anything about the fact that you have seen him as an

13    attorney that might have his side start up ahead of mine in

14    some way?

15         VENIRE MEMBER:  Not -- I mean, not -- I don't

16    guess so.  I mean, I would just probably have to hear both

17    sides.

18         MR. GILLAM:  Fair enough.  Thank you, ma'am.

19         Anybody else that knows Mr. Dacus or his firm out

20    of Tyler?

21         They're also represented by Mike Sacksteder, who

22    is seated over here.  You'll also hear from a couple of

23    other attorneys, Bryan Kohm and Shannon Turner, and they're

24    from a San Francisco law firm.  I'm assuming, unless I see

25    a hand, that nobody knows them.  Anybody?

```
 1              Okay.  We went through this exercise this morning,

 2   but because we've sort of shuffled the deck -- chairs here

 3   for a minute, let me ask you again, who knows -- out of

 4   this group, who knows each other in this particular case?

 5   Anybody?

 6              All right.  Mr. -- let's see, Mr. Thomason, do you

 7   know, behind you, Ms. --

 8              VENIRE MEMBER:  I know Ms. Rich, Ms. Haugh, and

 9   Mr. Pierce, who is over there.

10              MR. GILLAM:  Okay.  Thank you, sir.

11              Ms. Haugh, Ms. Pierce -- or Mr. Pierce and

12   Ms. Rich.

13              Anybody else that knows people?

14              Okay.  Mr. Williams, who did you know, sir?

15              VENIRE MEMBER:  I know Mr. Belt.

16              MR. GILLAM:  Mr. Belt.  Okay, sir.  Thank you.

17              Did I miss any hands?  Okay.

18              Ms. Jones, I don't think you were up toward the

19   front this morning, I don't believe.  Who do you know,

20   ma'am?

21              VENIRE MEMBER:  My neighbor.  My neighbor.

22              MR. GILLAM:  Okay.  And it's -- which one is that?

23   Back there --

24              VENIRE MEMBER:  No. 18.

25              MR. GILLAM:  Ms. Waddell?
```

```
 1              VENIRE MEMBER:  Uh-huh.

 2              MR. GILLAM:  All right.  Thank you, ma'am.

 3              And were there any other hands that I missed?

 4    There's another one back here.

 5              Okay, sir.  That is Mr. -- is it Mr. Donald?  No,

 6    not Mr. Donald.  Which hand do I have here?  Which juror

 7    number is that, sir?

 8              VENIRE MEMBER:  15.

 9              MR. GILLAM:  No. 15.  Okay.  No. 15, you're

10    Mr. Belt?

11              VENIRE MEMBER:  I'm Mr. Belt.  I know --

12              THE COURT:  Let's use the microphone, please.

13              VENIRE MEMBER:  I know Mr. Williams and Mr.

14    Brotherton.

15              MR. GILLAM:  Okay, sir.  Thank you.

16              The Defendant in this case, Supercell, that I

17    mentioned to you a few moments ago, is a company from

18    Finland.  Has anybody heard of Supercell before today?

19              And let me go ahead and tell you this.  A number

20    of you said that you have played some of the Supercell

21    games, and so I'm going to get into that in a few moments.

22              But has anybody, other than the games themselves,

23    heard of Supercell, or is that the way that you've heard of

24    them?  Anybody heard of Supercell other than the games?

25    Okay.
```

 1              Now, let me step back then.  How many have heard

 2    of Supercell because you've played some of their games?

 3              And that is Mr. -- is it Mr. Reynolds?

 4              VENIRE MEMBER:  Yes, sir.

 5              MR. GILLAM:  Mr. Reynolds, No. 24, and what other

 6    person did I see at the very back?  That'd be Mr. Turner,

 7    is it -- Ms. Turner, I'm sorry. No. 29 -- Ms. Turner.  And

 8    Mr. Pierce.

 9              And then is it Mr. Shaver?  Okay.

10              Any other -- any others that I missed here?  Thank

11    you.

12              Now, I don't have anything -- anything bad to say

13    about any of those games, but I do want to ask a couple of

14    you some of the questions.  Let me see the hands again for

15    those of you that have played some Supercell games.  And I

16    want to concentrate, if I could here.  Let me ask you,

17    Mr. Reynolds, if I could.

18              Mr. Reynolds, what Supercell games have you

19    played?  I'm particularly interested in Clash of Clans, Hay

20    Day, Clash Royale, any of those, sir?

21              VENIRE MEMBER:  Clash of Clans.

22              MR. GILLAM:  Are you in a clan, sir?  And this may

23    not mean anything for those of you that don't play it, but

24    I'm asking you specifically about the game.

25              VENIRE MEMBER:  No, not anymore.  I stopped

 1   playing around 2012.

 2           MR. GILLAM:  Okay.  Did you spend any money -- I

 3   talked about them being free to start off with and then

 4   being able to spend any -- did you spend any money to

 5   progress in the game?

 6           VENIRE MEMBER:  I did not, but I know that a lot

 7   of people did that I was around and played with.

 8           MR. GILLAM:  Okay.  Did you ever participate in a

 9   clan war?

10           VENIRE MEMBER:  No, I did not.

11           MR. GILLAM:  Okay.  Thank you.

12           And could I see the other hands that were -- that

13   I saw earlier?

14           No. 27.  I may get to No. 27.

15           Let me ask -- Mr. Shaver, let me ask this

16   question, sir:  Which game did you play, sir?

17           VENIRE MEMBER:  The Clash of Clans.

18           MR. GILLAM:  Were you part of a clan?

19           VENIRE MEMBER:  No, sir.

20           MR. GILLAM:  Did you spend any money to move

21   forward in the game process?

22           VENIRE MEMBER:  No, sir.

23           MR. GILLAM:  Okay.  Didn't -- weren't

24   participating in a clan war either?

25           VENIRE MEMBER:  No, sir.

```
 1              MR. GILLAM:  Okay.  Thank you, sir.

 2         How many of you on the panel -- I'm sure we're

 3  going to get a lot of hands over this, but how many of you

 4  own real estate of one form or another?

 5         Okay.  Who believes -- and let me see a show of

 6  hands once you -- once you -- once I ask you this question,

 7  but who believes that you got every right to keep people

 8  off your property if you find that they're trespassing?

 9  Who doesn't believe that?  Anybody that doesn't believe

10  that you have a right?

11         Mr. Reynolds, could I talk to you for just a

12  second?  If you own a piece of property and it's your

13  property and somebody trespasses on it, tell me how you

14  feel about that.

15              VENIRE MEMBER:  Well, I mean, I might own property

16  legally, but the land doesn't belong to anyone.

17              MR. GILLAM:  Okay.  If you own the property

18  legally and somebody trespasses on your property, do you

19  believe that you would have the right to file a lawsuit to

20  stop them from doing so?

21              VENIRE MEMBER:  I believe I have the right to, but

22  I would not.

23              MR. GILLAM:  You would not do so.  I understand.

24         And that's because why, sir?

25              VENIRE MEMBER:  I just don't believe that people
```

1   have rights to own land that's not theirs.

2          MR. GILLAM:  Okay.  Thank you, sir.  Appreciate

3   that.

4          Anyone else that are landowners that feel the same

5   way, that if you're a landowner and you own some property,

6   that filing a lawsuit is not the way to keep somebody off

7   your land if you think they're trespassing?  Anybody?

8          Ms. Visage, let me ask you a question.

9          You're from Longview?

10         VENIRE MEMBER:  Yes.

11         MR. GILLAM:  Did you do a turn at the Bargain Box

12   or two?

13         VENIRE MEMBER:  I have.

14         MR. GILLAM:  The reason I'm asking you that,

15   Ms. Smith has done so, as well.  And then my wife, as well.

16         Did you know Ms. Smith from the Junior League

17   stuff in Longview?

18         VENIRE MEMBER:  I was active about 10 years ago,

19   so I don't remember.

20         MR. GILLAM:  Okay.  All right.  Thank you, ma'am.

21         Do you remember the question this morning, and I'm

22   not going to go through the whole list of questions, but

23   generally, I want to talk to you about the area of too many

24   lawsuits.

25         How many thought there were too many lawsuits?

1  There were a bunch of hands this morning.

2        All right.  Can I see the hands?  Raise them real

3  high if you think there are too many lawsuits.

4        Okay.  I don't know if you remember the discussion

5  this morning, but one of the prospective jurors this

6  morning said:  I think there are too many lawsuits.  And I

7  think the -- in answer to the question, it would be

8  difficult to say that the person bringing the lawsuit is

9  starting even.  Do y'all remember that discussion from this

10  morning, that she would start a little bit farther behind?

11        Is there anyone that believes that generally, that

12  because there are so many lawsuits out there -- and we are

13  obviously in the role of the Plaintiff in this case.  Is

14  there anyone that believes that because there's too many

15  lawsuits, that we sort of start off behind a little bit as

16  we get started here today?  Anyone?

17        There was another question that was asked this

18  morning.  Another gentleman said:  Listen, I think there's

19  too many lawsuits, but we're going to start even.

20  Everybody is going to start in the same place.  Everybody

21  is going to start equal.

22        How many of you feel that way as we get started

23  here today?

24        Anybody that doesn't feel that way, I need to see

25  your hand, please.

1             Okay.  Yes, ma'am.  Ms. Pendley?  Tell me about

2     that, please, ma'am.

3             VENIRE MEMBER:  I'm actually kind of flip-flopped

4     from what you were asking us about.

5             MR. GILLAM:  Okay.

6             VENIRE MEMBER:  While I do adamantly believe

7     there's too many lawsuits, in this particular case -- I

8     mean, I kind of agree with the too many McDonald's

9     lawsuits.

10            MR. GILLAM:  Yes, ma'am.

11            VENIRE MEMBER:  In this particular case with

12    patent laws, I really tend to lean a lot more towards the

13    people who started with the intellectual property.

14            MR. GILLAM:  Okay.

15            VENIRE MEMBER:  So I would say that size, like on

16    second or third.

17            MR. GILLAM:  Okay.  Okay.  Understood.  Thank you,

18    Ms. Pendley.  I appreciate you raising that for us.

19            Is there anyone, though, that feels that, look,

20    because there are so many cases out there, we start a

21    little bit behind as we get started here?

22            Yes, ma'am.  Ms. Haugh, we talked to you this

23    morning about that, correct?

24            VENIRE MEMBER:  Yes, sir.

25            MR. GILLAM:  Yes.  And you feel the same way now

```
 1   as you felt this morning?
 2           VENIRE MEMBER:  Yes, sir.
 3           MR. GILLAM:  Okay.  Anyone else that feels like
 4   Ms. Haugh as we begin here today?
 5           Yes, sir.  That would be Mr. -- Mr. Thomason, you
 6   do, as well, sir?
 7           Any other hands?
 8           Thank you, sir, for your honesty.
 9           MR. GILLAM:  Anybody like Ms. Haugh or
10   Mr. Thomason, as we begin here starting today?
11           GREE is a Japanese company.  It's a company that's
12   headquartered in Japan.
13           Now, Supercell is headquartered in Finland.
14           We're here in the United States District Court
15   because these are United States patents that were issued,
16   as I mentioned to you, to GREE by the United States Patent
17   Office.  And if someone alleges that someone is using a
18   United States patent in the United States, that's where the
19   cases are brought, are in a United States District Court.
20           But I need to ask you, and this is sort of a
21   flavor of what we talked about earlier this morning.  Is
22   there any of you that believe that because my client is
23   from Japan, is not a United States company, that it causes
24   you any trouble, as far as them bringing this lawsuit here
25   in the United States?  I need to see a show of hands,
```

1   please.  Anyone?

2            I'd rather hear it from you today than I would a

3   week from now when this case is over, okay?

4            Yes, ma'am, Ms. Haugh?

5            VENIRE MEMBER:  Now, why are they bringing it?

6            MR. GILLAM:  If you have a United States patent.

7            VENIRE MEMBER:  It's because it's a United States

8   patent, they have to bring it here --

9            MR. GILLAM:  And --

10           VENIRE MEMBER:  -- for trial.

11           MR. GILLAM:  -- if you allege infringement in the

12   United States, you bring it in the United States, that's

13   where you bring it.  Does that cause you any trouble?

14           VENIRE MEMBER:  No.

15           MR. GILLAM:  Okay.  Thank you.

16           Anybody else?

17           Ms. Rich, can I talk to you for just a moment

18   again?

19           I believe I read on your questionnaire that you

20   believe that foreign countries and businesses were

21   detrimental to the U.S. economy in some way.

22           VENIRE MEMBER:  Yes, sir.

23           MR. GILLAM:  Do you recall that?

24           VENIRE MEMBER:  Yes, sir.

25           MR. GILLAM:  Well, this is a company that's from

1   Japan.  Does this --

2           VENIRE MEMBER:  Well --

3           MR. GILLAM:  -- cause you any issue -- or should I

4   be concerned about that, as we begin this trial, because of

5   those feelings that you have?

6           VENIRE MEMBER:  I would hope not, you know.  I

7   mean, I understand that there's going to be stuff that -- I

8   mean, I know that Japan is going to be coming, but I'm --

9   the question, why I said it -- the way I said it -- I guess

10  the way I read it -- I'm sorry, I'm a little nervous -- is

11  that I feel like -- that as being in a business that I am

12  in, that I can see small businesses, and they're taking

13  over some of our small businesses, is the way I was going

14  around.

15          MR. GILLAM:  Okay.

16          VENIRE MEMBER:  If that makes sense.

17          MR. GILLAM:  All right.  I understand.  Thank you

18  for being honest with me about that.  Should that give me

19  some concern based on the limited amount that you know

20  about who GREE is, where they're from, and what they do?

21          VENIRE MEMBER:  I should hope not.  I mean, I

22  should -- I mean, I feel like I could be okay with that.

23  You know what I'm saying, bias of it, so...

24          MR. GILLAM:  Okay.  Well, as far as you know,

25  that's not going to put me behind starting off?  That's

1  what I need to know.  Or if it is, that's perfectly okay,

2  we just need to know it as we go through this little

3  process here.

4          VENIRE MEMBER:  I should hope not.

5          MR. GILLAM:  Well --

6          VENIRE MEMBER:  I mean -- I mean, I -- I really

7  don't know because I haven't really heard.

8          MR. GILLAM:  Sure.

9          VENIRE MEMBER:  You know, I would like to hear --

10  I mean, you know, if I get picked, I can hear both sides.

11          MR. GILLAM:  Yes, ma'am.

12          VENIRE MEMBER:  And I can make a -- you know --

13  but they don't know me --

14          MR. GILLAM:  Yes, ma'am.  Let me -- let's limit it

15  just to the fact that my client is from Japan.  Does that

16  cause a problem for you?

17          VENIRE MEMBER:  Not really.

18          MR. GILLAM:  Okay.  Thank you, ma'am.

19          Anybody else that feels that way as Ms. Rich?

20          Does everybody agree that if you're a foreign

21  company, whether you're selling products in the United

22  States -- and this goes to both sides -- whether you're

23  selling products in the United States, that you ought to

24  have to respect or play by the United States patent rules?

25  Who believes that?

```
 1              Anybody disagree with that?  Anybody?

 2              Now, you're going to hear a lot about video games

 3    in this case, a lot.  And I notice that a number of you had

 4    written down some negative comments about video games on

 5    your questionnaires.

 6              Who has negative feelings -- some negative

 7    feelings about video games in general?  Could I see a show

 8    of hands?  And let me -- let's keep those up for me, if you

 9    could.  And I'm sorry if I can't see the numbers.

10              But Ms. Pendley is No. 6?

11              Okay.  And who else did I get?  Mr. --

12    Mr. Thomason, No. 10.

13              And who else did I see?  Ms. Visage, No. 3.

14              Who am I missing?  Mr. Cook, No. 7.

15              Ms. Rich, No. 8.

16              Ms. Haugh, No. 17.

17              And who have I missed back here?  Is it Ms. -- is

18    it No. 23, Ms. Booth?  Is that the number?

19              Mr. Donald, No. 22.

20              Ms. Bert, No. 30.

21              THE COURT:  You've got five minutes remaining,

22    counsel.

23              MR. GILLAM:  Okay.  Thank you.

24              Mr. Cook, let me ask you, sir, tell me -- tell me

25    what your concerns are.
```

1          VENIRE MEMBER:  It's just my opinion that I think

2    that the games are bad for a young mind, and that's pretty

3    much it.  Besides the -- they've gotten extra gory, and I

4    just don't think it's good for people.

5          MR. GILLAM:  Okay, sir.  Thank you.

6          Anyone feel -- that raised your hands, anyone feel

7    differently or have another reason, other than what

8    Mr. Cook told us?  For those of you that raised your hands?

9    Anybody?

10         We think the evidence in this case is going to

11   show you that Supercell games have made about $2.87 billion

12   in the United States.  The damage number that we're asking

13   for in this case is $61 million in past damages.  Or if you

14   add future damages to it, it comes to $92 million, but

15   we'll explain those ranges to you.

16         But is there anyone on the jury panel that says, I

17   don't care what the evidence is, as far as what happened

18   here, those are numbers that you're throwing out there that

19   I simply cannot go with?

20         Let me reverse it for you.  If the evidence

21   supports those kind of numbers that I just said, 61 to $92

22   million, could you award that number if the evidence showed

23   that?  Can I see a show of hands?  If the evidence

24   supported that number?

25         Anyone that could not if the evidence supported

1  it?

2       I'm going to end up like the other two lawyers

3  ended up this morning, and that is, you get to the end of

4  this process, and you think, okay, I've heard what you

5  said, I've heard a little about the case, but you didn't

6  ask me that one question.

7       Is there anything that any of you have gnawing at

8  you right now, based on what you've heard so far, that

9  says, you know what, there's something that fellow didn't

10  ask me that he would want to know that's going to be a

11  factor as to whether or not -- yes, sir, No. -- 11?

12          VENIRE MEMBER:  Yes, sir.

13       Personally, I understand what type of games both

14  companies make.  You called them freemies.  Typically, in

15  the gaming community, they would -- we would call them

16  pay-to-win games.  I personally don't like those games at

17  all.  So I couldn't be really partial to either party for

18  either desire in the outcome.

19          MR. GILLAM:  Okay, sir.  And you're No. 11?

20          VENIRE MEMBER:  11.

21          MR. GILLAM:  Either side?

22          VENIRE MEMBER:  That's right.

23          MR. GILLAM:  Okay.  And No. 27 back there; is that

24  right, sir, Mr. Shaver?

25          VENIRE MEMBER:  My opinion is almost exactly the

1    same as his.  I don't -- my young son, he plays video

2    games, and some of them -- you know, they have the

3    pay-to-win or they're called loop boxes, and it makes

4    younger children think, oh, if I spend this kind of money,

5    I'll be better, I'll do better at the games.  So I don't

6    feel I'd be impartial to either side.

7           MR. GILLAM:  That's the kind of thing I need to

8    know.  Any other reasons that you can think of?

9           Yes, ma'am, Ms. Booth?

10          VENIRE MEMBER:  Yes.  I feel the same way they do.

11   I would be biassed, too.

12          MR. GILLAM:  Okay.  All right.

13          Anybody else?  Anybody else?

14          Yes, ma'am, Ms. Pendley?

15          VENIRE MEMBER:  I have to say, as you can see on

16   my questionnaire, I don't really do video games.  And so

17   some of that was news to me, but having heard that, if this

18   is a pay-to-win-type thing, that sounds really bad.

19          MR. GILLAM:  I understand.  Okay.

20          Any other reasons that I -- any other hands that I

21   missed out there?

22          Anybody know what open source means?  Anybody?

23   Okay.  We got a couple of hands in the very, very back.

24   Okay.  All right.

25          Yes, sir, Mr. Williams, you do, as well?

1          Any other hands that I missed there?

2          Okay.  Thank you very much for visiting with me,

3     and I also look forward to working with those of you that

4     are selected as jurors in this case.  Thank you.

5          THE COURT:  All right.  Mr. Dacus, you may address

6     the panel.

7          MR. DACUS:  Thank you, Your Honor.

8          THE COURT:  Mr. Holbrook, would you put your mask

9     back on, please?  Thank you.

10         Go ahead, counsel.

11         MR. DACUS:  Thank you, Your Honor.

12         Well, as I was sitting there, I was thinking you

13    may need to ice your arms this -- tonight because we keep

14    asking you to raise your arms so many times.  So I'll ask

15    you a question that you probably won't need to raise your

16    arms for.  How many of you are excited to hear from one

17    more lawyer today?  Raise your arm high.

18         Okay.  That's kind of what I thought.

19         Now, let me say that Supercell and the 300 men and

20    women that work at Supercell are just as unhappy to be

21    here.  Mr. Williams and others told us this morning that

22    they had in the course of their life been falsely accused

23    and that they had the right to stand up for themselves.

24         And Supercell certainly believes that it has the

25    right to stand up and defend itself in a federal courthouse

1   in Marshall, Texas, when it believes it's been falsely

2   accused.

3          As I said to you earlier, I'm Deron Dacus.  I'm a

4   lawyer over in Tyler.  I actually grew up in Gilmer,

5   graduated from Gilmer High School.  Was fortunate enough to

6   get a baseball scholarship and go to Texas A&M.  I was

7   fortunate enough to graduate.  Went to Baylor Law School,

8   same place that the Judge went, where I met my wife, who

9   was also in law school.  We've now been married for 27

10  years, have two college age kids.  And we've been in Tyler

11  now for about 25 years or so.

12         The Judge is -- as you know, allows each side to

13  kind of give an overview of how they see things and how

14  they see the case.

15         So I want to take just a few minutes to do that.

16         Supercell is a company that was started in 2010.

17  It was started with very humble beginnings, literally, in a

18  single-room office with chairs but no desks, with a few

19  programmers working on creating games with the thought that

20  they could create games that would be highly successful and

21  would be family-oriented.  And to a large degree, they have

22  been successful.

23         Since 2010, they have five games that they've put

24  into the marketplace, and those games have been enjoyed by

25  literally millions of people in the United States and

1    worldwide.

2         Those games, or at least the ones that are at

3    issue in this case, as you've heard, are Clash of Clans,

4    Clash Royale, and another game that I don't think we've

5    heard, but called Hay Day.  Those are the games that these

6    folks claim use their patents.

7         Now, the folks at the other table who brought this

8    lawsuit, GREE, they have a fairly different story.  As they

9    said, they're a Japanese company.  They started out as a

10   social networking company, which basically means that's

11   Facebook and those type of things.  In fact, I think they

12   generally call themselves -- and I'm sure they'll say it in

13   this trial, they refer to themselves as the Facebook of

14   Japan.

15        They got into this mobile gaming business sometime

16   after they became this sort of social networking phenomenon

17   in Japan.  And although their gaming business was

18   successful in Japan, when they brought it to the United

19   States, it largely was unsuccessful.  In fact, in 2017,

20   they withdrew or closed their offices in the United States

21   because of the lack of success of their games.

22        Now, here in this courthouse, they claim that

23   Supercell uses or infringes six of their patents.  If you

24   sit on this jury, we're going to put evidence in front of

25   you, employees from Supercell, experts for Supercell are

1 going to testify and show you that, in fact, we do not use

2 these patents.  We do not infringe these patents.

3          And indeed, as you heard from the video this

4 morning, you're the ultimate determiner -- you're the

5 ultimate arbiter of whether or not these patents are valid.

6          And four of these six patents are not valid.  They

7 don't contain inventions or ideas that are new.  It's

8 something that the Patent and Trademark Office should have

9 never issued.  And as you've heard from the video this

10 morning, that's your ultimate determination, and you're

11 going to hear evidence in this case that the Patent and

12 Trademark Office never had before it or in front of it.

13          Now, just to make sure we've closed the loop on

14 who knows whom in the courtroom today, Steve Moore works at

15 the law firm -- here at the GREE table -- of Kilpatrick

16 Townsend.  Mr. Moore, I think, is in the San Francisco

17 office, but they have offices all over the country.  Does

18 anybody know Mr. Moore or the Kilpatrick Townsend law firm?

19 If you do, would you raise your hand and let me know?

20          Okay.  Good, I don't see any hands.

21          As Mr. Gillam also said, GREE is located in Japan.

22 And as you might expect, I want to make sure that when

23 we're seating eight fair and impartial jurors, that we

24 don't have any folks that will be partial to them or favor

25 them because they are a Japanese company.  So has anyone

1   ever lived in Japan?  If you have, would you raise your

2   hand and let me know?

3           Okay.  I don't see any hands.

4           Does anyone speak Japanese, raise your hand and

5   let me know.

6           And I'll tell you why I ask that.  It's because

7   they're going to have some witnesses that require

8   interpreters.  And those people speak Japanese.  And you'll

9   hear from them.

10          Yes, sir, Mr. Donald, I think you had your hand in

11  the air, sir.

12          VENIRE MEMBER:  I'm not fluent.  I just know a few

13  words from being there while I was in the service.

14          MR. DACUS:  Okay.  You were in Japan in the

15  service?

16          VENIRE MEMBER:  Yes.

17          MR. DACUS:  All right.  Well, thank you for your

18  service, sir, first of all.

19          Would the fact that you served there in any way

20  tend for you to favor them in any way?

21          VENIRE MEMBER:  No.

22          MR. DACUS:  Okay.  Thank you very much.

23          Now, I know Ms. Smith asked this morning whether

24  or not anyone had ever been falsely accused.

25          Mr. Williams, a bunch of others raised their

1  hands.  I know you raised your hand, also.  I want to ask

2  you something about that.  I'm not going to ask you the

3  details about that, but I want to ask you about something.

4          Right here, No. 2.

5          I think you said this morning, Mr. Williams, you

6  felt like you had the right to defend yourself; is that

7  right?

8          VENIRE MEMBER:  Correct.

9          MR. DACUS:  And I'm not -- as the Judge said

10  earlier, I don't want to know the details of this.  But I

11  do want to understand where you stand on things, and then

12  find out where others do, also.

13          Sometimes when folks are falsely accusing you,

14  they're asking you to sort of change what you're doing or

15  change your conduct.  Was that a similar situation to what

16  you found yourself in?

17          VENIRE MEMBER:  Correct.

18          MR. DACUS:  And did you feel like you had the

19  right to say, no, I'm not going to change what I'm doing,

20  I'm going to stick to my guns because I'm right?

21          VENIRE MEMBER:  Correct.

22          MR. DACUS:  And you understand that's the position

23  that Supercell is in this lawsuit.  These folks are saying:

24  Hey, you need to change your conduct.

25          And we say:  No, we don't because we're not doing

1    anything wrong.

2          Do you understand that?

3          VENIRE MEMBER:  Correct.

4          MR. DACUS:  Now, here -- thank you, sir.  I

5    appreciate it very much.

6          So here's what I need to know from everyone.  Does

7    anyone disagree with what Mr. Williams says and what

8    Supercell is saying in this lawsuit, and that is, look, we

9    don't think we've done anything wrong, and we think we have

10   the right to defend ourselves and not roll over or cower?

11   Anybody disagree with that in general?

12         Ms. Reed, I don't think we've heard from you.  Let

13   me ask you.  I'm not picking on you.

14         That's No. 5 -- Juror No. 5.

15         VENIRE MEMBER:  Would you ask the question again,

16   please?

17         MR. DACUS:  I will be happy to.  I hope I do a

18   better job.

19         What Mr. Williams said is:  Look, just because

20   someone accuses you of doing something, if you really

21   believe you haven't done anything wrong, you have the right

22   to stands up and defend yourself?

23         VENIRE MEMBER:  Absolutely.

24         MR. DACUS:  Okay.  So just because Supercell finds

25   itself in this courthouse, you don't lean towards saying,

 1  oh, they must have done something wrong --

 2          VENIRE MEMBER:  No.

 3          MR. DACUS:  -- just because they're here to defend

 4  themselves; is that a fair statement?

 5          VENIRE MEMBER:  Yes.  I'd want to hear the whole

 6  thing, but, yes, generally speaking, that is correct.

 7          MR. DACUS:  Absolutely.  And thank you for raising

 8  that.  Thank you very much, ma'am.  So thanks for raising

 9  you'd want to hear the whole thing.

10          VENIRE MEMBER:  Right.

11          MR. DACUS:  So that -- the other question that got

12  asked this morning -- I think it was Mr. Angel -- I think

13  he said he had five daughters, and he was asked whether or

14  not he accepted the first story that that first daughter

15  told him when she ran to him when they got in a scuffle,

16  and he said, no, because oftentimes the people that tell

17  the story first may not give you the full truth, may not

18  give you the truth at all, but may not give you the full

19  truth.

20          So let me -- let me talk to you, Ms. Crossland.  I

21  don't think we've had a chance to talk to you today.

22          So do you generally agree with that?

23          Ms. Crossland, I didn't write down if you had any

24  children or not.  Do you?

25          VENIRE MEMBER:  I have one son, yes.

 1            MR. DACUS:  Okay.  Well, he doesn't have anybody

 2    to fight with.  Lucky for you.

 3            VENIRE MEMBER:  Yes, I do agree with that.

 4            MR. DACUS:  Okay.  And here's why I'm asking that.

 5    The way our jury system works is the folks who bring the

 6    lawsuit get to go first.  Did you know that?

 7            VENIRE MEMBER:  No.

 8            MR. DACUS:  Okay.  So the folks here who brought

 9    the lawsuit, GREE, they get to go first.  I have to go

10    second.  Supercell has to go second.

11            So what I need you to commit to do, just like

12    Mr. Angel said he did as a good dad, is wait until you hear

13    the full story before you make a decision.  Can you agree

14    to do that?

15            VENIRE MEMBER:  Of course, yes.

16            MR. DACUS:  So thank you very much.

17            So this is what I need to know from everyone.  I'm

18    going to have to sit here -- Supercell is going to have to

19    sit here for several days and listen to GREE put on their

20    case and their evidence and bite our lip.

21            You know, it may be late Tuesday or Wednesday of

22    next week before we get to start presenting our case.  Can

23    everyone just give me some comfort by raising your hand and

24    letting me know that you'll wait until you hear all

25    evidence before you make the decision?  Everyone agree to

1    do that?

2           Okay.  Thank you.

3           Now, I'm going to ask a question, and I'm sure it

4    won't be the last one that I ask in this trial that seems a

5    little silly.  But who believes that technology plays an

6    important role and an important part of our life today?

7           Pretty much everybody, right?

8           Who agrees that technology, particularly in the

9    last decade, changes very quickly?

10          Everybody agreed to that.

11          Who believes that if you are a business in the

12   technology industry, that you better innovate and you

13   better stay up-to-date with your technology, or you're

14   going to get passed by?

15          And I'll talk about an example here.  For some of

16   you that have as much gray hair as I do, you may remember

17   those very first cell phones.  They were flip phones made

18   by Nokia.  Motorola made them, but -- made one also, but

19   Nokia made one.  Anybody remember those cell phones?

20          Okay.  Let me ask you, Mr. Cook, if I could.

21          That's Juror No. 7.

22          Do you remember in the early days of cell phones,

23   those flip phones like Nokia had, and do you remember that

24   that's the kind of phone that almost everyone had?

25          VENIRE MEMBER:  Yeah, and I kept mine forever.

1          MR. DACUS:  Did you?

2          VENIRE MEMBER:  Yeah.

3          MR. DACUS:  But you agree that probably most folks

4   that walked in here today, they probably don't have those

5   Nokia flip phones.  They probably have an Apple or some new

6   brand of a smartphone?

7          VENIRE MEMBER:  Yes.

8          MR. DACUS:  And I guess what I'm trying to get to

9   is to is, do you agree that the reason most folks have

10  Apple or some other brand of Smartphone today is because

11  folks like Nokia got passed by --

12         VENIRE MEMBER:  Yes, correct.

13         MR. DACUS:  -- their innovation?

14         Do you find anything wrong with people competing

15  in the marketplace fairly by having new innovation that may

16  surpass the people who came first?

17         VENIRE MEMBER:  Not at all.

18         MR. DACUS:  Not at all.

19         So thank you very much, sir.

20         So that's what I need to know from everyone else,

21  because I'm going to tell you, that's part of the evidence

22  that I think you're going to hear in this case.

23         Mr. Gillam stood up here and told you that these

24  folks were the first people to have mobile gaming.  I don't

25  think we need to argue about that.  I may not completely

1    disagree, but we don't need to argue about it.

2            But our position is they may have been the first,

3    but when smartphones came along, then we had better

4    innovations for mobile gaming, and our games have been more

5    successful.

6            So does anyone disagree with Mr. Cook that it is

7    appropriate to compete in the marketplace fairly by having

8    new and better innovation and technology?  Does anyone

9    disagree with that?

10           Ms. Waddell, can I ask you --

11           That's Juror No. 18.

12           Did I pronounce your last name correctly?

13           VENIRE MEMBER:  Waddell.

14           MR. DACUS:  Waddell.  Thank you.  Do you agree

15   with that, ma'am, that --

16           VENIRE MEMBER:  I agree.

17           MR. DACUS:  Okay.  If you're the first, that

18   doesn't necessarily mean you have the right to remain the

19   only.

20           VENIRE MEMBER:  If you're the first, you're not

21   going to be the last.  Things are going to change.

22           MR. DACUS:  All right.  Anyone disagree with

23   Ms. Waddell?

24           Okay.  I don't see any hands.

25           Let's see, Ms. Pendley, you act like you might

1  disagree with her?  Do you?  And it's fine.  I didn't say

2  this at the beginning.  But you know what the great thing

3  about this country is, we all get to have an opinion.  So

4  I'm happy to hear yours --

5       VENIRE MEMBER:  I do agree with fair competition,

6  like you said.  But if there is a patent, then there's also

7  such things as royalties and some of those kind of stuff

8  to give credit where credit is due.  So if the new

9  technology was based on the old technology, shouldn't we

10  get credit?

11       MR. DACUS:  Absolutely.  Yeah, you won't find any

12  argument from Supercell on that.  So thank you very much

13  for letting us know that.

14       I know that we asked this question this morning,

15  and I may not have gotten a complete answer.

16       But let's just talk about the first three rows

17  here.  The first three rows, have any of you applied for a

18  patent or have you had a very close relative apply and

19  receive a patent?  If you have, raise your hands.  Anybody

20  in the first three rows?

21       Mr. Thomason?

22       Anybody else?  Oh, you said your uncle had,

23  Mr. Hunt, correct?

24       VENIRE MEMBER:  Correct.

25       MR. DACUS:  Let me ask you this, Mr. Hunt, just so

```
 1   I can sleep easy at night.  These folks over here say they
 2   have valid patents.  Do you understand that?
 3             VENIRE MEMBER:  Yes, sir.
 4             MR. DACUS:  If -- oh, I'm sorry, Judge.  I thought
 5   you said something.
 6             If you serve on this jury, sir, can I sleep
 7   comfortable at night knowing that you're not going to favor
 8   these folks just because you have an uncle who's also
 9   applied for and received a patent?
10             VENIRE MEMBER:  Correct.
11             MR. DACUS:  You'd be willing to sit there and
12   listen to the evidence and make your decision based on the
13   evidence?
14             VENIRE MEMBER:  Sure.  Correct.
15             MR. DACUS:  Thank you very much, sir.
16             I don't think I asked you, Judge, but would you
17   let me know when I have five minutes left, please, sir?
18             THE COURT:  Yes, I will.
19             MR. DACUS:  Thank you.
20             Now, who here, before you came here today, and you
21   heard -- remember you heard the patent video this morning
22   that explained to you the patent process?  Who, before you
23   came here today, knew that a jury determines whether or not
24   a patent is valid, rather than the Patent Office?  Who knew
25   that?  Raise your hand.
```

1              Okay.  A few people did.

2              Mr. -- Ms. Hammett, that's Juror No. 13.

3              So the Judge is fond of making confessions.  I'll

4    make one, too.  Before I started doing these types of cases

5    a dozen or so years ago, I did not know that a jury made

6    that determination either.

7              So you know now from the Court's video that a jury

8    makes the ultimate determination on whether or not a patent

9    is valid.  You understand that?

10             VENIRE MEMBER:  Yes.

11             MR. DACUS:  Okay.  And before you came here, you

12   did not know that; is that fair?

13             VENIRE MEMBER:  No, I did not.

14             MR. DACUS:  Did you know, also, that this patent

15   process, like you've heard about on the video this morning,

16   is a secret process where only the people applying for the

17   patent and the Patent Office are the only people

18   participating in that process?  Did you know that?

19             VENIRE MEMBER:  I did know that.

20             MR. DACUS:  You did know that?

21             VENIRE MEMBER:  Yes.

22             MR. DACUS:  Okay.  That's good.

23             Who else knew that?  Who else knew that that

24   patent process was a secret process?

25             Okay.  Some people -- I'm not done with you,

1    Ms. Hammett.  You're not getting off that easy.

2           VENIRE MEMBER:  Oh --

3           MR. DACUS:  So here's what I want to know.  Given

4    that you now know that a jury makes that determination, and

5    you know, as Mr. Gillam has said to you, that the Patent

6    Office actually issued these folks six patents, would you

7    be willing to find that four of these six patents are not

8    valid if we prove that to you?

9           VENIRE MEMBER:  If it's proven to me a hundred

10   percent, then, yes.

11          MR. DACUS:  Well, let's talk about that hundred

12   percent now.  You remember --

13          VENIRE MEMBER:  No, no, the fair balance.

14          MR. DACUS:  Right.

15          VENIRE MEMBER:  You just got to tip it a little.

16          MR. DACUS:  And so let's stop and talk about that.

17   It's fair to say a hundred percent.  I suspect you have

18   never done any invalidity analysis on a patent before you

19   walked through that door this morning?

20          VENIRE MEMBER:  You would be 100 percent correct.

21          MR. DACUS:  Fair enough.  And so that -- so it's

22   fine to say a hundred percent.  And that's what I want to

23   make sure of now.  You remember the Judge said there's this

24   burden called clear and convincing evidence.  Do you

25   remember that?

```
 1              VENIRE MEMBER:  Yes.

 2              MR. DACUS:  So these folks have to prove it just

 3    by tipping the scale.  We've got to prove clear and

 4    convincing evidence on invalidity by tipping the scale a

 5    bit more.  Do you understand that?

 6              VENIRE MEMBER:  Yes.

 7              MR. DACUS:  And so if we put that evidence in

 8    front of you and prove that these patents are not new, that

 9    people had it before they had the idea, including Supercell

10    itself, would you be able to find that these patents are

11    invalid?

12              VENIRE MEMBER:  Yes.

13              MR. DACUS:  Okay.  And so that -- thank you very

14    much, Ms. Hammett.

15              VENIRE MEMBER:  Are you done now?

16              MR. DACUS:  For now.  For now.

17              So here's what I need to know from everyone else.

18    I mean, this is -- I mean, I'm joking with Ms. Hammett a

19    bit.  But this is a serious issue.  We would not be here if

20    this was not a serious issue for Supercell, and we would

21    not be saying that four of these patents were invalid if we

22    did not truly believe it.

23              Is there anybody here who just has a little bit of

24    reservation that says:  Look, the Patent Office issued

25    these patents.  I don't know that I can find that they're
```

1   invalid?

2        Is there anybody that just has a little bit of

3   feeling along those lines?

4        Ms. Pendley, you -- I think you've told us that

5   you're in that camp.

6        Anybody else in that camp that says, even if you

7   prove it, I don't know if I could find they're invalid?

8   Okay.  I don't see any hands.

9        And let me ask you one other question.  Who has

10  served on a criminal jury?

11       So, Mr. Williams, let me ask you -- not many

12  people raised their hands.  I apologize for getting you up

13  again.

14       Do you remember in that criminal -- did y'all find

15  the Defendant guilty or not guilty?

16       VENIRE MEMBER:  I think the case -- we went out to

17  deliberate, and when we got back in, they had already --

18       MR. DACUS:  Resolved it.

19       VENIRE MEMBER:  -- resolved it.

20       MR. DACUS:  Okay.  Were you thinking the Defendant

21  was guilty or not guilty?

22       VENIRE MEMBER:  Pretty much guilty.

23       MR. DACUS:  Yeah.  And so here's what I want to

24  ask you.  Do you remember in that case that the Judge said

25  to you that that Defendant had a presumption of innocence?

1    Do you remember him saying that?

2            VENIRE MEMBER:  Yes, sir.

3            MR. DACUS:  Okay.  And so this Judge is going to

4    tell you, and these folks are going to probably shout it

5    pretty loud, that a patent has a presumption of validity.

6    But that presumption can be overcome just like it was in

7    your criminal case.  The Defendant had a presumption of

8    innocence, but the prosecution proved to you that, in fact,

9    they were guilty, and you found they were guilty, or in

10   your mind you did, right?

11           VENIRE MEMBER:  Yes.

12           MR. DACUS:  And could you do that with respect to

13   these patents if we show you that, in fact, these are not

14   new and that they're invalid?

15           VENIRE MEMBER:  Yes.

16           MR. DACUS:  Okay.  Thank you, sir.

17           I want to touch on this issue that GREE's lawyer

18   raised about the amount of money that GREE's asking

19   Supercell to pay here.  And I think he told you it's

20   upwards of $90 million, depending on how you count it.

21           Is there anyone who believes that if they were to

22   prove to you that Supercell infringes -- we don't think

23   they can.  But if they were to prove to you that, that GREE

24   should get whatever amount of money they are asking for?

25           If you believe that, raise your hand.

1              Mr. Thomason, you agree?

2              Anybody else?

3              Ms. Pendley, you agree?

4              That's -- Mr. Reynolds and Mr. Brotherton, y'all

5      both had your hands up, right?

6              And I don't need to ask you, Mr. Brotherton --

7              VENIRE MEMBER:  Well, I'm not sure what you asked,

8      I'm sorry.

9              MR. DACUS:  Okay.  Well, let me do a better job.

10     And I apologize.  I've been doing this awhile, but I still

11     do not ask great questions.

12             So these folks say we infringe.  We say we don't.

13     But it's not my decision to make.  It's going to be your

14     decision.  So I don't know how you're going to come out.

15             But they say if Supercell infringes, they want

16     somewhere around $90 million.  So my question is:  Even if

17     you find that we infringe, do you believe that they're

18     entitled to $90 million, or to any other -- anything they

19     ask for without proving it?

20             And I may ask you, Mr. Brotherton -- hopefully

21     I've done a better job of asking the question.

22             VENIRE MEMBER:  No, I do not.

23             MR. DACUS:  Would they have to prove to you --

24             VENIRE MEMBER:  They'd have to prove.

25             MR. DACUS:  And I'll tell you that in this case

1    what you're going to find, if you sit on this jury, is that

2    these patents -- I'll say alleged patents and inventions

3    are small -- what we think are very small features in these

4    multi-faceted, multi-component games.  And so we say, even

5    if we don't infringe, the amount of money you're asking for

6    is to be diplomatic and unreasonable.  Do you understand

7    that?

8            VENIRE MEMBER:  Yes, sir.

9            MR. DACUS:  And if you sat on this jury, you'd

10   make them prove what the value of their patents were?

11           VENIRE MEMBER:  Yes, sir.

12           MR. DACUS:  Okay.  Let me ask you this,

13   Mr. Brotherton, while I have you up.  If I -- let's assume

14   that somebody had a patent on a hubcap for a car, and

15   somebody else had a patent for an engine on a car that

16   would allow the car to get a hundred miles per gallon.  Are

17   you with me so far?

18           THE COURT:  You have five minutes remaining,

19   counsel.

20           MR. DACUS:  Thank you, Your Honor.

21           VENIRE MEMBER:  Wish I had the car.

22           MR. DACUS:  That's what I was going to ask you:

23   Which of those do you think would be more valuable?

24           VENIRE MEMBER:  The engine.

25           MR. DACUS:  Right.  So you agree, sir, that even

1   folks with patents -- and we don't think four of these are

2   valid.  But even folks with patents, some patents have a

3   lot of value, and some patents don't have nearly as much;

4   is that a fair statement?

5           VENIRE MEMBER:  I would imagine that's correct,

6   sir.

7           MR. DACUS:  Okay.  Thank you, Mr. Brotherton.  I

8   appreciate it.

9           Anybody disagree with that?  Anybody disagree that

10  different patents can have different values or no value at

11  all?

12          Okay.  I'll wind up and -- where everyone else

13  did, where every other lawyer did, and that is, if you're

14  sitting there thinking that there's some reason that you

15  would not make a good juror for this case -- in other

16  words, you lean towards one side or the other for whatever

17  reason, would you just raise your hand and let me know now?

18          Yes, ma'am, Ms. Booth?

19          VENIRE MEMBER:  I just don't have any concern

20  about any type of game -- I just don't have any concern

21  about any type of gaming.

22          MR. DACUS:  Understood.  So, Ms. Booth, let me ask

23  you a question about that.  If you learn during the course

24  of this that Supercell puts out games that are what I'll

25  call family friendly or appropriate for all ages of people,

 1   would you be able to sit in --

 2          VENIRE MEMBER:  No.

 3          MR. DACUS:  I'm sorry?

 4          VENIRE MEMBER:  No, sir.

 5          MR. DACUS:  Okay.  Ms. Booth, I appreciate you

 6   being candid with me.

 7          Anybody else have anything that they think they

 8   would need to share that would impact whether or not you

 9   could be a fair juror in this case?

10          Ms. Haugh, I think we've heard from you.  Do you

11   have -- is there something additional?  Okay.

12          All right.  With that, I will sit down, Your

13   Honor, and I appreciate the time and thank you very much.

14          THE COURT:  All right.  Ladies and gentlemen, I

15   need to ask a question I asked of the earlier panel and I

16   haven't asked it of this panel yet.

17          As I think I made clear earlier, the jury selected

18   at this time is going to start right into the GREE case.

19   We're going to do a little bit this afternoon, and then we

20   will pick back up Monday morning, May the 3rd.  And I

21   expect the rest of the trial to be complete by the end of

22   next week.

23          If you're selected for this jury, you will need to

24   be available all of next week.  And so if there are any of

25   you that have a surgical procedure scheduled next week for

1   you or a family member or something very serious -- not

2   just inconvenient, because jury service, by its nature, is

3   always inconvenient, and every one of you is making a

4   sacrifice to be here.  That's a given.

5          But if there's something really serious above and

6   beyond mere inconvenience that would prohibit you from

7   being here all of next week, if you were selected, then I

8   need to know about that.  If there's anybody that has that

9   kind of a situation, would you raise your hand and let me

10  make a note of it?

11         All right.  No. 4, Ms. Jones.

12         Anybody else?

13         All I see is Ms. Jones.

14         Okay.  Thank you all very much.

15         Now, as we did before, ladies and gentlemen, I'm

16  going to need to meet with the lawyers outside of your

17  presence.  It's possible that some of you may be brought in

18  to talk with me while I'm in the jury room.  If that's the

19  case, then one of the Court Security Officers will escort

20  you in, and then when I'm through, back to your seats.

21         While I'm off the bench, feel free to have a

22  conversation with your neighbor if you want to.  Keep it

23  quiet to the extent that you can.  The main thing is don't

24  talk about anything that's happened while you've been in

25  the courtroom today, either during the earlier jury

1  selection or this jury selection.

2       Again, let me just make it crystal clear, nobody

3  has heard any evidence in this case whatsoever.  Talk about

4  anything you'd like, but don't talk about anything that's

5  happened in the courtroom today.

6       With that, I'll see Mr. Gillam and Mr. Dacus,

7  along with the court reporter, in chambers -- I mean, in

8  the court -- in the jury room.

9       COURT SECURITY OFFICER:  All rise.

10      (Conference held outside the presence of the

11 venire panel.)

12      THE COURT:  Mr. Gillam, does the Plaintiff have

13 any challenges for cause?

14      MR. GILLAM:  Yes, Your Honor, we do.

15      Challenge -- challenge Juror No. 10 for cause

16 based upon his questionnaire, which we had mentioned to the

17 Court earlier, and I will specifically point out.

18      THE COURT:  I don't -- I'll come back and hear

19 your reasons.  I just want to identify who the recipient

20 is.

21      MR. GILLAM:  Sure.  No. 10, No. 23 --

22      THE COURT:  Ms. Booth?

23      MR. GILLAM:  Ms. Booth.

24      THE COURT:  Okay.  Anybody else?

25      MR. GILLAM:  No. 11.

 1           THE COURT:  Mr. Holbrook?

 2           MR. GILLAM:  And -- well, I think we agreed on No.

 3  17.  But -- oh, and then No. 24.

 4           THE COURT:  Mr. Reynolds?

 5           MR. GILLAM:  Yes, sir.

 6           THE COURT:  Anything else?

 7           MR. GILLAM:  No, sir.

 8           THE COURT:  Mr. Dacus, does the Defendant have

 9  challenges for cause?

10           MR. DACUS:  Yes, Your Honor.  No. 6.

11           THE COURT:  Ms. Pendley?

12           MR. DACUS:  Yes.  And as Mr. Gillam said, we've

13  agreed on No. 17.

14           THE COURT:  Do both sides agree that Ms. Haugh,

15  No. 17, should be excused?

16           MR. DACUS:  Yes.

17           MR. GILLAM:  Plaintiff agrees.

18           THE COURT:  All right.  Then No. 16 -- excuse me,

19  17, Ms. Glenda Adams Haugh, H-a-u-g-h, is excused.

20           Other than No. 6, Ms. Pendley, does Defendant have

21  additional challenges for cause?

22           MR. DACUS:  We would agree, Your Honor, to the

23  challenge with respect to No. 11.

24           THE COURT:  Mr. Holbrook?

25           MR. DACUS:  Yes, sir.

1          THE COURT:  Both parties agree No. 11,

2   Mr. Holbrook, should be excused from the jury; is that

3   right, Mr. Gillam?

4          MR. GILLAM:  Yes, Your Honor.

5          THE COURT:  Okay.  Then he's excused.

6          MR. DACUS:  And we would also agree to No. 23.

7          THE COURT:  Ms. Cassandra Booth.  Does Plaintiff

8   agree?

9          MR. GILLAM:  Yes.  Yes, Your Honor.

10          THE COURT:  Then based on the agreement of both

11   parties, No. 23, Ms. Booth, is excused.

12          MR. DACUS:  That's all I have, Your Honor.

13          THE COURT:  So the only freestanding challenge for

14   cause you have is No. 6?

15          MR. DACUS:  Correct.

16          THE COURT:  And the only one that I see who's got

17   a potential scheduling problem is Ms. Jones, No. 4.  So

18   we'll need to see Ms. Jones, No. 4; Ms. Pendley;

19   Mr. Thomason -- that's three.

20          MR. GILLAM:  If you're asking for other ones we'd

21   like to talk to, I have a couple others.

22          THE COURT:  I'm trying to figure out, based on

23   what you've told me, if Ms. Jones has a legitimate

24   scheduling problem, and I have to excuse her and if I

25   should grant the separate challenges for cause, which I

1    don't know that I will, what's the furtherest into the

2    panel we'd have to go to strike through?  I'm trying to see

3    if we get to 24 or not.

4            I don't think we get to 24.  Do you all?

5            MR. DACUS:  I do not.

6            THE COURT:  Okay.  Now, Mr. Gillam, is there

7    somebody that you don't want to challenge for cause that

8    you want the Court to talk to?

9            MR. GILLAM:  Well, I was going to say 27, but if

10    we don't get that far, we won't get to 27.

11            THE COURT:  I don't see any way we get to 27.

12            MR. GILLAM:  Make sure I've got my notes right

13    here.  We have talked to 6.  I did want to visit with

14    No. -- No. 7.  No. 7 is the one that he said video games

15    are bad for the young mind.  So I want to make sure -- I'm

16    not sure which way that cuts.

17            THE COURT:  Are you challenging for cause?  I

18    mean, I'm not going to bring him back here just to have

19    further voir dire.  If you want to lodge a challenge, go

20    ahead.  If you -- if you're not concerned enough to

21    challenge him, then I'm not going to bring him back here.

22            MR. GILLAM:  Well, then I'll challenge him.

23            THE COURT:  Okay.

24            MR. GILLAM:  Yes, sir.

25            So then I have -- we've agreed on -- we had --

1  well, No. 10 -- No. 10.  I mentioned No. 10, obviously.

2          THE COURT:  Yes.

3          MR. GILLAM:  We've agreed on 11.

4          THE COURT:  And 17.

5          MR. GILLAM:  No. 17.  And then No. 23 is out.  And

6  then if we get to 24, I would challenge No. 24.  It's

7  already done, so...

8          THE COURT:  I have that.

9          MR. GILLAM:  Okay.  That's it.

10          THE COURT:  All right.  Ms. Brunson, let's ask the

11  Court Security Officers to bring Ms. Shelley Jones, No. 4,

12  back, please.

13          (Venire member brought into jury room.)

14          VENIRE MEMBER:  Sorry, the one time I get up.

15          THE COURT:  That's all right.  Have a seat right

16  there, Ms. Jones.  Thank you for joining us back here.

17          Earlier, I asked if anybody who was on the panel

18  would have a serious problem that might interfere with

19  their ability to be here all of next week if they were

20  selected, and you raised your hand.  Tell me what you had

21  on your mind.

22          VENIRE MEMBER:  Like the email that I sent the

23  Court Clerk, I'm the sole driver for my mother, and she has

24  doctor appoints on -- I want to say it's the 3rd.  She's

25  got follow-ups for her cataract surgery.

1          THE COURT:  Is it only the 3rd that you're

2     concerned about her having transportation?

3          VENIRE MEMBER:  Yes, but I have a doctor

4     appointment I've waited two months for, but it's not until

5     the 13th.  That's why I had a problem with the second one.

6          THE COURT:  Okay.  Is there anybody that could

7     cover your mother for Monday, the 3rd, so that you could be

8     here?

9          VENIRE MEMBER:  I'm afraid not.  My sister doesn't

10    live in town.  She lives all the way in Arlington.

11         THE COURT:  And your mother lives where and her

12    doctor's appointment is where?

13         VENIRE MEMBER:  Doctor appointment is in Diana and

14    we're roommates.  We live together.

15         THE COURT:  You and your mother live together or

16    you and your mother's doctor live together?  I'm confused.

17         VENIRE MEMBER:  Me and my mother live together.

18         THE COURT:  Okay.

19         VENIRE MEMBER:  We moved in to take care of each

20    other, so...

21         THE COURT:  Okay.  And the doctor is in Diana --

22         VENIRE MEMBER:  Longview.

23         THE COURT:  Longview.  So --

24         VENIRE MEMBER:  We live in Diana.

25         THE COURT:  Okay.

```
 1              VENIRE MEMBER:  The doctor is in Longview.

 2              THE COURT:  But there's not a neighbor or a church

 3   friend or anybody that could fill in for you on just that

 4   one day?

 5              VENIRE MEMBER:  No, sir --

 6              THE COURT:  I'm just asking --

 7              Venire member:  Even though my neighbor is here, I

 8   don't know them.  I've lived there for six or seven years,

 9   I just don't socialize.

10              THE COURT:  Okay.  All right, Ms. Jones.

11              Mr. Gillam, do you have any questions of

12   Ms. Jones?

13              MR. GILLAM:  I do not, Your Honor.

14              THE COURT:  Mr. Dacus?

15              MR. DACUS:  No, Your Honor.  Thank you.

16              THE COURT:  Ms. Jones, I'm going to let you take

17   your seat back in the courtroom.  Just don't discuss what

18   we talked about in here.

19              VENIRE MEMBER:  Yes, sir.

20              THE COURT:  Thank you, ma'am.

21              (Venire member excused to return to courtroom.)

22              THE COURT:  I'm going to excuse Ms. Jones.

23              Let's bring in No. 6, Ms. Pendley, please.

24              (Venire member brought into jury room.)

25              THE COURT:  Have a seat right there, Ms. Pendley.
```

 1          During the questioning earlier today, I think you

 2    said that you tend to favor the one that had the patents

 3    first.  You also said pay-to-win sounds really bad.  And

 4    the other comment I have is, I believe, Mr. Dacus asked if

 5    the Defendant proved infringement, does anybody believe the

 6    Plaintiff should get whatever amount of money they asked

 7    for?  And I had you down as a yes on that.  But I want to

 8    go over those things with you and make sure I've got it

 9    clear.

10          VENIRE MEMBER:  Sure.

11          THE COURT:  Tell me how you feel about those

12    things.

13          VENIRE MEMBER:  Well, the first one -- I'm sorry,

14    can you tell me the first one again, because I want to make

15    sure that I'm --

16          THE COURT:  Sure.  Do you have -- do you have a

17    concern that you would favor --

18          VENIRE MEMBER:  Okay.  Yes.

19          THE COURT:  -- the patentholder because they were

20    the first one to get the patents?

21          VENIRE MEMBER:  I would, just because if they're

22    the ones that came up with the technology first, even if

23    that was the jumping-off point, I understand that the

24    technology changes and that there's going to be new and

25    different ideas, but there's a jumping-off point.  So that

1    should be credited somehow.

2              THE COURT:  Okay.

3              VENIRE MEMBER:  I've been involved with developing

4    new products and creating new products, even though I

5    don't -- we don't have any patents with my business.

6              Can I pull this down?  Is that okay?

7              THE COURT:  Sure.

8              VENIRE MEMBER:  So I guess that's maybe a sore

9    spot for me because in our business, that intellectual

10   property has been called upon, and I have -- my dad has

11   been sued based on -- for his intellectual property.

12   Fortunately, he won that case because the people didn't

13   have any grounds.

14             THE COURT:  All right.  Let me ask this.  If

15   you're on this jury, the Plaintiff's going to put on their

16   case and present evidence that the Defendant has infringed

17   their patents.  And you're going to see very specific

18   claims in those patents, and each of those claims is going

19   to have a certain number of elements.

20             VENIRE MEMBER:  Uh-huh.

21             THE COURT:  They're called limitations in there.

22             VENIRE MEMBER:  Uh-huh.

23             THE COURT:  And I'm going to tell the jury that if

24   even one of those limitations or elements is missing from

25   the Plaintiff's proof, then the Defendant doesn't infringe.

1    Every one of them has got to be proven.

2              VENIRE MEMBER:  Okay.

3              THE COURT:  So you're not going to get a question

4    about --

5              VENIRE MEMBER:  So there can't be partial --

6              THE COURT:  You're going to get questions about,

7    are all the elements proven?  And then you're going to get

8    questions about, are the Plaintiff's patents invalid?  And

9    the way the Defendant is going to try to show that is by

10   showing that there was what we call prior art out there --

11             VENIRE MEMBER:  Okay.

12             THE COURT:  -- in advance of the time the patents

13   were approved that basically showed the same invention that

14   the patents are covering.

15             And I hear your concern, and I appreciate your

16   candor about --

17             VENIRE MEMBER:  Isn't that the due diligence of

18   the Patent Office, though, if -- I mean, if they did their

19   homework on it and researched and gave them that patent,

20   then --

21             THE COURT:  Then there's a presumption of

22   validity.

23             VENIRE MEMBER:  Yeah, yeah.

24             THE COURT:  But a Defendant can still prove a

25   patent is invalid, and that's why there's that higher

1   burden of clear and convincing evidence.  They have to do

2   more.  But if they prove that -- of course, the Patent

3   Office is not perfect.  They're made up of human beings,

4   and anybody can make a mistake.

5        So if the Defendant can come forward with

6   something that shows you that even though the Patent Office

7   issued the patent, that the ideas and the inventions in the

8   patents were actually obvious or known and shown by this

9   prior art, then the jury can invalidate those patents.

10        But nowhere along the way does it seem to me that

11   your concern about somebody getting credit for being the

12   first one to come up with an idea, even if it's

13   subsequently developed further, that's not a question

14   you're going to have to answer.

15        VENIRE MEMBER:  Okay.

16        THE COURT:  Now, what I really need to ask you is:

17   Can you begin this trial with both sides in the same equal

18   position, and can you listen to the evidence and follow my

19   instructions and let the evidence, as applied to and guided

20   by my instructions, be the sole reason you reach whatever

21   results you reach?  If you can't do that, tell me.

22        VENIRE MEMBER:  I was going to say, the really

23   good part of me wants to really say yes, but the honest

24   part of me -- I really already feel skewed, like...

25        THE COURT:  Okay.  You feel skewed toward the

1   Plaintiff?

2       VENIRE MEMBER:  Yes.

3       THE COURT:  And against the Defendant?

4       VENIRE MEMBER:  Yes.

5       THE COURT:  Do you think -- you don't think you

6   can get back to zero is what you're telling me?  And I just

7   want an honest answer.

8       VENIRE MEMBER:  Well, and -- yeah.

9       THE COURT:  Yes, you don't --

10      VENIRE MEMBER:  I don't think that I can.

11      THE COURT:  Okay.

12      VENIRE MEMBER:  I --

13      THE COURT:  That's why we're back here talking.

14      VENIRE MEMBER:  I want to be -- like I -- yeah,

15  that's not the right answer, I know that.  But --

16      THE COURT:  Well, the truthful answer is the right

17  answer.

18      VENIRE MEMBER:  Yeah.

19      THE COURT:  Mr. Gillam, do you have any questions

20  of Ms. Pendley?

21      MR. GILLAM:  If -- you understand that both sides

22  get -- under the law, both sides get to start out equally?

23      VENIRE MEMBER:  I understand that, and I wish

24  that -- I wish I was there.

25      MR. GILLAM:  I understand.  I understand.

1   Anything about the -- the only question I had was not

2   directly toward that, but I think that -- well, I tell you

3   what, no, I don't have any other questions for you.   I

4   just -- I appreciate you being honest with us.   This helps

5   us.

6              VENIRE MEMBER:   I'm sorry.

7              MR. GILLAM:   No, no, it helps us.

8              THE COURT:   Mr. Dacus, do you have any questions?

9              MR. DACUS:   I do not, Your Honor, other than to

10  express what I did to Ms. Pendley out there, we appreciate

11  her candor.

12             THE COURT:   And I'll echo that, Ms. Pendley.

13  Thank you for being honest with us.   I'm going to let you

14  take your place back in the courtroom.

15             VENIRE MEMBER:   Can I sneak into that bathroom and

16  get a tissue first?

17             THE COURT:   Sure.   When you go back into the

18  courtroom, just don't talk about what we did in here.

19             VENIRE MEMBER:   I won't.   That's why I want to not

20  be like this before I go back out there.

21             THE COURT:   That's fine.

22             (Venire member excused to return to courtroom.)

23             THE COURT:   I'm going to excuse Ms. Pendley for

24  cause.

25             Once she comes out, Ms. Brunson, we need to get

1    No. 7, Mr. Cook.

2              MR. GILLAM:  Did I -- before that next one comes

3    in, did I mentioned No. 8?

4              THE COURT:  No.

5              MR. GILLAM:  Well, No. 8, I could never get a

6    straight answer about being behind on a question about -- I

7    was questioning her.  But she's the one that saw Dacus

8    before -- Mr. Dacus before.  And I am concerned about that.

9    I never was -- we went round and round and round about it,

10   all I got -- all I ever got was:  I'll try.

11             THE COURT:  Well, I've let you go back to the well

12   twice on challenges for cause.  Are you asking to go back a

13   third time?

14             MR. GILLAM:  Yes, sir.

15             THE COURT:  Any objection, Mr. Dacus?

16             MR. DACUS:  Of course.  No, Your Honor.

17             THE COURT:  All right.  We'll bring Ms. Rich back.

18             (Venire member brought into jury room.)

19             THE COURT:  Have a seat, sir.

20             Mr. Cook, we're just wanting to make completely

21   sure that if you're selected to serve on this jury, you can

22   treat both of these parties equally and listen to the

23   evidence and let the evidence and only the evidence guide

24   you on what you end up doing.  Do you feel like you can?

25             VENIRE MEMBER:  Yes, sir.

1          THE COURT:  Okay.  Mr. Gillam, do you have

2    questions for Mr. Cook?

3          MR. GILLAM:  Yes, sir, I do.  And thank you for

4    coming back, sir.

5          The question that I had was kind of toward the

6    end, and we were asking about anything that I need to be

7    concerned about, anything I left out, essentially.  And you

8    raised an issue, something about games being bad for the

9    young mind.  Do you recall that, sir?

10         VENIRE MEMBER:  Uh-huh.

11         MR. GILLAM:  So the question I have is, obviously,

12   you know, my company is involved in the games industry,

13   it's what they are.

14         VENIRE MEMBER:  Right.

15         MR. GILLAM:  And so what I need to know is -- and

16   Mr. Dacus is, too, I mean, to be fair.  So what I need to

17   know, though, is that because we are, because you have some

18   concerns about games and then what impact they may have on

19   young people, is that going to impact the way you look at

20   our folks -- my folks, particularly, starting off with?

21   Are we going to start off somehow behind their side as we

22   begin to -- as we begin this proceeding?

23         VENIRE MEMBER:  I'm looking at it as a business,

24   not games.

25         MR. GILLAM:  Okay.

 1          THE COURT:  Does that mean you can treat them both

 2   the same?

 3          VENIRE MEMBER:  Yeah, I'm looking at them as

 4   companies.

 5          THE COURT:  And that's what they are.

 6          VENIRE MEMBER:  Right.

 7          MR. GILLAM:  Okay.  That's what I needed to know.

 8          VENIRE MEMBER:  Yeah.

 9          THE COURT:  Other questions?

10          MR. DACUS:  No, Your Honor.  None from me.  Thank

11   you.

12          THE COURT:  All right.  Mr. Cook, thanks for

13   coming back.  Don't discuss anything that we've talked

14   about in here.  You can take your seat back in the

15   courtroom.

16          VENIRE MEMBER:  All right.  Thanks.

17          (Venire member excused to return to courtroom.)

18          THE COURT:  All right.  I'm going to deny the

19   challenge for cause on Mr. Cook.

20          Let's get No. 8, Ms. Rich.  We'll get her back

21   here before Mr. Gillam comes up with any more additional

22   challenges.

23          (Venire member brought into jury room.)

24          THE COURT:  Hi, Ms. Rich.  Have a seat right there

25   please.

1      VENIRE MEMBER:  Yes, sir.

2      THE COURT:  What I want to clarify real quickly

3 was, I know you told us that you had been involved in a

4 patent trial before.

5      VENIRE MEMBER:  Yes, sir.

6      THE COURT:  And I think the way you said it was

7 you found the Defendant not guilty, but I took that to mean

8 you ruled for the Defendant and not the Plaintiff, and I

9 know you had a little bit of trouble remembering.

10      VENIRE MEMBER:  Yes.  We can -- I think it was

11 non-guilt -- see, I can't remember.  I just remember it

12 being non-guilty, the verdict.

13      THE COURT:  Maybe non-infringement?

14      VENIRE MEMBER:  Prob -- I'm trying to think.  Let

15 me think.

16      THE COURT:  Well, the other point was Mr. Dacus

17 took part in that trial, and I just need know that you're

18 going to treat all these lawyers the same --

19      VENIRE MEMBER:  Sure.

20      THE COURT:  -- and you're not going to lean toward

21 Mr. Dacus because you had seen him before and --

22      VENIRE MEMBER:  No, sir.

23      THE COURT:  -- he was probably impressive and did

24 a good job.

25      VENIRE MEMBER:  He did do a good job.  But, no,

1    I'm fine.  I'll be fine.

2          THE COURT:  And you'll treat them both fairly?

3          VENIRE MEMBER:  Well, I think -- I mean, I'm sure

4    I will.  I'm a fair person.

5          THE COURT:  Okay.  And you'll let the evidence

6    determine which way you end up in this case?

7          VENIRE MEMBER:  Yes, sir.

8          THE COURT:  Not anything else?

9          VENIRE MEMBER:  Not anything else.

10         THE COURT:  Mr. Gillam, do you have questions for

11   Ms. Rich?

12         MR. GILLAM:  Yes, ma'am.  Thank you.  Thank you

13   for coming back.

14         The only question I had was I thought we went

15   round and round in there, and I got a lot of:  Well, I'll

16   try.  And that's all I'm concerned about is to make sure

17   that I start off on the same foot that he does.

18         VENIRE MEMBER:  Right.

19         MR. GILLAM:  And that we're -- my client, not me,

20   but my client does.  Because of some experience you had in

21   the past, either with Mr. Dacus or because you sat on

22   another patent jury --

23         VENIRE MEMBER:  Right.

24         MR. GILLAM:  -- that my client who actually

25   brought this lawsuit doesn't start off a little bit behind

1  because of your feelings.

2         VENIRE MEMBER:  Let's just -- I wouldn't -- like I

3  said, I wouldn't think I would.  I'm just saying, I don't

4  think I would.  I mean, I'd do the best I can by listening

5  to both sides.  Does that make sense?

6         THE COURT:  So to the best of your knowledge.

7         VENIRE MEMBER:  Yes, sir.  I'm going to try to be

8  as fair as I can.  But, I mean, like I said -- I mean, I

9  haven't heard either side, so -- I mean, how can I find

10  you --

11         MR. GILLAM:  I completely understand that.  And

12  that's -- I will -- I completely believe you on that.  The

13  only question I had was only because you had heard him do a

14  presentation before --

15         VENIRE MEMBER:  Yes.

16         MR. GILLAM:  -- and because you had apparently

17  given a defense verdict before, voted for his side, which

18  is the defense side in this case, if it's because of that

19  somehow that you're leaning a little bit more toward that

20  side as we get started here versus my side.

21         VENIRE MEMBER:  I wouldn't -- like I said, I'm

22  going to do the best I can.  I mean, I'm not saying I would

23  go either way not because I've heard him before or, you

24  know -- I just want to go -- I mean, I would like to hear

25  both sides.  If you choose me, I will listen to both sides

1  and do the best I can.

2       THE COURT:  Let me ask a question, Ms. Rich.  Can

3  you tell me that whatever happened in that prior trial and

4  whatever presentation you heard from the lawyers in that

5  trial, even if one or more of them are in this trial, is

6  not going to impact what you decide in this case?  You're

7  going to hear both sides of this case --

8       VENIRE MEMBER:  Yes, sir.

9       THE COURT:   -- and you're going to let the

10  evidence in this case --

11      VENIRE MEMBER:  Yes, sir.

12      THE COURT:  -- control what you end up doing?

13      VENIRE MEMBER:  Yes, sir.

14      THE COURT:  You can tell me that without any

15  question?

16      VENIRE MEMBER:  Yes, sir.

17      THE COURT:  Okay.  Any other questions for

18  Ms. Rich?

19      MR. GILLAM:  Not from me, anything.  Thank you.

20      THE COURT:  Mr. Dacus?

21      MR. DACUS:  No, Your Honor.  Thank you.

22      THE COURT:  Ms. Rich, just don't talk about

23  anything we did in here.

24      VENIRE MEMBER:  Yes, sir.

25      THE COURT:  I'll let you go back and take your

1    seat in the court room.  Thank you.

2         (Venire member excused to return to courtroom.)

3         THE COURT:  All right.  I'll deny the challenge

4    for cause as to Ms. Rich.

5         Next is No. 10, Mr. Thomason.

6         MR. GILLAM:  Right.

7         (Venire member brought into jury room.)

8         THE COURT:  Hello, Mr. Thomason.  Would you have a

9    seat right there, please, sir?

10        THE WITNESS:  Can I take this off?

11        THE COURT:  Yes, sir, you can.  We wanted to

12   clarify a couple things that were discussed out in the

13   courtroom.

14        Mr. Gillam, do you have some questions for

15   Mr. Thomason?

16        MR. GILLAM:  Yes, sir, I do.

17        And, Mr. Thomason, my stuff really relates more --

18   well, we'll start off with what happened out there.  You

19   said at one point in time, you were leaning toward the

20   group that would lean toward -- I would start off behind as

21   the Plaintiff in the case as we started off.

22        I asked the questions about there was a fellow

23   that raised his hand and talked about the fact of the

24   parties started equally or things of that nature.  And you

25   were one of the ones that said:  Well, I'll go with that

 1   side rather than go with the other lady that said --

 2           VENIRE MEMBER:  That could have been my arm.  I

 3   started getting tired.

 4           MR. GILLAM:  It could be.  It could be.  But I

 5   need to know what your feelings are about that.

 6           VENIRE MEMBER:  Well, I'm fine.  I mean, first of

 7   all, I don't like games.  So, I mean, I'm zero interested

 8   in any of this.  You're suing them --

 9           MR. GILLAM:  Yes, sir.

10           VENIRE MEMBER:  -- for monetary value, right?

11           MR. GILLAM:  Yes, sir.

12           VENIRE MEMBER:  So -- and you're saying it's

13   patent -- their saying -- you're saying it's patent

14   infringement on what they're doing.  So, I mean, I could

15   hear both sides.  I could see both sides.  I just -- I

16   really don't know how to give you the answer you're looking

17   because I'll say something and you'll twist it and ask me

18   another question and try to get me slip up and say

19   something different.

20           THE COURT:  Nobody is trying to trick anybody back

21   here, Mr. --

22           VENIRE MEMBER:  Some of those questions I heard

23   out there, may -- it was confusing to a lot of people on

24   what they were -- on what y'all were asking.

25           THE COURT:  That's part of why we're back here, to

1   resolve any confusion.  Nobody is trying to trick you

2   though.

3          VENIRE MEMBER:  I'm not saying you're behind the 8

4   Ball starting out the gate.  I mean, clearly you got a

5   case.  I mean, I don't know if you all tried this case

6   before, and this is another round of it.  I don't know none

7   of that.  But, no, I mean, I'm not saying either one of

8   y'all are behind the 8 Ball coming out.  I mean, you both

9   got to present your cases.  I mean, apparently you got

10  validity to make it this far for a lawsuit, and you're

11  asking for $90 million.  That's no chump change.

12         MR. GILLAM:  Right.  Right.

13         One of the questions that was asked to you on your

14  questionnaire, you said you have strong opinions about

15  lawsuits and people that bring them.  It's Question No. 9,

16  it said:  The problem with this country is there are too

17  many lawyers wanting to sue for patent infringement.

18         Well, obviously, in this particular case, I'm one

19  of those folks.

20         VENIRE MEMBER:  Yeah.

21         MR. GILLAM:  And so I need to know what you're --

22  you know, what your feelings are about that, and then go

23  ahead and --

24         VENIRE MEMBER:  I guess I'm referring to just

25  ambulance chasing lawyers, trial lawyers, patent --

1    everything.  In my line of work, we own a lot of real

2    estate.

3              MR. GILLAM:  Right.

4              VENIRE MEMBER:  We've been sued countless times,

5    people falling, people tripping.  But the lawyers get

6    together, the insurance companies, well, that's $10,000.

7    Just to settle it out of court, we'll go on about the

8    business.  We'll just pass it on to the consumer.

9              MR. GILLAM:  Right.

10             VENIRE MEMBER:  So if you win the 90 million, his

11   company, they just going to raise the rate to offset the --

12   the loss.

13             MR. GILLAM:  Uh-huh.

14             VENIRE MEMBER:  And just like the reason the

15   insurance rates are so high.  I feel for the people in

16   Louisiana.  Everywhere you go, there's an ambulance chasing

17   lawyer on a billboard.  You know, I'm in the timber

18   business, you know, log trucks.  You can't even afford

19   insurance for log trucks because it's so outlandish.  You

20   know, just every time you pick up the paper, it's a

21   lawsuit, back and forth, back and forth.

22             MR. GILLAM:  Right.  Well, I guess the question

23   I've got then is because of your feelings that you have

24   about lawsuits, and, obviously, I'm on the side of the one

25   in this case bringing the lawsuit, does that put me behind

 1  just because of the feelings you have -- and it's fine with

 2  me.  I mean, whether it puts me behind --

 3          VENIRE MEMBER:  You're not starting strong.  I

 4  don't -- I'm just not -- I've always been a fan -- I've not

 5  been a fan of five things:  Attorneys, actuaries,

 6  accountants, something, something, and something else.  I'm

 7  not going to say back here.

 8          MR. GILLAM:  Well, I'm -- I'm one of the -- I'm in

 9  one of the five.

10          VENIRE MEMBER:  You're in the top three, yeah.

11          MR. GILLAM:  I'm in the top three.  So that --

12  does that -- that puts me off starting a little bit behind

13  here in this case.

14          VENIRE MEMBER:  Both of y'all really.

15          MR. GILLAM:  Well, fine.

16          VENIRE MEMBER:  Nothing against a fellow Aggie

17  there.  I mean, I'm just not --

18          THE COURT:  Would that fellow Aggie issue be a

19  problem for you?

20          VENIRE MEMBER:  Could be.

21          THE COURT:  I mean, I know y'all are pretty tight

22  coming out of A&M.

23          VENIRE MEMBER:  A&M, yeah.

24          THE COURT:  I'm serious.  It's a serious question.

25          VENIRE MEMBER:  It's almost as much as the Mason,

1   you know.  It's pretty thick.

2         MR. GILLAM:  There's another question you had on

3   here.  It's No. 45.  I don't like the idea of using my time

4   for some patent infringement case.  This will cost my

5   family.  And that also gives me some concern about --

6   because this is going to be five days' worth of -- worth

7   of --

8         VENIRE MEMBER:  I went out there to check my phone

9   awhile ago.  All right.  I work for my family in the family

10  business.  We own 250 rentals, probably 30 commercial

11  buildings, 16,000 acres of timberland.  I got three logging

12  operations going right now.  I had five missed calls on air

13  conditioners not working, plumbing problems, so, yeah, you

14  know, I can't answer my phone and say, hey, I'm busy.  So I

15  got to go out there when he let me -- just to let everybody

16  know, I'll get back with you as soon as I can.

17        MR. GILLAM:  Yes.

18        VENIRE MEMBER:  So, yes, it is.  If I'm not

19  working, I'm not making money.

20        MR. GILLAM:  Right.

21        VENIRE MEMBER:  I don't know if you got kids.   I

22  got three at the house.

23        MR. GILLAM:  Right.

24        VENIRE MEMBER:  One is fixing to go to college.

25  One's going to the fourth grade.  I mean, it's --

```
 1            MR. GILLAM:  Right.

 2            VENIRE MEMBER:  -- it's a lot for me not to be

 3   home working and tending to my business, I mean --

 4            MR. GILLAM:  Sure,  sure.

 5            VENIRE MEMBER:  I've got a lot going.  And, plus,

 6   my cousin and my uncle that help us that's in the business

 7   with me, his daughter's husband just died yesterday in the

 8   emergency room -- he's an ER doctor that just died

 9   yesterday.  So now we're dealing with that.

10            MR. GILLAM:  Right.

11            VENIRE MEMBER:  So, yeah, I'm not really excited

12   to be down here.

13            MR. GILLAM:  Well, I understand.  I think that --

14   I'm getting the drift.  I understand.

15            You know, and from my standpoint the question is,

16   is obviously do I start off a little bit behind sort of

17   because of the feelings you have?  And if I do, that's

18   great.  I understand it, and we can go on about our way.

19            VENIRE MEMBER:  I said, you're not starting

20   strong, you know.

21            MR. GILLAM:  All right.

22            THE COURT:  Any questions, Mr. Dacus?

23            MR. DACUS:  I do not, Your Honor.  Thank you.

24            THE COURT:  Mr. Thomason, I'm going to let you

25   take your place back in the courtroom.  Don't discuss
```

 1  anything we talked about in here.

 2          VENIRE MEMBER:  Yes, sir.

 3          (Venire member excused to return to courtroom.)

 4          THE COURT:  I'm going to sustain the challenge for

 5  cause as to Mr. Thomason.

 6          Okay.  Let's do a recap.  No. 4 has been excused,

 7  No. 6 has been excused, No. 10, No. 11, and No. 17.  That's

 8  five.  Five and 16 is 21.  We agree we should strike

 9  through -- or you all should strike through Venire Member

10  No. 21.

11          MR. DACUS:  Yes, sir.  Yes, Your Honor.

12          MR. GILLAM:  So we do not -- yes, sir, so we do

13  not get to 23.

14          THE COURT:  I don't see any need to bring anybody

15  else --

16          MR. GILLAM:  We don't get to 22 either.  We

17  just --

18          THE COURT:  You don't get past 21.

19          MR. GILLAM:  I am the one burning a strike on 22,

20  that's right.  Good point.

21          THE COURT:  All right.  I'll give you 15 minutes

22  to strike your list.  We'll go out in the courtroom, I'll

23  tell the panel what's going on, and then as soon as you get

24  your list struck, give them to Ms. Brunson, and we'll

25  identify our new jury.

1          MR. GILLAM:  Where are we with this system here,

2   people, jurors running around and stuff?  Where are we

3   congregating to do our list striking?

4          You got the downstairs room.  You want the

5   upstairs room?  What do you want?

6          MR. DACUS:  It doesn't matter.  Whatever.

7          THE COURT:  One group can use this jury room.  I

8   think the conference room around the corner is open, as

9   well.

10          MR. DACUS:  We'll go to the conference room.

11          MR. GILLAM:  Okay.  I'll have them come in here.

12          THE COURT:  We're off the record.

13          (Off-the-record discussion.)

14          (Conference outside the presence of the venire

15   members concluded.)

16          (Open court.)

17          (Venire panel in.)

18          COURT SECURITY OFFICER:  All rise.

19          THE COURT:  Ladies and gentlemen, as you remember

20   from the first jury we picked, we're at that point where

21   counsel for the parties need an opportunity to exercise

22   their peremptory challenges, and that will take about 15

23   minutes.

24          Shortly after that, I'll be back on the bench,

25   we'll announce the jury in the GREE versus Supercell case,

1   and the members of the jury will come into the box and be

2   sworn.

3            While I'm out of the courtroom, continue to follow

4   all the same instructions I gave you.  Don't discuss

5   anything about what's happened in the courtroom today.  If

6   you need a restroom break or water or something, contact or

7   raise your hand and the Court Security Officers and the

8   clerk's office will work with you.

9            I'll be back at soon as possible, and we'll

10  identify and call out the names of our eight jurors in this

11  case.

12           The Court stands in recess.

13           COURT SECURITY OFFICER:  All rise.

14           (Recess.)

15           (Venire panel in.)

16           COURT SECURITY OFFICER:  All rise.

17           THE COURT:  Be seated, please.

18           All right.  Ladies and gentlemen, if you will

19  listen carefully when your name is called by our courtroom

20  deputy and then come forward to the jury box, we're going

21  to position this jury just like we did the first one.  The

22  first four jurors will be on the front row, and I'll ask

23  whoever is called as Juror No. 1 to go to the last seat on

24  the front row of the jury box, stand in front of that seat.

25           The second juror will go to the third seat from

1    the end with a vacant seat between them, stand in front of

2    that seat.  And the other two jurors, 3 and 4, will be in

3    the same position on the front row.

4         And then Jurors 5, 6, 7, and 8 will be positioned

5    the same way on the second row.  We want a vacant seat

6    between every member of the jury, the first four on the

7    front row, the second four on the second row.  And if

8    you'll all remain standing until everybody is in the box.

9         All right.  Ms. Brunson, will you call the name --

10   the names of our eight jurors, please.

11        COURTROOM DEPUTY:  Patti Reed; Robert Cook; Robin

12   Crossland; Melissa Hammett; Marvin Cook, II; Thomas Hunt;

13   Johnny Livingston; Sarah Fry.

14        THE COURT:  All right.  Ladies and gentlemen, I'll

15   ask Ms. Brunson to administer the oath to you as jurors at

16   this time.

17        (Jurors sworn.)

18        THE COURT:  Please have a seat.

19        I'm about to excuse the remainder of the panel

20   that was not selected on either of our two juries today.

21   As I do that, ladies and gentlemen, I want to express the

22   Court's sincere thanks for your presence today.  Even

23   though you were not selected on either of these two juries,

24   you all appeared as summonsed, you put yourselves forward

25   to serve as jurors, had you been selected, you participated

1 in the process as the Court asked, and every one of you had

2 other places to be and things to do this day that is

3 important in your own respective lives, and the Court

4 appreciates the sacrifice that you've made.

5   Part of being a good citizen is being willing to

6 sacrifice for the benefit of our country, and you've done

7 that today, even though you weren't selected to serve.  So

8 please leave here knowing that you have the sincere thanks

9 and appreciation of the Court, the Court staff.  The

10 parties and the lawyers in these two cases also join me in

11 thanking you for your public service by being available

12 today, even though you weren't selected.

13   As you leave the courtroom through the double

14 doors in the back, if you will see the clerk's office on

15 the way out, they're going to want to recover your numbers

16 that you have and those very expensive little badges you're

17 wearing.  They'll also be available to you to answer any

18 questions.

19   If you need documentation for an employer as to

20 where you've been today, they'll work with you on that.  In

21 short, if you have any questions, please refer them to

22 Ms. Clendening in the clerk's office, and they'll be happy

23 to help you.

24   With that, those not selected to serve on the jury

25 are excused at this time.

```
 1              COURT SECURITY OFFICER:  All rise.

 2              (Venire panel out.)

 3              THE COURT:  Be seated, please.

 4         Ladies and gentlemen, we're going to take a brief

 5   recess in a minute.  There is a late lunch waiting for you

 6   in the jury room.  But before we do that, I need to cover a

 7   couple important instructions with you.

 8              You heard these instructions for the earlier jury

 9   today, so I'm not going to go into as much detail as I did

10   with them.

11         I do think -- and I would ask each of you to, over

12   this lunch break, please make sure Ms. Clendening has a

13   working cell phone number for all of you.  It's possible

14   that over the course of this trial, we might need to reach

15   you after hours for some reason.  I don't think that's

16   likely, but if you would, make sure she has a good cell

17   phone number for everybody.

18              Speaking of cell phones, I'm going to ask you to

19   leave your cell phones in the jury room if you have them

20   with you today.  And starting Monday, I'm going to ask you

21   either to leave them at home or to leave them in your

22   vehicles.

23              One of the things I'm going to tell you, and you

24   heard me tell the earlier jury, is not to do any research

25   about anything regarding this case.  Smartphones are a
```

1    small computer you hold in your hands, and they're tempting

2    to Google this or to search for that.  And it's better if

3    you don't have that temptation at your fingerprints.

4            If you need to check text messages or emails for

5    business purposes, then leave your phones in your vehicles.

6    And during the day each day, you'll have an opportunity to

7    go to your vehicle and check those things.  But don't bring

8    your cell phones back into the courtroom starting Monday.

9            You should note the lawyers are all going to have

10   cell phones and iPads and other electronic devices.  Those

11   are tools of the trade these days, but they're under strict

12   instructions from me to keep them on silent so they don't

13   disrupt this trial, and they're well aware that I'll take

14   appropriate action if that's not followed and if there are

15   any disruptions from their devices.

16           As you heard me tell the earlier jury, do not

17   discuss this case with anyone, including the eight of

18   yourselves.  I won't go over again all the reasons, but

19   there is one fundamental primary reason that this relates

20   to, and that is, you must have only the material and the

21   evidence and the information before you when you answer the

22   questions in the verdict form at the end of the trial that

23   came to you through the witnesses on the witness stand who

24   were under oath and subject to cross-examination, and the

25   documents and other exhibits that the Court has found

1    admissible under the Rules of Evidence and has admitted as

2    exhibits in the trial.

3           Those must be the sole and only source of

4    information you have before you to draw on.  Therefore,

5    don't talk with anybody, don't communicate with anybody,

6    orally, in writing, digitally, or any other way.

7           And that goes for the eight of yourselves, until

8    such time as I instruct you otherwise.

9           Likewise, the parties in this case and their

10   counsel are not going to enter into conversation with you,

11   even when they pass you in the hallway or you see them on

12   the front steps of the building.  Again, that's my

13   instruction.  That's so that the only communication and the

14   only information you'll have is what comes to you through

15   the trial in the courtroom.  Don't think they're being

16   rude.  Don't hold it against them.  That's simply my

17   instruction.

18          And when I've told you earlier -- as I've told you

19   earlier, when you are -- or when you're instructed by me

20   not to communicate with anyone about the case, that covers

21   social media.  Don't post.  Don't tweet.  Don't do anything

22   on any social media platform.  Don't email.  Don't text.

23   Don't communicate in any way with anyone about anything

24   related to the case.

25          If under any circumstance anybody approaches you

1  during your service as jurors that you feel awkward or

2  uneasy about, tell Mrs. Clendening immediately, she'll let

3  me know, and I will deal with it.  I don't think that's

4  likely, but it is possible.

5      And, finally, ladies and gentlemen, if there's

6  anything that changes with your circumstances or your

7  immediate family's circumstances that impacts you with

8  regard to their public health, if somebody should go into

9  quarantine that would cause you to have a problem, or

10  somebody should test positive for the Coronavirus that

11  would cause you a problem, let Ms. Clendening know.

12      We're going to take every reasonable precaution we

13  can to see that that doesn't happen.  But we don't have you

14  here 24/7.  And if something, despite best efforts, goes

15  awry, make sure we know about it, and she is the person you

16  should communicate with.

17      While you're in the jury room for this shortened

18  lunch break, the face shields I told you about are back

19  there.  Please open them and get one ready so that when you

20  come back after this lunch break, we cannot look at half of

21  your faces through those non-transparent masks but we can

22  see all of your faces with the face shield in front of you.

23      Again, the lawyers will remain masked, the support

24  teams will remain masked, except when the lawyers are

25  addressing you or the Court from the podium.

1          Those are my instructions.  Please follow them.

2     Please enjoy a short lunch.  And then we'll get back in

3     here in about 30 minutes.

4          At that time, I have some more detailed

5     instructions to give you on the record.  And then after my

6     instructions to you, counsel for the Plaintiff will present

7     their opening statement, and Defendant will then follow and

8     present Defendant's opening statement.

9          These are not arguments.  These are statements.

10    This is what the parties believe the evidence will show you

11    over the course of the trial.

12         And, again, ladies and gentlemen, what the lawyers

13    tell you in this case is not evidence.  But we'll hear

14    opening statements from both Plaintiff and Defendant.

15         After those opening statements are complete, then

16    I'm going to excuse you for the day, and we'll plan to see

17    you back here Monday, May the 3rd, ready to go, assembled

18    by 8:30.  And we'll follow the same kind of times table

19    that I told the other jury about.  Hopefully, we can

20    complete this trial, and I can accept your returned verdict

21    by or before the end of next week.  And by working longer

22    days, we'll make sure that it doesn't take two weeks, if we

23    can do it in one week.

24         Again, please follow all my instructions,

25    including, of course, not to discuss the case with anyone

1    and among yourselves.

2           With that, ladies and gentlemen, you're excused to

3    the jury room for lunch.

4           COURT SECURITY OFFICER:  All rise.

5           (Jury out.)

6           THE COURT:  We stand in recess until shortly after

7    3:00 p.m.

8           COURT SECURITY OFFICER:  All rise.

9           MR. DACUS:  Your Honor, what time?

10          THE COURT:  Shortly after 3:00 p.m. -- no, I'm

11   sorry, 3:30, 3:40, plus or minus.

12          MR. DACUS:  Thank you.

13          (Recess.)

14          (Jury out.)

15          COURT SECURITY OFFICER:  All rise.

16          THE COURT:  Be seated, please.

17          Let's bring in the jury, please, Mr. Elliott.

18          COURT SECURITY OFFICER:  All rise.

19          (Jury in.)

20          THE COURT:  Please be seated, ladies and

21   gentlemen.

22          Welcome back, ladies and gentlemen of the jury.

23          I'd like to now give you some preliminary

24   instructions on the record before we start with the opening

25   statements from the lawyers for the parties.

1      You've now been sworn as the jurors in this case.

2  And as the jury, you are the sole judges of the facts.  And

3  as such, you will decide and determine what all the facts

4  are in this case.

5      As the Judge, I will give you instructions on the

6  law, I'll decide any questions of law, evidence, or

7  procedure that arise during the trial, and I'm responsible

8  for maintaining the efficient flow of the evidence over the

9  course of the trial and maintaining the proper decorum of

10 the courtroom.

11     At the end of the evidence, I'll give you detailed

12 instructions about the law to apply in deciding this case,

13 and I'll also give you a list of questions that you are

14 then to answer.  This list of questions is called the

15 verdict form.  And your answers to those questions will

16 need to be unanimous.  And those unanimous answers to the

17 questions in the verdict form will constitute the jury's

18 verdict in this case.

19     Now, let me briefly tell you what this case is

20 about.

21     This case involves a dispute regarding certain

22 United States patents.  I know you all saw the patent video

23 film prepared by the Federal Judicial Center, but I need to

24 give you some instructions now and on the record about a

25 patent and how one is obtained.

1              Patents are granted or denied by the United States

2    Patent and Trademark Office, sometimes called the Patent

3    Office, sometimes called, just for short, the PTO.

4              A valid United States patent gives the holder of

5    the patent the right for up to 20 years from the date the

6    application is filed to permit others from making, using,

7    offering to sell, or selling the patented invention within

8    the United States, or from importing it into the United

9    States without the patentholder's permission.

10             A patent is a form of property called intellectual

11   property, and like all forms of property, a patent can be

12   bought or sold.  A violation of the patentholder's rights

13   is called infringement.  The patentholder may try to

14   enforce a patent against persons it believes to be

15   infringers by filing a lawsuit in federal court, and that's

16   what we have in this case.

17             The process of obtaining a patent is called patent

18   prosecution.  To obtain a patent, one must first file an

19   application with the United States Patent and Trademark

20   Office or simply the PTO.  The PTO, ladies and gentlemen,

21   is an agency of the United States Government, and it

22   employs trained examiners who review patents and

23   applications for patents.

24             The application includes within it what is called

25   a specification.  The specification contains a written

1    description of the claimed invention telling what it is,

2    how it works, how to make it, and how to use it.  The

3    specification concludes or ends with one or more numbered

4    sentences.  These numbered sentences are called the patent

5    claims.

6          When a patent is granted by the PTO, it's the

7    claims, ladies and gentlemen, that define the boundaries of

8    its protection and give notice to the public of those

9    boundaries.

10          Now, patent claims may exist in two forms referred

11   to as independent claims and dependent claims.

12          An independent claim does not refer to any other

13   claim in the patent.  It is independent.  It's not

14   necessary to look at any other claim to determine what an

15   independent claim covers.

16          However, a dependent claim refers to at least one

17   other claim in the patent.  A dependent claim includes each

18   of the elements or limitations of that other claim or

19   claims from which it depends or to which it refers, as well

20   as the additional limitations or elements recited within

21   the dependent claim itself.

22          Accordingly, to determine what a dependent claim

23   covers, it's necessary to look at both the dependent claim

24   itself and the independent claim or claims from which it

25   refers, or as we sometimes say, from which it depends.

1          Now, the claims of the patents-in-suit use the

2     word "comprising."  Comprising means including or

3     containing.  A claim that includes the word "comprising" is

4     not limited to the methods or devices having only the

5     elements that are recited in the claim but also covers

6     methods or devices that add additional elements.

7          Let me give you a simple example.  If you take a

8     claim that covers a table, if the claim recites a table

9     comprising a tabletop, legs, and glue, the claim will cover

10    any table that contains these three structures, even if the

11    table also contains other structures, such as leaves to

12    expand the tabletop, or wheels to go on the ends of the

13    legs.

14         Now, that's a simple example using the word

15    "comprising" and what it means.  In other words, ladies and

16    gentlemen, it can have other features in addition to those

17    that are covered by the patent.

18         Now, after the applicant files their application

19    with the Patent and Trademark Office, an examiner is

20    assigned, and that examiner reviews the application to

21    determine whether or not the claims are patentable, that is

22    to say, appropriate for patent protection, and whether or

23    not the specification adequately describes the invention

24    claimed.

25         In examining the patent application, the examiner

1    reviews certain information about the state of the

2    technology at the time the application was filed.  The PTO

3    searches for and reviews this type of information that's

4    publicly available, or it was submitted by the applicant.

5            This type of information is called prior art.  The

6    examiner reviews this prior art to determine whether or not

7    the invention is truly an advance over the state of the art

8    at the time.  Prior art is defined by law, and I'll give

9    you specific instructions at a later time as to what

10   constitutes prior art.

11           However, in general, prior art includes

12   information that demonstrates the state of the technology

13   that existed before the claimed invention was made or

14   before the application for a patent was filed.

15           Now, a patent contains a list of certain prior art

16   that the examiner has considered.  The items on this list

17   are called the cited references.

18           Now, after the prior art search and examination of

19   the application by the examiner, the examiner then informs

20   the applicant in writing of what the examiner has found and

21   whether the examiner considers any claim to be patentable

22   in which case it will be allowed.

23           Now, this writing from the examiner to the

24   applicant is called an Office Action.

25           Now, if the examiner rejects the claims, the

1    applicant has the opportunity to respond to the examiner,

2    to try to persuade the examiner to allow the claims.

3            The applicant also has the chance to change or

4    amend the claims or to submit new claims, and these papers,

5    ladies and gentlemen, generated through these

6    communications back and forth between the applicant and the

7    examiner are called the prosecution history.

8            And this process may go back and forth between the

9    applicant and the examiner for some time until the examiner

10   is satisfied that the application meets the requirements

11   for a patent.  And in that case, the application issues as

12   a United States patent, or in the alternative, if the

13   examiner ultimately decides that the application should be

14   rejected, then no patent is issued.

15           Sometimes patents are issued after appeals within

16   the PTO or to a Court.

17           Now, to help you follow the evidence, I'll give

18   you a brief summary of the positions of the two competing

19   parties.

20           As you well know, the party that initiates and

21   brings a lawsuit is called the Plaintiff.  The Plaintiff in

22   this case is GREE, Inc., which you'll hear referred to

23   throughout the trial simply as either the Plaintiff or as

24   GREE.

25           And as you know, the party against whom a lawsuit

1   is brought is called the Defendant.  The Defendant in this

2   case is Supercell Oy, which you'll hear referred to simply

3   as the Defendant or as Supercell.

4        And as I told you during jury selection, this case

5   is a case of alleged patent infringement, and there are six

6   United States patents that have been asserted in this case.

7        The first of these is United States Patent

8   No. 10,328,346, and as you may know, patents are commonly

9   referred to by the last three digits of their patent

10  number.  So in this case, Patent No. 10,328,346 will be

11  referred to and you'll hear it referred to throughout the

12  trial as the '346 patent.

13       The second U.S. patent at issue in this case is

14  United States Patent No. 10,335,689, which you will hear

15  referred to as the '689 or the '689 patent.

16       The third patent is United States Patent

17  10,076,708, which you'll hear referred to as the '708

18  patent.

19       The fourth U.S. patent is United States Patent

20  No. 10,413,832, which you'll hear referred to as the '832

21  or the '832 patent.

22       The fifth United States Patent at issue is U.S.

23  Patent No. 9,079,107, which you'll hear referred to as the

24  '107 patent throughout the trial.

25       And the sixth and final U.S. patent at issue in

1  this case is United States Patent No. 9,561,439, which

2  you'll hear referred to as the '439 or the '439 patent

3  during the course of the trial.

4        Now, these patents together -- these six patents

5  together, ladies and gentlemen, will be referred to

6  collectively over the course of the trial at various times

7  as either the patents-in-suit or the asserted patents.

8        When those terms are used, it means all six of

9  them.  And these patents generally relate to video game

10  technology.

11        Now, the Plaintiff in this case, GREE, contends

12  that the Defendant, Supercell, is infringing certain claims

13  of the patents-in-suit by making, using, selling, or

14  offering for sale or importing into the United States

15  products that include their patented technology.

16        GREE also contends that Supercell's infringement

17  is willful.

18        GREE also contends that Supercell has induced or

19  contributed to and continues to induce or contribute to

20  infringement by others.

21        GREE also contends that it's entitled to money

22  damages as a result of that infringement.

23        The Defendant, Supercell, denies that it is

24  infringing any of the Plaintiff's patents-in-suit and

25  contends that certain of the asserted claims of the six

1   patents-in-suit are invalid as either being anticipated or

2   obvious in light of the prior art.

3          Supercell also contends that certain of the

4   asserted claims of the patents-in-suit are invalid because

5   the patent specifications do not contain a sufficient

6   written description of the invention.

7          Now, I know, ladies and gentlemen, that there are

8   many new words and many new concepts that have been thrown

9   at you today.  I'm going to define a lot of those words and

10  concepts as we go through these instructions.

11         The attorneys in the case from both sides are

12  going to discuss them and help you with them in their

13  opening statements.  The witnesses that you will hear over

14  the course of the trial are going to help you through their

15  testimony to understand these words and concepts.

16         So, please, do not feel overwhelmed at this point.

17  I promise you, it will all come together as we go forward.

18         Now, one of your jobs in this case is to decide

19  whether or not the asserted claims of the six asserted

20  patents have been infringed.

21         You'll also be asked to decide whether or not

22  certain of the asserted claims from within the

23  patents-in-suit are invalid.

24         If you decide that any claim of the

25  patents-in-suit has been infringed by the Defendant and is

1    not invalid, then you'll need to decide whether or not that

2    infringement has been willful.  You'll also need to decide

3    what amount of money damages should be awarded to the

4    Plaintiff as compensation for that infringement.

5            Now, my job in this case is to tell you what the

6    law is, handle rulings as to evidence and procedure, and

7    oversee the course of the trial.

8            In determining the law, ladies and gentlemen, it

9    is specifically my job to determine the meaning of any of

10   the claim language from within the asserted patents that

11   needs to be interpreted.

12           And I've already determined the meanings of

13   certain claim language from the patents-in-suit, and you

14   must accept the meanings that I give you and use those

15   meanings or constructions when you decide whether any

16   particular claim has or has not been infringed and whether

17   or not any particular claim is invalid.

18           You'll be given a document in a few moments that

19   reflects these meanings or constructions which the Court

20   has provided to you.

21           Now, for any claim term or language for which I

22   have not provided you with a definition or construction,

23   you should apply the plain and ordinary meaning as

24   understood by a person of ordinary skill in the art.

25           Now, if I have provided you with a definition, you

1    are to apply my definition to those terms and that language

2    throughout the case.

3              However, ladies and gentlemen, my interpretation

4    of some of the language of the claims should not be taken

5    by you as an indication that I have any personal opinion at

6    all regarding issues such as infringement and invalidity,

7    because those issues are yours to decide as a jury, and

8    they're yours alone to decide.

9              I'll provide you with more detailed instructions

10   on the meanings of the claims before you retire to

11   deliberate on your verdict.

12             In deciding the issues that are before you, you'll

13   be asked to consider specific legal rules, and I'll give

14   you an overview of those rules now.  And then at the

15   conclusion of the case, I'll give you more detailed

16   instructions.

17             The first issue that you are asked to decide is

18   whether the Defendant, Supercell, has infringed any of the

19   asserted claims of the patents-in-suit.

20             Infringement, ladies and gentlemen, is determined

21   and assessed on a claim-by-claim basis.  And GREE, the

22   Plaintiff, must show you by a preponderance of the evidence

23   that a claim has been infringed.  Therefore, there may be

24   infringement as to one claim but no infringement as to

25   another claim.

1        There are also a few different ways that a patent

2   claim can be infringed, and I'll explain the requirements

3   for each of these types of infringement in detail at the

4   conclusion of the case.

5        But in general, a Defendant may infringe an

6   asserted patent by making, using, selling, or offering for

7   sale in the United States or importing into the United

8   States a product meeting all the requirements of a claim of

9   the asserted patents.

10       And I'll provide you with more detailed

11  instructions on infringement at the conclusion of the case.

12       Now, the second issue that you'll be asked to

13  decide is whether certain of the asserted claims are

14  invalid.

15       Invalidity, ladies and gentlemen, is a defense to

16  infringement.  Therefore, even though the United States

17  Patent and Trademark Office has allowed the asserted

18  claims, and even though an issued United States patent is

19  presumed to be valid, you, the jury, must decide whether

20  those claims are invalid after hearing the evidence

21  presented during this trial.

22       Excuse me.

23       You may find a patent claim to be invalid for a

24  number of reasons, including because it claims subject

25  matter that is not new, or it is obvious.

1        For a patent claim to be invalid because it is not

2   new, the Defendant must show by clear and convincing

3   evidence that all of the elements of a claim are

4   sufficiently described in a single previous printed --

5   printed publication or patent.  If a claim is not new, it

6   is said to be anticipated.

7        Another way that a claim can be found to be

8   invalid is that it may have been obvious.  Even though a

9   claim is not anticipated because every element of the claim

10  is not shown or sufficiently described in a single piece of

11  prior art, the claim may still be invalid, if it would have

12  been obvious to a person of ordinary skill in the field of

13  the technology of the patent at the relevant time.

14       Now, you'll need to consider a number of questions

15  in deciding whether the claimed invention in the asserted

16  patents is obvious.  And I'll provide you with more

17  detailed instructions on these questions at the conclusion

18  of the trial.

19       Now, another way that a claim can be found to be

20  invalid is that there may have been a lack of a written

21  description -- a lack of an adequate written description.

22       A patent may be invalid if its specification does

23  not describe the claimed invention in sufficient detail so

24  that one skilled in the art can reasonably conclude that

25  the inventor actually had possession of the invention they

1  are claiming.

2       If you decide that any of the claims of the

3  patents-in-suit have been infringed and are not invalid,

4  then you'll need to decide whether the Defendant's

5  infringement has been willful.  If you decide that any

6  claim of the patents-in-suit has been infringed and is not

7  invalid, then you'll need to decide what amount of money

8  damages should be awarded to the Plaintiff -- in this case

9  GREE -- to compensate it for that infringement.

10       A damage award in a patent case, ladies and

11  gentlemen, must be adequate to compensate the patentholder

12  for the infringement, and in no event may a damage award be

13  less than what the patentholder would have received if it

14  had been paid a reasonable royalty for the use of its

15  patent.

16       However, the damages you award, if any, are meant

17  to compensate the patentholder, and they're not meant to

18  punish the Defendant.  And you may not include in any

19  damages award an additional amount as a fine or a penalty

20  above what is necessary to fully compensate the

21  patentholder for the infringement.

22       Additionally, damages can't be speculative, and

23  the Plaintiff, GREE, must prove the amount of its damages

24  for the alleged infringement by a preponderance of the

25  evidence.

1          I'll give you more detailed instructions on the

2     calculation of damages for the Defendant's alleged

3     infringement of the patents-in-suit at the conclusion of

4     the trial, including by giving you specific instructions

5     with regard to the calculation of a reasonable royalty.

6          However, the fact that I'm instructing you on

7     damages does not mean that GREE is or is not entitled to

8     recover damages.

9          Now, over the course of the trial, ladies and

10    gentlemen, you're going to be hearing from a number of

11    witnesses in this case.  And I want you to keep an open

12    mind while you're listening to the evidence, and not decide

13    any of the facts until you have heard all of the evidence.

14         This is important.  While the witnesses are

15    testifying, remember that you, the jury, will have to

16    decide the degree of credibility and believability to

17    allocate to each of the witnesses and the evidence.

18         So while the witnesses are testifying, you should

19    be asking yourselves things like this:  Does the witness

20    impress you as being truthful?  Does he or she have a

21    reason not to tell the truth?  Does he or she have any

22    personal interest in the outcome of the case?  Does the

23    witness seem to have a good memory?  Did he or she have an

24    opportunity and ability to observe accurately the things

25    that they've testified about?  Did the witness appear to

1    understand the questions clearly and answer them directly?

2    And, of course, does the witness's testimony differ from

3    the testimony of any other witness, and if it does, how

4    does it differ?

5         These are some of the things that you should be

6    thinking about while you're listening to each witness over

7    the course this trial.

8         Also, ladies and gentlemen, I want to talk to you

9    briefly about expert witnesses.

10        When knowledge of a technical subject may be

11   helpful to the jury, a person who has special training and

12   experience in that particular technical field, we call them

13   an expert witness, is permitted to testify to the jury

14   about his or her opinions on those technical matters.

15        However, ladies and gentlemen, you're not required

16   to accept an expert witness's or any witness's opinions at

17   all.  It's up to you to decide who to believe and whether a

18   witness is correct or incorrect, or whether or not you want

19   to believe what they have to say.

20        Now, I anticipate that there will be expert

21   witnesses testifying in support of each of the parties in

22   this case.  But when they do, it will be up to you to

23   listen to their qualifications.  And when they give you an

24   opinion on some technical matter and explain their basis

25   for it, you'll have to evaluate what they say, whether or

1   not you believe it, and what degree, if any, that you want

2   to give that opinion weight.

3          Remember, judging and evaluating the credibility

4   and the believability of each and every witness is a very

5   important part of your job as jurors.

6          Now, during the trial, it's possible that there

7   will be testimony from one or more witnesses that are going

8   to be presented to you through what's called a deposition.

9   In trials like this one, it's difficult, if not impossible,

10  to get every witness physically present at the same time to

11  testify live from the courtroom.

12         So the lawyers from each side, prior to the trial,

13  take the depositions of each of the witnesses.  In a

14  deposition, a court reporter is present, the witness is

15  sworn and placed under oath, just as if he or she were

16  personally in court.

17         The parties are represented by their lawyers.

18  They ask this witness questions.  And the answers and the

19  questions are written, transcribed, and taken down by the

20  court reporter.

21         It's important to understand, ladies and

22  gentlemen, that during the course of the trial, when these

23  deposition witnesses are presented to you, you're likely to

24  see places where they are spliced together or clips.

25         Let me explain.  Most depositions now are taken

 1   with a video recording, as well as the written

 2   transcription of the questions and the answers.

 3          And where there's a video recording, and portions

 4   of that deposition are played to the jury during a trial,

 5   it's inevitable that you're going to see places where it's

 6   clear that the videotape has been spliced together.

 7          It's also clear that there are going to be times

 8   when the person's voice changes because the lawyers or the

 9   parties stops, and the other lawyer starts asking

10   questions.

11          Don't let those spliced segments or the change in

12   voices distract you in any way.  Remember, ladies and

13   gentlemen -- and let me explain.

14          Most depositions in lawsuits like this last many

15   hours, typically seven hours each.  Well, there might be 15

16   minutes of testimony taken during that deposition that both

17   of the parties in the trial think is important for the jury

18   to hear, and that witness can't appear physically to give

19   that testimony.

20          So by taking that 15 minutes out and splicing it

21   together and playing that portion of the video to you, it

22   saves you and me and everybody else listening to the entire

23   seven-hour deposition to get that 15 minutes.

24          So when you see those places where it's obviously

25   spliced or you hear a different-sounding voice, just think

 1  of it as saving you hours and hours of time, and don't let

 2  it distract you in any way.

 3          Now, deposition testimony -- and I want to be

 4  clear about this.  Deposition testimony, even though the

 5  person is not physically present in the courtroom, is

 6  entitled to the same consideration, insofar as possible,

 7  and is to be judged by you, the jury, as to the

 8  credibility, weight, and otherwise considered in the same

 9  way as if the witness had been physically present and given

10  their testimony live from the witness stand in open court.

11          Also, ladies and gentlemen, information on some of

12  the documents that you're going to see over the course of

13  the trial will have been redacted prior to their

14  presentation to you based on orders of the Court.  That's

15  because there may be information in those documents that's

16  not relevant to what you're deciding.

17          You should not be distracted by any redactions or

18  blacked-out places in any of the documents that you see

19  over the course of the trial.  Don't focus on the

20  redactions.  Don't try to guess what has been redacted.

21  Focus on the unredacted portions that is clearly presented

22  to you to look at.

23          Again, the Court's ordered those redactions

24  previously based on a determination that that material is

25  not relevant to the issues you're going to be asked to

1   decide.

2          Also, over the course of the trial, certain

3   exhibits are going to be shown to you that are called

4   demonstrative exhibits, and that's sometimes shortened to

5   be simply referred to as demonstratives.

6          Demonstrative exhibits are a party's depiction,

7   picture, model to describe something involved in the trial.

8          Demonstrative exhibits are often used, along with

9   the witness's own testimony, to help describe or

10  demonstrate what the witness is testifying about.

11         But remember, demonstrative exhibits, or

12  demonstratives for short, are not evidence, but the

13  witness's testimony given under oath while using a

14  demonstrative is evidence.

15         Also, during the course of the trial, it's

16  possible that the lawyers will from time to time raise

17  certain objections.  And when they do, I will issue rulings

18  on those objections.

19         It's the duty of an attorney to object when the

20  other side offers evidence or testimony that the attorney

21  believes is not proper under the rules of the Court or the

22  Rules of Evidence.

23         Upon allowing the testimony or the other evidence

24  to be introduced over the objection of an attorney, the

25  Court does not, unless expressly stated, indicate to you

1    any opinion as to the weight or effect of that evidence.

2           As I've said before, you, the jury, are the sole

3    judges of the credibility and believability of all the

4    witnesses and the weight and what effect, if any, to give

5    to the evidence that's presented over the course of the

6    trial.

7           Now, let me compliment the parties in your

8    presence, ladies and gentlemen, because prior to today,

9    long before you got to the courthouse, the parties and the

10   Court worked very diligently to go through many, many, many

11   exhibits and potential exhibits that would be offered to

12   you during the course of the trial.

13          And through all these pre-trial procedures, which

14   took many hours, I assure you, all the rulings from the

15   Court have already been made about the admissibility of the

16   exhibits.

17          And I promise you, that process has saved you

18   much, much time that you would otherwise have to sit and

19   listen to over the course of this trial.

20          And because these exhibits have already been

21   tested as to their admissibility before the Court and the

22   Court's entered its rulings, the parties don't have to go

23   through the formal offer of that exhibit and hear the

24   objections and let the Court rule on it during the trial.

25          All that's already been done so that when the

1  parties show you an exhibit that's been admitted by the

2  Court, they can simply show it to you, put it in the proper

3  context, and use it during the course of the trial.

4        And you may not understand it, but you have been

5  spared many, many hours of tedious arguments about

6  admissibility of exhibits that the Court has taken up with

7  the lawyers in advance of today.

8        And both sides have worked very diligently with

9  the Court to streamline these issues so that you don't have

10  to listen to them over the course of the trial.  And I

11  promise you, it has saved you a lot of time.

12        However, even though that's the case, it's still

13  possible that during the course of the trial objections

14  will arise during the trial itself.

15        And if I should sustain an objection to a question

16  addressed to a witness, then you, the jury, must disregard

17  the question entirely, and you may draw no inference from

18  its wording, and you may not speculate about what the

19  witness would have said if the Court had allowed them to

20  answer the question.

21        On the other hand, if I overrule an objection to a

22  question addressed to a witness, then you should consider

23  the question and the witness's answer just as if no

24  objection had been made.

25        Now, you should know, ladies and gentlemen, that

1   the law of the United States permits a United States

2   District Judge to comment to a jury regarding the evidence

3   in the case, but those comments from the Judge to the jury

4   on the evidence are only an expression of the Judge's

5   opinion, and the jury may be free to completely disregard

6   those comments because as I've told you, you, the jury, are

7   the sole judges of the facts in this case, the credibility

8   of the witnesses, and the amount of weight, if any, to give

9   to all of the evidence.

10          Let me assure you, even though the law may permit

11   me to make those kind of comments, as I told you earlier, I

12   am going to try very hard not to comment on any of the

13   evidence presented to you over the course of this trial.

14          Now, our court reporter in front of me,

15   Ms. Holmes, is taking down everything that's said in the

16   courtroom.  And that produces a written transcript of

17   everything that's said over the course of the trial.

18          However, the written version of that transcript is

19   not going to be available to you to review in the jury room

20   when you deliberate on the evidence and consider the

21   questions presented to you in the verdict form.

22          The transcript is prepared in case there's an

23   appeal of this case to a higher Court.  That means, ladies

24   and gentlemen, you're not going to have the transcript to

25   use.  You're going to have to rely on your memory of the

1  evidence.

2        Now, in a moment, you're each going to be given a

3  juror notebook.  In the front of that notebook, you'll find

4  places -- actually in the back of the notebook, you'll find

5  a legal pad where you can take notes over the course of the

6  trial.

7        Also, some of the inserted pages in the notebook

8  itself will have ruled lines on them where you can take

9  additional notes.

10       It is up to each of you to decide whether or not

11  over the course of the trial you want to take notes during

12  the witness's testimony.  And if you do, it's up to you to

13  decide how detailed you want those notes to be.

14       But, remember, any notes that you may take are for

15  your own personal use.  You still have to rely on your

16  memory of the evidence, which is why you should pay close

17  attention to the testimony of each and every witness.

18       You shouldn't abandon your own recollection of the

19  evidence, ladies and gentlemen, because some other juror's

20  notes indicate something differently.  Your notes, if you

21  take them, are to refresh your recollection, and that's the

22  only reason you should be keeping them.

23       I'll now ask our Court Security Officer to

24  distribute these juror notebooks to each member of the

25  jury.

1          In these notebooks, ladies and gentlemen, you'll

2     see that you each have a copy of the various asserted

3     patents that we've talked about, the patents-in-suit.

4          You'll also see that you should have a chart in

5     there listing on one side the language from the asserted

6     claims that the Court has construed and provided you with

7     definitions of, and on the corresponding ledger to the

8     side, you'll see the construction or the definition that

9     the Court's given you.

10          And, again, you are to use my definitions in the

11     constructions where I've given them to you throughout the

12     course of the trial with regard to the issues you're asked

13     to decide.

14          Also, you'll find in those notebooks a section of

15     witness pages for each witness that might testify with a

16     picture of the witness at the top of the page, their name,

17     and ruled lines beneath for additional note-taking.

18          And you'll find the legal pad in the back that I

19     mentioned to you.  And you should also find a pen in the

20     front.  All of this is to accommodate you in taking notes

21     during the trial if you wish to take notes.

22          Now, in a minute, ladies and gentlemen, the

23     lawyers in this case are going to present their opening

24     statements.

25          The opening statements are designed to give you a

1 roadmap of what each side expects the evidence will show,

2 and you should remember throughout the trial that what the

3 lawyers tell you is not evidence.

4          The evidence is the sworn testimony that you'll

5 hear both from the witness stand of live witnesses and the

6 deposition testimony of witnesses who are not present in

7 the courtroom, as well as any of the exhibits that the

8 Court has already admitted into the evidence.  That's the

9 evidence in this case.

10          What the lawyers tell you is their impression of

11 what the evidence is and what it means, and they have a

12 duty to try and point out to you what they believe the

13 evidence is.  But, remember, what they tell you is not

14 evidence.

15          Now, after the opening statements are complete, we

16 will recess until Monday morning at 8:30, and on Monday

17 morning at 8:30, we'll begin with the presentation of the

18 Plaintiff's evidence in this case.

19          The Plaintiff will put on their evidence first.

20 That's called the Plaintiff's case-in-chief.

21          After the Plaintiff puts on its case-in-chief, its

22 evidence, it will rest.

23          And then the Defendant will put on its

24 case-in-chief and call its witnesses.  When the Defendant

25 has completed and presented all its evidence, then the

1    Defendant will rest.

2          After the Defendant rests, the Plaintiff has an

3    opportunity to call what are called rebuttal witnesses if

4    they choose to.  They're not required to.

5          If there are rebuttal witnesses, then when the

6    Plaintiff's rebuttal witnesses are presented, at that point

7    and when that's complete, then you will have heard all the

8    evidence in this case.

9          After that, I will give you my final instructions

10   on the law that you're to apply, and you will hear closing

11   arguments from the lawyers for each of the parties.  And

12   when the closing arguments are complete, then I will

13   instruct you to retire to the jury room, take the verdict

14   form that's been prepared with you, and deliberate on your

15   verdict.

16         Remember, until that time, you are not to discuss

17   the case or any of the evidence with each other.  Only when

18   all of that has happened and I've instructed you to retire

19   to the jury room to deliberate on your verdict, at that

20   moment, the light switch turns, and it becomes your duty to

21   discuss the evidence that you've heard over the course of

22   the trial with each other in an effort to reach a unanimous

23   decision about the questions in the verdict form.

24         But until that point, you must not discuss the

25   evidence or any of the witnesses or anything about the

1   trial with each other or, of course, with anyone else.

2          At this time, we'll proceed to hear the opening

3   statements from the parties.

4          The Plaintiff, GREE, may present its opening

5   statement to the jury at this time.

6          MR. MOORE:  Thank you, Your Honor.

7          THE COURT:  Would you like a warning on your time,

8   counsel?

9          MR. MOORE:  Yes, Your Honor.  Five minutes,

10  please.

11         THE COURT:  I'll warn you at five minutes

12  remaining.

13         MR. MOORE:  Thank you.

14         THE COURT:  You may proceed with your opening

15  statement.

16         MR. MOORE:  Thank you, Your Honor.  And may it

17  please the Court.

18         Good afternoon, ladies and gentlemen.  I know it's

19  been a long day.  At the end of probably a very long week

20  for many of you.  So thank you very much for your service

21  in this matter.  And this is a very important case for my

22  client, GREE.

23         I'll be happy to present our opening statement to

24  you.

25         My name is Steve Moore, and like the others have

1  done today, I'll give a little introduction about myself as

2  well as my client and our team.

3       I live in California right now.  But I grew up

4  most of my life, most of my childhood, I should say, in

5  Louisiana, just outside of New Orleans.  I moved to Georgia

6  for high school, then to North Carolina for college where I

7  met my wife and then law school, as well.

8       I practiced law between Georgia and North Carolina

9  for a number of years until my law firm entered into a

10  merger with a California firm.  At that point I moved out

11  west.

12       I've been married as they say for more than 25

13  years.  My wife work works for a technology company.  I

14  have two children.  My son is 21, my daughter is 17.  Now,

15  she's trying to get through high school, but he's been in

16  college, but with COVID and things going remote, decided to

17  take the year off, come back home and work for a year, but

18  will go back in the fall.  So that's a little bit about me.

19       I also want to introduce to you my client here at

20  the table, Mr. Eiji Araki.  Mr. Araki is from Tokyo, Japan,

21  and has come here to Marshall as the representative for

22  GREE.  Thank you, Mr. Araki.

23       Mr. Araki is a senior vice president and also on

24  the board of directors for GREE, and you'll hear from him

25  early next week in his testimony.  You've already met my

 1   co-counsel, Mr. Gillam, so I'd like to also introduce you

 2   then to my law partner and good friend, Ms. Taylor Ludlam.

 3          Ms. Ludlam was born and bred in North Carolina and

 4   practices law now with my firm, as well.  You'll hear from

 5   her in the case.  You may also hear from some other folks

 6   on our team later on.

 7          As you've heard many times and seen this morning,

 8   this is a patent case, and it involves six patents.  Let's

 9   see if I can get this to work.  There we go.

10          As you heard this morning, the case involves

11   important rights in our constitution.  The constitution

12   provides for our patent system, and provides the government

13   to allow patents to be issued.

14          And GREE did just that.  It did the right thing

15   and invested in patents in its inventions, not only in its

16   home country, but also here in the United States.

17          Now, the constitution of our country also provides

18   for a right to trial by jurors, and as you've heard, that's

19   what happens in a case like this one where a Plaintiff,

20   like GREE, believes that another company is infringing or

21   using its technology under a U.S. patent for sales

22   activities here in the United States.

23          And so that's why we brought this action, to have

24   you address and decide this important case.

25          Now, certainly, it is true, as Supercell's counsel

1   reminded you, that this right to trial by jury also

2   involves a right to defend yourself.

3          And they absolutely have every right to do that.

4          And you should listen and hear all of the

5   evidence, not make up your mind before you've heard it all.

6          But we believe that at the end of all of that

7   evidence, that you will agree with us that Supercell has

8   infringed GREE's six patents, and we'd ask you to hold

9   Supercell accountable for that infringement.

10         Now, as you've heard already, the case is about

11  gaming, in particular, video or computer games.  And as

12  Mr. Gillam said, we've got to cast our minds back quite a

13  while to remember what it was like, a child of the '70s

14  like me remembers going to arcades and putting quarters in

15  to play games.

16         You know, after that we then had consoles

17  throughout the '90s and to the early part of this century.

18  And it was very different then, as you've heard.  You had

19  to save up your money, you didn't know if you'd like the

20  game, the game never changed.

21         GREE is a company that helped change that as part

22  of this forefront of what's called mobile social games,

23  games played on your phone, your mobile device, with other

24  people, maybe around -- down the street, maybe around the

25  world.

1          And also games that you don't have to pay to

2    download and try out if you want to.  And you can decide

3    later if you do like it enough that you want to pay

4    something for it.

5          And so GREE has been a part of that, as I say, a

6    pioneer on the forefront of that movement in the gaming

7    industry.  And as you've heard, they started -- they

8    started out and remain headquartered in Japan.  And for

9    those of you who are sports fans, may have heard something

10   about Japan in the sports world.

11         The Olympics are going to be there next month or

12   in two months, I think.  Those of you who are golf fans

13   know Mr. Matsuyama, the Japanese golfer, first Japanese

14   golfer to win the Master's a few weeks ago.

15         But Japan is also well known for gaming.  It's

16   very popular there.  A lot of the advances in the industry

17   have come out of Japan.  In fact, I believe just about

18   everything on this slide came or was originated from a

19   Japanese company, from PacMan to Space Invaders to Game

20   Boys and SEGAs, Nintendos, and the like and GREE is another

21   in the line of that investment.

22         Now, how did GREE get started?  It was founded

23   close to 20 years ago by Mr. Tanaka in Japan.  And he had

24   been inspired by his travels in the United States, about

25   the entrepreneurship and the technology innovations in the

```
 1   United States.

 2          When he went back home, he decided that he wanted

 3   to have a technology company.  So he started GREE on the

 4   side as a hobby, as a side project from his regular job.

 5          He started as a social networking company.  And,

 6   finally, it got so popular, he decided to quit his job and

 7   take a risk and start a company.  He started hiring people,

 8   including Mr. Araki, one of his first hires.

 9          And GREE has grown from that initial foray into

10   the social networking world.  A couple years later started

11   with gaming, and now it has grown to more than 1,700

12   employees, 400 engineers, over 1,800 patents, and is

13   involved in not only gaming and social media, but media

14   advertising, virtual reality, et cetera.

15          But at its more humble beginnings, GREE started

16   one of the world's first mobile social games.  This game

17   you'll hear about, Mr. Araki worked on, is called Fishing

18   Star where you can enter fishing tournaments, compete with

19   your friends, team up with them, or try to compete to see

20   who can catch the biggest one.

21          And so in that sense, GREE was ahead of its time.

22   These mobile social games hadn't made their way to other

23   parts of the world, including the United States.

24          And you'll also hear about the model, which I

25   think you heard about early a little bit, this freemium
```

1  model.

2       Which is, instead of buying the game, you can try

3  it out for free, and then you can, if you like it enough,

4  choose to pay to get certain advantages to get ahead in the

5  game, if that's what you want to do.  So that's why we have

6  this word "freemium" combined from free and premium.

7       The last thing about these games you'll hear a lot

8  about is because of their nature, you need networks.  You

9  know, 20 years ago we didn't have the networks we have now.

10      But now we can play with somebody around the world

11  or down the street on our game using WiFi or cellular

12  networks.  And you have these things called servers,

13  they're big computers that essentially run the games and

14  operate it so that if you're playing somebody in Seattle,

15  Washington, you both know what's going on in the game at

16  the same time, for example.

17      And so that's GREE's start and where it got to be.

18  What about Supercell?  They started a little bit later.

19  They were founded in 2010.  And as many companies do, I

20  think all companies in most industries, and certainly in

21  the gaming industry, they look around at what are other

22  folks doing in the industry.  Certainly GREE does that.

23  They look at other companies, other games, see what they're

24  doing, try to learn from it.

25      And that's exactly what Supercell did as it was

167

1  developing its first couple games.  It looked around the

2  industry, and it noticed GREE as one of the players in the

3  industry, particularly these new type of social games.

4          And Supercell talked about that internally.

5  You'll see this exhibit, PTX-166.

6          This is where Supercell's CEO, Mr. Paananen, back

7  in 2012, shared with some of the other executives of the

8  company about this GREE social game that was one of the top

9  mobile social games in Japan at the time, made about

10  $25 million per month.  So that made an impression, made an

11  impression that this social gaming was where the industry

12  was headed.

13          Supercell continued with that.  Mr. Greg Harper,

14  who is seated here at their table, wrote to the CEO and

15  other executives a few months later talking about an

16  interview with Mr. Araki at the table there.

17          Mr. Araki was interviewed by the press about what

18  GREE and other Japanese game makers had been doing in the

19  mobile social gaming world.

20          And Mr. Harper noticed that, emphasized some of

21  the text that was important about how these social features

22  in games really helped drive user engagement, and made the

23  users, the players interested in the games.

24          And from there, GREE and Supercell had a number of

25  interactions.  They had a few meetings and correspondence.

1   They met some of each other.

2          And in 2013, contingent from Supercell traveled to

3   Japan to learn about the gaming industry from a variety of

4   Japanese companies.  One of the companies they talked to

5   was GREE.

6          And there were some meetings at that time about

7   whether they might be able to work together, for example,

8   helping Supercell introduce its games and make them more

9   popular in Japan, or other type of business arrangements.

10         And you'll hear that after that meeting, Supercell

11  left extremely impressed by GREE, in Mr. Harper's words,

12  and that the meeting was incredibly helpful to them.

13         Now, ultimately, Supercell didn't agree to work

14  with GREE.  They said, no, thanks.  And the parties went

15  their separate ways.  And so that's where the parties left

16  it in 2013.

17         Now, that might have been the end of the story,

18  except that about three and a half years later from that,

19  in 2016, GREE did some looking at some features that had

20  been added into Supercell's games in the intervening time

21  period, and found out that some of those features infringed

22  its patents.  And so that's what ultimately leads us here

23  today.

24         Now, talking about infringement, and you saw this

25  in the video and have heard it from Judge Gilstrap,

 1   infringement is -- it's a type of trespassing, really, of a

 2   property right.  Not a land property right, but an

 3   intellectual property right.  Just as you might fence off

 4   your land, the claims of a patent fence off your rights to

 5   intellectual property.  And that's what we'll talk about

 6   here.  You'll hear a lot about claims.

 7           GREE received a number of patents on its

 8   inventions.  There are six United States patents that GREE

 9   has received that are at issue here today.

10           And these are the six patents that the U.S.

11   Government awarded to GREE based on its applications.  I

12   put them on the slide here, as well, and we'll talk about

13   them.

14           Now, as you just heard, patents are often referred

15   to by their last three numbers, so we don't have to repeat

16   that long number every time, and that's how we'll talk

17   about them.

18           We've also added some short names to help us

19   remember them, so some of us may -- like me, may not have a

20   memory for numbers, we've added some short names that we

21   think are descriptive, so you'll hear about that, as well.

22           Just a couple other things on patents, and I know

23   you were just given this juror notebook, probably haven't

24   had a chance to look at it.

25           But if you look, there are the six patents, as you

1   heard.  And just to orient you a little bit on what the

2   patents involve, you've got the front page with a number up

3   here at the top right, and a whole lot of, you know, kind

4   of basic information about the patent.

5           And then if you keep flipping, you'll see prior

6   art -- a list of prior art that the Patent Office looked at

7   when they granted the patent and decided it was new.

8           Then you'll see a variety of drawings or figures

9   that visually depict the invention.  And then you get to

10  this dense text in the two columns on each page.

11          Now, that's called the specification.  And you'll

12  hear a lot throughout this trial, witnesses or the

13  attorneys talking about the specification.  And you see

14  these column numbers at the top.  You see the numbers down

15  in the middle of the page, those are line numbers.

16          So, for example, a witness might say, well, turn

17  to Column 5, let's look at Line 8.  And so that's just a

18  way to help you orient if we're looking at a patent, what

19  you might want to be looking for.

20          Now, the claims are at the end of the patent.  And

21  so for this particular example, the '346, live battle

22  patent, if you go to Column 10, about halfway down, about

23  Line 33, you see what is claimed is, and then there's these

24  numbered paragraphs that go on for a couple pages.  Those

25  are the claims.  That's the meets and bounds, so to speak,

1   the legal description of the intellectual property right,

2   and that's what we'll walk through when we prove to you

3   that there's been infringement, is some of those claims.

4          Now, these patents have a lot of claims.  Don't

5   worry, we won't go through all of them.  We're going to go

6   through nine claims among the six patents that we've

7   selected for this trial.  And that's what -- these patents

8   all generally relate to advances in the gaming field that

9   help improve games, improve these -- particularly these

10  mobile social server-based network games, and that help

11  keep users engaged and interested.  And you'll hear a lot

12  about patents, so I won't go into much more detail right

13  now about that.

14         Now, one way to think about a lot of inventions,

15  really, but particularly inventions in the gaming space

16  is their -- it's kind of like a puzzle.  You know, if you

17  have a game, there's probably a lot of things that go into

18  that game and that make it a good game.  It's like a

19  puzzle.  You have a lot of pieces.

20         Now, if you've done puzzles, you know that you

21  might get irritated if you lose a piece because it's not

22  quite the same.  And I think the same is true for these

23  games that we're going to be talking about.  There are many

24  things that contribute to the success, but some puzzle

25  pieces are more important than others.  They go to the

1    heart of the game.  And that's what we believe is the case

2    here with respect to GREE's patents and Supercell's games.

3           You'll hear about three games by Supercell:  Clash

4    of Clans, Clash Royale, and Hay Day.  And those games, we

5    will show you, infringe multiple GREE patents.  And I've

6    put here on the slide which ones.  We'll present that in

7    much more detail so you can see during the evidence phase

8    exactly which patents we believe each game infringes, but

9    those are the three Supercell games that we're going to

10   talk about.

11          And now, Supercell has been very, very successful

12   with these games, particularly in the U.S. market, and

13   that's the market we're here to talk about in this case.

14          So in the U.S. market, just for these three games,

15   and just during the time that Supercell began infringing

16   GREE's patents in 2015, Supercell's made almost $3 billion,

17   with a B, among those three games.  And this is all from

18   people who have decided that they like the games well

19   enough that they want to pay.  They don't want to just play

20   it for free like you could do, they want to pay.

21          So that's how successful Supercell has been from

22   its games.

23          And now, we certainly agree, there may be other

24   things that drove that, as well.  But we believe and we

25   think we will show you that at least some portion of that

 1    success comes from Supercell's decision to adopt infringing

 2    features in its games in GREE's patents, and to put those

 3    features in its source code for the games.

 4          You'll hear first thing Monday morning from

 5    Dr. Robert Akl.  I think he's -- yeah, Dr. Akl, if you

 6    would please rise.  Professor Akl comes here from Dallas --

 7    thank you, Dr. Akl -- and he's going to be our first

 8    witness on Monday morning.  He's a tenured professor there

 9    in engineering and computer science.  And he's done a lot

10    of work in this case to examine Supercell's games, not just

11    played them, but he's actually gone under the hood and

12    looked at the source code, which is the computer language

13    the games that are written in, and that's how you can

14    really tell there's infringement.

15          So he's looked under that hood and looked at that

16    source code, and he's found GREE's patented technology

17    there in the source code.  And he'll show you exactly where

18    he found it in the games on Monday.

19          Now, I'll warn you, he's going to be on the stand

20    for a little while.  It's going to be a few hours.  The

21    infringement is extensive.  And so I think you'll probably

22    hear from him at least all of Monday morning.  But he'll --

23    we're going to present him first so you can see why we

24    believe there's infringement, and you can look at that

25    evidence.

1          And as you've heard several times, infringement is

2    our burden to bear.  We have to prove it and prove it by a

3    preponderance of the evidence.  You've got this balanced

4    scale.  We've just got to tip it a little bit.

5          Now, I think we're going to tip it a whole lot.

6    But as you've heard, we just have to tip it this little bit

7    for you to find that there's infringement.

8          And let's talk a little bit about the specific

9    features of the Supercell games that infringe that you're

10   going to hear about.

11         For the first set of patents, the social gaming

12   patents, this is the one that three Supercell games

13   infringe.  Those patents that GREE filed the application in

14   March of 2013, and about a year later Supercell introduced

15   Clan Wars and Clash of Clans that infringes.  And then

16   after that, Hay Day and this Neighborhood Derby, and then

17   they put Clan Wars into Clash Royale a few years later.

18   And so those features Supercell added after we filed for

19   these patents.

20         They did the same thing for the attack strength

21   patent.  That patent was filed in 2014, and they put a

22   feature in Clash of Clans which allows the bonus for a

23   certain type of troop, this dragon.  You'll hear about Baby

24   Dragon.  They put that in a couple of years later.

25         The next patent, same thing, GREE filed for it in

1    2013.  A few years later Supercell came out with Clash

2    Royale which infringes the live battle patent.

3            And then, lastly, these prize selection patents,

4    GREE filed for those in 2012, and Supercell came out with

5    Clash Royale and a number of features but one you're going

6    to hear a lot about is Legendary King's Chest a number of

7    years later.  And these aren't just minor features by the

8    way.  These are major pieces of the game.

9            Now, you don't have to believe me.  You can look

10   at Supercell's own documents that say that.  Their internal

11   documents, the things they wrote and said outside of this

12   courtroom.

13           This, for example, PTX-135, is a presentation

14   Supercell did to the game industry.  And it talks about

15   this infringing Clan Wars feature which infringes the

16   social gaming patents.  They say it's the social glue of

17   Clash, massively popular, supercharged the metrics,

18   including the revenue.

19           And who said that?  Well, it was the game lead for

20   Clash of Clans, the person in charge of the game, Mr. Eino

21   Joas, who said -- and this is what he said in his

22   deposition here, and you'll hear this next week.  He said

23   that Clan Wars really was the social glue of Clash.  It

24   made people excited to play the game.  And he said, in

25   fact, before Clan Wars, before 2014, the name of the game

1    was Clash of Clans, but there hadn't been clashing between

2    clans.  What that is, if you play the game, you can join a

3    clan with a bunch of other people, and then you can get

4    your clans together with other clans and you can have these

5    Clan Wars.  So it really put the name in the game.  It's a

6    key puzzle piece for the Clash of Clans puzzle.

7         To use an analogy you heard earlier, it's the

8    engine that gets you a hundred miles per gallon.  It's not

9    the hubcap.  It's important to the game and to the over $1

10   billion in revenue that Supercell has earned here in the

11   U.S. on Clash of Clans alone.

12        In fact, if you go to the App Store, Supercell

13   advertises Clan Wars as one of the features to get people

14   to try the game out and decide if they like it so much they

15   want to pay for it.

16        Similarly with Hay Day and the Derby feature, that

17   was added a few years after our patent, and Supercell

18   itself said it's one of the biggest successes, that Derby

19   has become the most important feature of the game.  In

20   fact, the game had started to lose traction before, as you

21   see right here.  This is, again, Supercell saying this

22   internally, but Derby had become the most important

23   feature.  Is it a hubcap or engine?  Well, 79 percent of

24   the weaponry for the game is tied to players playing the

25   Derby, and it's so heavily incorporated, it's impossible to

1   separate it.

2        Same thing with Legendary King's Chest for Clash

3   Royale.  It's the main revenue driver, generates the most

4   revenue out of the game.  Again, these are key puzzle

5   pieces.

6        And GREE's inventions, the infringement that

7   Supercell has done, are the key puzzle pieces in each of

8   Supercell's games.  Without those puzzles, the games are

9   incomplete.  That's why Supercell added these features in.

10  With the puzzles, supplies like GREE's patented inventions,

11  Supercell games are more complete and more successful.

12        Now, you'll hear from a couple of other witnesses

13  as well.  One of them that's in this courtroom, Dr. David

14  Neal.  If you could please rise, sir.  Dr. Neal is a survey

15  expert.  You'll hear from him early next week.  Thank you.

16  He did a survey -- he didn't just take what Supercell said

17  about it.  We asked Supercell players in a double-blind

18  survey:  Do you like these features?  Do you think they're

19  important?  Do you use them?  Do you even know about them?

20        And you'll see that particularly among players who

21  pay to play these games, there's a high level of awareness,

22  they use them, and they think they're important features.

23  You'll hear Dr. Neal talk about that.  This is just an

24  example on Clan Wars.

25        You'll also hear from our financial expert,

1    Dr. Becker -- Dr. Stephen Becker from Austin.  He's going

2    to come up next week early and talk to you about what he

3    believes the appropriate amount of damages would be, the

4    royalty here.

5           And the question is what would Supercell and GREE

6    have agreed to if they sat down at a table and worked this

7    out.  That's the standard that you'll apply, and you'll

8    hear him -- you'll hear him give his opinions on that, and

9    that has to do with what is the value of these inventions

10   to Supercell?  How much are they using them?  How important

11   are they?  And what would the parties have concluded is an

12   appropriate royalty?  And you'll hear that out of this

13   nearly $3 billion in revenue, Dr. Becker will give opinions

14   that he thinks these patents contribute between 1 and 2

15   percent, and that that's the appropriate royalty rate that

16   the parties would have agreed if they had concluded the

17   negotiation.

18          Now, these numbers here are for past damages -- so

19   in other words, from beginning in 2015 for a couple -- for

20   one of the patents up through the time of this trial, just

21   before it, but there's also a question of future damages

22   because after all, patents are valid and enforced for

23   around 20 years.  They've got a lot of life on them, as

24   they say.

25          And in this case, the numbers for past damages

1   would just take care of Supercell's infringement from 2015

2   through today, but the patents go on and do not expire

3   until 2034.  So you'll hear a discussion of whether a lump

4   sum is the right form of a royalty or not.  And I think

5   there'll be some argument on that.  And that's

6   essentially -- a lump sum just means what it sounds like.

7   It's a one-and-done payment.  You pay right now.  You can

8   use it the rest of the life of the patent.  And that, of

9   course, involves a lot more use.  13 more years.  And the

10  past damages wouldn't account for that.

11          And so that's what Dr. Becker will calculate as

12  well as if there were a lump sum.  And why would that be

13  appropriate?  Well, Supercell's goal, as it has said

14  repeatedly, is to create great games that people play for

15  years and are remembered forever.

16          So they're not just a company that puts out games

17  and pulls it off in a year and gets a new one.  They make

18  games that last, and these features have lasted.  They've

19  been in the games for a number of years.  And so it's every

20  reason to believe they would continue using the features,

21  and they need to pay to do that, and so that's where the

22  lump sum comes in.

23          Now, the calculation, Dr. Becker will explain, but

24  essentially you look to what the usage would be in the

25  future, the expected usage.  You discount that to the value

1   of the 2021 dollar and so forth.  And that's how you would

2   get to these figures that he'll present to you, which is

3   the $92 million figure that you heard a little bit earlier

4   today.  He'll walk through that in detail.  We very much

5   agree it's our burden of proof to prove to you what the

6   damages are, and we intend to do that.

7           Now, the question of infringement itself, just

8   regular infringement, that's not something that Supercell

9   has to have meant to do.  And you'll hear that in the

10  Judge's instructions at the end of the trial.  They could

11  have not known about the patents at all.  Just like, you

12  know, if you're on someone's land and you don't know it,

13  someone else's land, you can still be held liable for

14  trespassing?

15          THE COURT:  You have five minutes remaining.

16          MR. MOORE:  Thank you, Your Honor.

17          Supercell doesn't have to know about that, but

18  there's another type of infringement called willfulness,

19  and that's what we'll talk about, as well.  We believe the

20  evidence will show that Supercell did know it infringed and

21  so it did so willfully, as well.  This is the timeline you

22  saw before.

23          In 2016, GREE told Supercell about its

24  infringement of various patents.  It wrote them about

25  mostly Japanese patents, some of which are related to the

1  patents in the trial here today.  And it told them that --

2  that it would like to reach a license, said we'd like to

3  negotiate with you.

4        Well, Supercell didn't agree to enter into a

5  license after they got this letter, and so GREE filed suit

6  in Japan first.  And what happened then?  The parties

7  fought there for a little bit.

8        But here's one thing you haven't heard yet.

9  Here's one key fact to this case that you don't -- you have

10  not heard yet.  And that is that in early 2019, GREE and

11  Supercell entered into a settlement agreement in Japan but

12  only for the Japanese patents that GREE owns, not for any

13  of the U.S. patents.

14        So Supercell did the right thing in Japan.  It

15  agreed to settle and paid GREE for the right to use patents

16  in Japan.  But it didn't do that here in the U.S.  And

17  that's why we're here because Supercell's continued to

18  refuse to pay for the use of GREE's patents in the U.S.

19  like it already agreed to do for the patents in Japan.

20        What will you hear from Supercell?  We think

21  you'll hear a lot of excuses, frankly.  They'll say they

22  don't infringe, but we're going to prove to you they did,

23  then they'll say for four of the six patents, the patents

24  are invalid, but not only are they presumed valid, but

25  they've got a higher burden of proof as you heard, and the

1   Patent Office considered a lot of prior art.

2         This is just the list of the prior art, not the

3   prior art itself.  Supercell's going to argue that the

4   Patent Office made four mistakes in a row, but it

5   considered all the prior art, all the relevant prior art,

6   and rightly issued the patents.

7         Supercell's also going to try to rewrite history.

8   They're going to say, well, actually we started doing what

9   the patent said in 2012 when Clash of Clans came out, and

10  so, no, it wasn't these features we added that infringed.

11        We were doing it before, and so the patents are

12  invalid.

13        But that's not right.  The game didn't do -- Clash

14  of Clans wasn't -- the social glue wasn't in there.  The

15  clans couldn't clash in 2012.  That happened later, and

16  that's when Supercell started infringing.

17        Now, they're also going to say, well, the patents

18  aren't worth much.  They're going to say, you know, one

19  thing they're going to do is try to spin this Japanese

20  settlement.

21        They're going to say, well, let's look at what we

22  paid there, and I'll tell you what they paid.  They paid

23  four and a half million dollars in Japan.  And they're

24  going to say, well, why would we pay this much here if we

25  already paid that in Japan?  But everybody, even their own

 1   witnesses agree the economics in Japan are not comparable

 2   to the economics here in the U.S.

 3        For one thing Supercell has made $3 billion here.

 4   Didn't make that there.  Made eight times more money here

 5   in the US.  So they shouldn't pay just a little bit.  They

 6   should pay for what they've used.  And also the legal

 7   systems, the patent systems are not the same.  Everyone

 8   agrees it's just not comparable.

 9        And then, lastly, Supercell will tout their

10   success.  They'll say, well, you know, it's actually GREE

11   that's been unsuccessful.  They had to close their

12   operations in the U.S.  They looked at Supercell's games

13   and praised them.

14        Well, that doesn't give them a pass to use our

15   patents.  We don't agree with a lot of that, but ultimately

16   it's a sideshow.  The question is, do they infringe?  And

17   if so, what value do they get out of it?

18        You may hear a lot of mud being slung at GREE

19   throughout the course of this case, but it's a side show to

20   the questions you're here to decide.

21        We filed for our patents before they added these

22   infringing features, and they infringe, and that's what's

23   important.

24        Supercell is using our inventions in its games.

25   It's in their source code.  Supercell paid for the

1   permission to do that in Japan, but it didn't do that here

2   in the U.S.

3           It needs to take responsibility for its actions,

4   needs to play by the rules.  This trial is our chance to

5   ask you to make them do that, and so we thank you once

6   again, ladies and gentlemen, very, very much for your

7   service in this important case others for your attention

8   here today, and we look forward to presenting our case to

9   you first thing Monday morning.

10          Thank you.

11          THE COURT:  Defendant may now present its opening

12  statement to the jury.

13          Would you like a warning on your time, counsel?

14          MR. SACKSTEDER: I would, Your Honor.  Thank you.

15  Five minutes, please.

16          THE COURT:  That will be fine.  Proceed when

17  you're ready.

18          MR. SACKSTEDER: Thank you, Your Honor.  May it

19  please the Court.

20          Good afternoon, ladies and gentlemen.  I bet you

21  didn't know you were going to have to hear so many

22  thumbnail sketches of lawyers' life stories when you came

23  here today, but I'd like to give you one more.

24          My name is Mike Sacksteder.  I am counsel for

25  Supercell in this case.  I grew up in a small town in

1  southern Indiana where my father was a minister and my

2  mother was a school teacher.

3          I live, as well, in California right now where I

4  practice law.  My wife and I have a -- what I was about to

5  call a little boy, but we had his 11th birthday party

6  virtually by Zoom this week, and so he's getting bigger

7  now.

8          And my wife is a magazine editor, and so I did

9  want to introduce myself to you before I got started.

10         Second thing I want to do is say thank you.  I

11  know it's been a long day.  You are -- have been attentive

12  through the whole process, and you continue to be.

13         And it's really important that you are, because

14  there are some things that jurors -- and you've heard this

15  kind of in bits and pieces throughout the day, but there

16  are things that are really, really important for juries to

17  pay attention to, and I'd like to ask you, please, to do

18  that.

19         Three things.  One is -- and this has come up

20  several times, is keeping an open mind.  You've heard

21  Mr. Moore make his case.

22         We're going to put on the evidence next week.  But

23  there are two sides to the story.  And there are a lot of

24  things that you haven't heard yet, and I'm not going to be

25  able to get to all of them, it's late on Friday afternoon,

1   and I don't have that much time.

2          But through the next week, you're going to see a

3   lot of different things that may change your view of the

4   way things are.  So please keep an open mind.

5          The second thing is focusing on the evidence.

6   Again -- and you've heard this again, what Mr. Moore said,

7   what I say, not evidence.

8          But there is important evidence, often evidence

9   that is in the words of the parties themselves.  Sometimes

10  when they didn't think anybody else was looking, and that's

11  very important for you to focus on.

12         And, finally, I believe in your preliminary

13  instructions, you heard that you should apply your common

14  sense.

15         That's what the jury is for in this country.

16  That's why we have a jury system is that we trust people

17  like you to apply common sense and to really think about

18  things, and to apply that to make the decisions about the

19  facts in the case.

20         Before I go any further, I would like to introduce

21  my colleagues at the table.  The first, Mr. Greg Harper,

22  you've heard him introduced before.  He is the general

23  manager of Supercell.  He's on the company's board of

24  directors, and he is in charge of the United States

25  operations of Supercell.

1          You met Mr. Dacus a little bit earlier.

2          And my law partner, Bryan Kohm, will also be

3    speaking to you or to the witnesses from time to time, and

4    so I wanted to introduce all of them.

5          So let's go to the history of Supercell and just

6    sort of talk about it a little bit.  This is -- this is

7    where Supercell started.

8          It's one room in Helsinki, Finland.  A handful of

9    people who started in 2010 to make games that would be

10   engaging and make people want to play them.  And it was a

11   very, very small operation when it started.

12         The picture on the right is the person who is one

13   of the founders.  To this day, he is the chief executive

14   officer, the CEO, of Supercell, but you'll notice he's

15   working on a card board box, because they didn't have

16   enough desks for people to work on.

17         So when they started, they had their CEO working

18   on a card board box, and it was actually out in the hallway

19   because they didn't have enough room for him in the office.

20         Supercell's grown somewhat.  This is the -- I

21   believe it's a picture from the most recent sort of company

22   off-site gathering for Supercell.

23         And that shows -- it doesn't show the whole

24   Supercell team, but it shows a fair number of them, game

25   developers, people who design games, people who develop

```
 1  games, and so forth.
 2          And I do want to say one other thing.  When you
 3  are successful in this industry, it is common for other
 4  larger companies to want to invest in your company.
 5          That has happened in this case, and there is
 6  another larger company that is a majority investor in
 7  Supercell now.
 8          So Supercell grew through its innovation.  Their
 9  mission was to create these fun and positive games that
10  people would want to play.  They started with the games
11  Hay Day and Clash of Clans.  The other three games that are
12  with -- are Supercell's primary games now are Boom Beach,
13  Clash Royale, and Brawl Stars.
14          I want to start with Supercell's first
15  best-selling games, Hay Day and Clash of Clans.
16          If we can look at the timeline.
17          So Supercell was founded in 2010.  In June of
18  2012, Hay Day was released publicly.
19          In August of 2012, Clash of Clans came out.  And
20  Supercell succeeded almost immediately.  And I want to talk
21  for a second about a couple of things we heard before.
22          When I heard Mr. Dacus, I smiled when he was
23  talking about those flip phones, and how the company that
24  developed those was really innovative but then, you know,
25  you don't see them much anymore because they didn't
```

1  continue to innovate.

2        Well, I actually had a phone that was older than a

3  flip phone, and it looked like a little brick.  And the

4  company that made that doesn't make cell phones anymore.

5        And now I have a watch that my wife can call me on

6  or text me on.  So other companies caught up and went

7  ahead.

8        And that's what happened with Supercell.

9  Mr. Moore talked about a game called Fishing Stars at GREE.

10        And Fishing Stars came out in 2007, and I have no

11  doubt that it was a great game in 2007.

12        But you didn't hear anything about any other GREE

13  games since then in the opening statement.

14        GREE did not move with the times.  And they were,

15  from the beginning, looking at Supercell as somebody who

16  was innovative and that they had to almost immediately try

17  to catch up to.

18        So if we could go to the next slide, please.

19        So I mentioned looking at the evidence.  This is a

20  piece of evidence.  This is an internal GREE document.  The

21  exhibit number is -- by the way, is DX-141B, and the reason

22  for its B is that it's the English translation of the

23  document.

24        It was originally written in Japanese.  The date

25  on that is September 10th, 2012.  That's about a month and

1  10 days after Supercell came out, about a month and a week.

2         And the whole document, the whole slide

3  presentation is called Clash of Clans Research.  They were

4  already looking at Clash of Clans as a successful game in

5  their market in 2012, in September of 2012.

6         So we can go to the -- we'll come back to this

7  document, by the way.  There are a couple of things that

8  are interesting in it.

9         In November of 2012, here is an email, and it

10  involves Mr. Araki, who is sitting at the table here.  And

11  they are talking about -- they want to, you know, design a

12  game that is in -- what's called RTS, that means, I

13  believe, real-time strategy.

14         And that's the field that Clash of Clans is in.

15  And so they're saying, you know, we need to get into this

16  market.

17         And then this Chris Paretti person, who is

18  e-mailing with Mr. Araki, says, if Clash of Clans is the

19  bar, we have a lot of work to do it.  It's a very polished

20  and well-thought-out game.

21         Now, it's important to notice that this is all

22  happening in late 2012.  This is before -- long before any

23  of GREE's patents issued.

24         It's before all but two of them were even filed.

25  So Supercell does not owe its success to any patents that

1    GREE says, incorrectly, are infringed.  Supercell was

2    already doing great before any of this came up.

3           Can we go to -- this is another email where

4    Mr. Tanaka in February of 2013, it has an email -- it's a

5    long email string, but with Mr. Araki and Mr. Tanaka, the

6    CEO of GREE.

7           And they're talking about Supercell, as well, and

8    talking about how they hear rumors that Supercell is making

9    a lot of money, and if they can learn anything from them,

10   let's learn it, because Supercell had already become an

11   innovator, one of the primary innovators in the market, and

12   GREE recognized that.

13          And at the same time, you know, we mentioned -- I

14   think Mr. Moore even mentioned, that GREE had tried to get

15   into the U.S. market, and all of this was kind of happening

16   at about the same time --

17          We can go to the next slide, Mr. Smith.

18          -- and was not doing very well with that.  And

19   their gaming was not going where -- well generally, as

20   well.

21          This is the annual report for GREE to its

22   shareholders in 2014.  If you go to the first page there,

23   this is the message to the stakeholders from Mr. Tanaka,

24   again, the CEO.

25          And he's saying, basically, we didn't do so well

 1  this year.  And the reason that he gives for that is the

 2  rapid spread of smartphones and the decline of the feature

 3  phone market.

 4          Now, feature phones are older types of phones, not

 5  smartphones, like iPhones that we have now.  And they

 6  focused too much on the feature phone market early, and so

 7  they did not -- were not able to keep up with companies

 8  like Supercell and, frankly, a lot of other ones.

 9          Okay.  So let's talk about the actual patents for

10  a minute.  I just want to sort of discuss the nicknames

11  that we're all giving to the patents for a little bit.

12          You know, GREE calls them one thing, we call them

13  something else because we think that those are the focuses

14  of those patents.

15          The -- we call them the comic strip patent, the

16  decreasing power patent, the scratch card patents, and the

17  game pieces patents.  And just to give one example, they

18  talk about the social gaming patents or the social glue

19  patents.

20          That's not what those patents claim.  Those

21  patents claim -- claims relate to game pieces in games.

22  So, you know, we tried to give that an accurate name.

23          One of the things that you heard was Mr. Moore

24  talk about excuses.  We don't think those are excuses.  In

25  U.S. jury trials, those are called defenses, and those are

1   things that Supercell is entitled to raise because

2   Supercell does not believe it infringes these patents.

3          And in four instances, Supercell does not think

4   these patents are valid, three of them because of what

5   Supercell did before.

6          Let's talk about infringement briefly.

7          You have heard and will hear again that a patent

8   isn't infringed unless each and every element of the patent

9   is in the game, is used by the game.

10          To give you an example of that -- if we can go to

11   the next slide, Mr. Smith.

12          So let's imagine that there is a patent that

13   covers a soccer ball, and it has these different elements

14   in it.

15          It has to be made of leather, has to be stitched

16   together, has to be filled with air, and has to be round in

17   shape.  You have to have all of those in order to infringe

18   a patent.

19          Well, if you have a football, it's made of

20   leather, it's stitched together, and it's filled with air,

21   but because it is not round in shape, it's oblong, it

22   doesn't infringe that patent.

23          So that's the way it works.  We're going to have

24   our experts, Mr. Stacy Friedman and Dr. Jose Zagal, who are

25   the both out in the audience today, and they are some of

1    the premier experts in the video game field in the country.

2    They are going to be explaining why the Supercell games do

3    not infringe.

4         So, you know, the comic strip patent, I'm not

5    going to go into this in great detail.  It's based on sort

6    of a comic strip concept.

7         It is asserted against our game, Clash Royale.  We

8    think that when we compare the claims of the patent to

9    Clash Royale, you will see that there is no infringement

10   there.

11        Another example is the scratch card patents.  I

12   think we all kind of call them something like that, but I

13   guess they call it a prize selection patent.

14        These patents talk about cells and the items --

15   and I don't want to get too deep in the weeds on this right

16   now.  We'll hear a lot of expert testimony next week -- and

17   it requires that each cell has to be associated with each

18   item, meaning there's an each-to-each relationship. But

19   that isn't what Clash Royale does at all.

20        Clash Royale gives the user a choice between

21   cards, and each choice is exactly associated with a card.

22   So it's one-to-one, it's not each-to-each.  So that's why

23   you will hear there's no infringement there.  We can move

24   on.

25        Okay.  I'd like to talk about invalidity briefly,

1    and we saw the -- we've seen a couple of times the picture

2    of the barbed wire fence and talk of trespassing.

3          And that is true, that patent infringement is like

4    trespassing.  But there are a couple of reasons why you --

5    in some circumstances, don't trespass, you don't infringe.

6          One, I never went over the fence, I never went

7    into the property, that's non-infringement, effectively.

8          But also, if you're trying to put the fence around

9    something that you don't own, something that either belongs

10   to the public because somebody else did it before, or in

11   some instances belongs to Supercell, then you're

12   effectively trying to take something that isn't yours, and

13   you can't prosecute somebody or sue somebody for

14   trespassing on it.

15         So that's like patent invalidity, that if somebody

16   else did it before, especially if it was Supercell, then

17   there is no -- you know, the Court said that invalidity is

18   a defense to patent infringement.  You can't infringe an

19   invalid patent.

20         So let's go back briefly to this Clash of Clans

21   research document again.  And here it is -- down at the

22   bottom, let me move through this pretty fast, Mr. Smith.

23         There is a guild versus guild targeting and a gem

24   that is a prize.  And this is GREE saying, here's what

25   Supercell's games did in September of 2012.

1         And down there it shows something called a Clash

2   Tournament -- or a Clan Tournament.  That's something that

3   you didn't see on the timeline in GREE's opening statement,

4   but that is something that happened before they filed their

5   patents.

6         And if what we do now, if what Supercell does now

7   infringes the patent, then this came before it and

8   invalidates the patent.

9         So they have that problem, and they recognized it

10  because this is in their own document.

11        Can we go to the next one, please?

12        Okay.  Another one that they have the same problem

13  with is that the '346 patent, which we call the comic strip

14  patent, but it relates to playing cards into the field of

15  battle that then are animated as troops, basically.

16        And they accuse Clash of Clans of doing that and

17  infringing their patent.  Again, we don't think we infringe

18  the patent, but if we did, we did it in 2012 with Clash of

19  Clans.

20        And, again --

21        If we go to the next slide.

22        Again, it's in the same Clash of Clans research

23  document.  If you look at the illustration on the right, it

24  says it right there, tap or press and hold to deploy

25  troops.

1            That's the same thing that they say that Clash

2   Royale does that infringes their patent.  So that is

3   evidence, it's evidence from GREE that shows that their

4   patent, if it is infringed, it's invalid because it's

5   invalid if somebody else did it before, and here Supercell

6   did it before.

7            Okay.  We can move to the next one.

8            Okay.  A couple of other points --

9            Mr. Smith, could we actually put up that -- the

10  slide that had the stacks of patents with the references

11  cited to the Patent Office?  It's actually from Mr. Moore's

12  presentation.

13           So I had mentioned earlier that you have to look

14  at the evidence.  It's very important.  Now, there's big

15  stacks of patents here that show supposedly that a lot of

16  different prior art references were cited to the Patent

17  Office.

18           But if you look at these really closely, they

19  aren't the right patents.  Those are, in some cases,

20  patents that aren't even asserted in this case.  And the

21  actual patents have, like, a page, maybe a little over a

22  page of prior art references in some cases, this big stack.

23           So throughout this trial, we need to look very

24  closely at the evidence.

25           Can we go to the other slide from GREE's

1   presentation, please?

2          So the other one, and I just want to sort of point

3   out that it's important to look at what to emphasize

4   sometimes.

5          If you look at this, this shows what GREE says is

6   a notice letter regarding their patents.

7          Well, they're -- if you look at the text in that

8   blown-out paragraph, there are those three little stars,

9   and that means they left something out.

10          What they left out is the part there in that back

11   part, on the left, which shows that there's a long list of

12   patents, and all but one of them says JP at the beginning.

13          Those are Japanese patents.  Those are not U.S.

14   patents.  They were, you know, filed and published and

15   issued in Japanese.

16          There's one U.S. patent application that is

17   identified at the bottom.  It is not at issue in this case.

18   And it is a patent that Supercell challenged the validity

19   of.  So this letter, in Supercell's view, doesn't provide a

20   notice at all of anything that's relevant to this case.

21          All right.  We can move back to the next one.

22          So I want to talk just briefly about all that

23   money that GREE is asking for.

24          And here's where your common sense really comes

25   in.  I really don't like to talk about the damages demand

1    at all in this case because we don't think the patents are

2    infringed.

3         Regarding four of them, we don't think they are

4    valid, and if that's the case, we don't owe them anything.

5    We don't owe them a penny, and that's what we think is the

6    case.

7         But just because they have brought up such a huge

8    amount of money, I think you ought to think and use your

9    common sense about what this case is really about, and

10   think about whether these damages claims make any sense.

11        Let's move on here.

12        Now, the game pieces patents.  One example of the

13   game pieces here is, if you look at those -- they're little

14   metals next to the numbers there, and we'll go into great

15   detail next week, but those are the -- what GREE says are

16   the game pieces in the Supercell game.

17        If you got rid of those, there wouldn't be any

18   game piece.  So the difference between having a number but

19   no game piece, which would not infringe, and the number and

20   the medal, which they say does infringe, although we

21   disagree.

22        They say the difference in value is $40 million.

23   And that's where your common sense has to come in.  Having

24   a picture of a medal on the screen is worth $40 million?

25   Think about it.

1              Let's go to one more example.

2              So, again, in the -- what we call the comic strip

3      patent, the one that's asserted against this part of Clash

4      of Clans, one of the things that is necessary in order for

5      there to be infringement is for -- you see that part on the

6      right there?

7              You can barely see there's a little Baby Dragon

8      character starting to come into existence, and there's a

9      little thing that says negative 4.

10             That is, according to GREE, text that overlaps

11     with a panel.  If that text did not overlap, if you moved

12     it over to the side there, that infringement argument

13     wouldn't work.

14             And they say the difference between having the

15     negative 4 over the Baby Dragon, and having it there off to

16     the right, they think that's worth $6 million.

17             You got to think about what this case is about,

18     ladies and gentlemen, and you have to apply your common

19     sense.

20             So I'm not going to take any more of your time.

21     I'm very grateful for your attention.  I know it's late in

22     the day.  Supercell considers this case very, very

23     important.

24             The jury system, in allowing Supercell to stand up

25     for its rights, is very, very important.  And we really

 1    can't thank you enough for your time and your attention.

 2            Thank you, Your Honor.

 3            THE COURT:  All right.  Ladies and gentlemen,

 4    you've now heard opening statements from both Plaintiff and

 5    Defendant.

 6            We're going to recess until Monday morning.  As we

 7    start Monday morning, the Plaintiff will begin, as I told

 8    you, its case-in-chief, and we'll have Plaintiff call their

 9    first witness first thing Monday morning.

10            As you leave the jury room in just a minute,

11    please take those juror notebooks with you.  Please leave

12    them closed on the table in the jury room.

13            They'll be there Monday morning when you get back.

14    You should either have those notebooks in your possession,

15    like you do now, or they ought to be in the jury room.

16    They shouldn't be left other places.

17            There may be times during the trial when we're

18    going to have a short recess, and you won't be out of the

19    jury box too long, and I'll simply say, ladies and

20    gentlemen, you may leave your notebooks closed and in your

21    chairs.  And if I do that, that's fine.

22            But unless I give you that kind of instruction,

23    take them with you and keep them in your possession.

24            Please follow all the instructions I've given you

25    about your conduct as jurors, including, first and

1   foremost, don't communicate with anybody about this case.

2          And I promise you, unless you live alone, when you

3   get home, the first question you're going to hear is, what

4   happened in federal court?

5          Just don't even try and answer that question.

6   Blame it on me.  That's part of what I'm here for.

7          But please follow all my instructions.  Please

8   have a good weekend, travel safely, and please be back

9   prepared to go forward, assembled and ready in the jury

10  room by 8:30 on Monday morning.

11         With that, the jury is excused until Monday.

12         COURT SECURITY OFFICER:  All rise.

13         (Jury out.)

14         THE COURT:  Counsel, let me remind you of your

15  meet-and-confer obligations.  I'll be available in chambers

16  by 7:30 Monday morning.

17         I'll look for updates delivered to my staff Sunday

18  evening, and, again, if there are any surviving unresolved

19  disputes by 7:00 o'clock in written form Monday morning.

20         But I'll be prepared to meet with you at 8:30

21  (sic) in hopes of disposing of all of any such items before

22  we meet at 8:30 to bring in the jury.

23         Hopefully you won't have any, but if you do, I'll

24  be available to you as a way to maximize your designated

25  trial time.

1          With that, is there anything from either Plaintiff

2    or Defendant before we recess for the day? Anything from

3    Plaintiff?

4          MR. MOORE:  No, Your Honor.

5          THE COURT:  From Defendant?

6          MR. DACUS:  No, Your Honor.  Thank you.

7          THE COURT:  We stand in recess until Monday

8    morning.

9          COURT SECURITY OFFICER:  All rise.

10          (Proceeding adjourned, 5:17 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4     correct transcript from the stenographic notes of the

5     proceedings in the above-entitled matter to the best of my

6     ability.

7

8

9      /S/ Shelly Holmes                    4/30/2021
      SHELLY HOLMES, CSR, TCRR              Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 10/31/2021

12

13

14

15

16

17

18

19

20

21

22

23

24

25